## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

RYAN SWEENEY, *et al.*,

        **Plaintiffs,**        **:**

    **v.**

NATIONWIDE MUTUAL
INSURANCE CO., *et al.*,        **:**

        **Defendants.**

**Case No. 2:20-cv-1569**
**Chief Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

Ryan Sweeney and Bryan Marshall are former employees of Nationwide Mutual Insurance Company and current participants in the company's 401(k) plan, the Nationwide Savings Plan. They filed this suit alleging that Nationwide Mutual, Nationwide Life Insurance Company, and members of the Plan's Benefits Investment Committee violated ERISA by maintaining the Guaranteed Fund (a stable value investment vehicle backed by a Nationwide Life annuity contract) as an investment option for Plan participants. The matter is now before the Court on cross-motions for summary judgment (ECF No. 209 (redacted), ECF No. 217 (sealed); ECF No. 212 (redacted), ECF No. 220 (sealed)) and cross-motions seeking to exclude expert opinion testimony (ECF No. 210 (redacted), ECF No. 218 (sealed); ECF No. 213 (redacted), ECF No. 221 (sealed)). The Court heard oral argument on November 10, 2025. (ECF No. 256.) For the reasons below, the case will be set for a bench trial.

## I.     BACKGROUND

Nationwide Mutual sponsors and maintains the Nationwide Savings Plan[1] to provide retirement savings benefits to its employees and their beneficiaries. The Plan operates like many other 401(k) plans. Employees decide whether to enroll and how much to contribute. If an employee does enroll, she becomes a Participant. As contributions accumulate in the Participant's account, she decides how to invest the funds. Available investment options are vetted by a Benefits Investment Committee (the "BIC") appointed by Nationwide Mutual's Board of Directors. As of 2022, the Plan's investment options included target-date funds, a brokerage window, a money market fund, and the Guaranteed Fund that is the subject of this litigation. (*See* ECF No. 220-1, PAGEID # 17729.)

### A.     The Guaranteed Fund

The Guaranteed Fund is supported by an Annuity Contract[2] that Nationwide Life issued to the Plan. Nationwide Life is an affiliate of Nationwide Mutual.[3] The

---

[1] Three iterations of the Plan appear in the record. The Plan, as Amended and Restated January 1, 2011, can be found at ECF No. 220-1, PAGEID # 17632–721 (the "2011 Plan"). The Plan, as Amended and Restated January 1, 2013, can be found at ECF No. 220-1, PAGEID # 17489–630 (the "2013 Plan"). The Plan, as Amended and Restated January 1, 2019, can be found at ECF No. 220-1, PAGEID # 17406–487 (the "2019 Plan"). Unless otherwise specified, any reference to the Plan will be to the 2019 Plan.

[2] The Annuity Contract can be found at ECF No. 220-3, PAGEID # 17923–39.

[3] As of summary judgment briefing, Nationwide Life was a wholly owned subsidiary of Nationwide Mutual. (ECF No. 220-2, ¶ 4.) But, for "a period of time that included a portion of the class period," Nationwide Mutual Fire Insurance ("Nationwide Fire") owned a portion of Nationwide Life. (*Id.*, ¶ 5.) Though Nationwide Mutual and Nationwide Fire had identical slates of directors and

Annuity Contract, formally known as Contract GA-P L941, was first issued in 1975 but was amended and restated in 2002. (ECF No. 220-3, ¶ 3; *see also* Annuity Contract, PAGEID # 17923.)

When a Participant invests in the Guaranteed Fund, her contributions are transferred to Nationwide Life, which uses that money to purchase securities then held in Nationwide Life's general account. (ECF No. 220-3, ¶ 4.) Nationwide Life guarantees the Participant's principal investment and a rate of return, known as the Crediting Rate. Historically, Nationwide Life has declared the Crediting Rate on a quarterly basis. (*See, e.g.*, ECF No. 220-6, PAGEID # 17969.)

The Guaranteed Fund is a heavily utilized investment option for Plan Participants. As of 2020, 86% of Plan Participants had some portion of their account invested in the Guaranteed Fund, accounting for $1.75 billion. (ECF No. 217-17, PAGEID # 13878; ECF No. 217-28, PAGEID # 13894.) Indeed, the Plan's design encourages investment in the Guaranteed Fund. For example, the default investment option is a Target Maturity Model that aligns the Participant's expected retirement date with an appropriately aggressive/conservative portfolio; the Guaranteed Fund is one component of the TMM portfolio. (*See* ECF No. 220-1, PAGEID # 17731; ECF No. 209-6, PAGEID # 11443.) In another example, Nationwide at one time offered an "easy enroll" option for new Participants;

---

officers, they were separate entities until Nationwide Fire merged into Nationwide Mutual at the start of 2023. (*Id.*)

Participants who enrolled this way were automatically invested in the Guaranteed Fund. (ECF No. 204-3, PAGEID # 10840–41.)

Three features of the Guaranteed Rate deserve special explanation: the Crediting Rate, the Additional Interest Reserve ("AIR"), and the lack of an equity-wash provision.

### 1. Nationwide Life sets the Crediting Rate.

Nationwide Life sets the Crediting Rate using a complex set of analyses and projections. In short, the Crediting Rate "is the sum of a **retrospective component** and a **prospective component**[.]" (*Id.*)

*Retrospective Component.* As the name suggests, the retrospective component of the Crediting Rate looks backwards. Nationwide Life derives the retrospective component by, first, calculating the prior period's investment earnings for the assets backing the Annuity Contract. It then "reduces" the investment earnings by applying a charge for default risk and other "expenses." (*Id.*) Those include Nationwide Life's investment office expenses and a ███ contract margin. (*See also* ECF No. 220-6, PAGEID # 17968 (listing the expenses allocated to the fund to include the "cost of maintaining the [f]und, investment expenses, risk and profit charges, taxes, the cost of subsidizing interest rates for other [any other contracts that also back the Guaranteed Fund], and the cost of maintaining adequate surplus to support the [f]und").) The result is the "net earnings" for that period. (*Id.*, PAGEID # 17969.) The prior period's Crediting Rate is then deducted from net earnings to determine the retrospective component of the next period's Crediting Rate. (*Id.*, PAGEID # 17970.)

4

*Prospective Component*. The prospective component then looks to expected investment performance. Nationwide Life first forecasts the projected earnings of the assets underlying the Annuity Contract, then reduces that amount by the default risk charge, investment offices expense, and contract margin. (*Id.*) These three charges are, together, referred to as the "spread." (Hr'g Tr., ECF No. 257, 7:7–13.)

After the Retrospective and Prospective Components are calculated, Nationwide Life ███████████ to determine the Crediting Rate for the forthcoming period. (*Id.*, PAGEID # 17971.)

Nationwide Life declares the Crediting Rate in advance of the relevant period, and credits each Plan Participant's Guaranteed Fund balance in accordance with that rate on a daily basis. (*See* ECF No. 220-6, PAGEID # 17978.)

### 2. The excess accumulates in the AIR, for later addition back into the Crediting Rate.

Any actual investment earnings in excess of the Crediting Rate accumulate in an Additional Interest Reserve ("AIR"). (*See* ECF No. 220-10, PAGEID # 18407.) The AIR balance is then added back into the Crediting Rate incrementally, to "smooth and support" the Crediting Rate over time. (ECF No. 220-16, PAGEID # 18520; *see also* ECF No. 220-4, PAGEID # 17949–50.)

The parties take very different views of the AIR. Defendants tout it as a benefit for Participants who invest in the Guaranteed Fund, because the AIR has been used to supplement net earnings and lift the Crediting Rate. Plaintiffs take a more cynical view, arguing that Nationwide Life uses the AIR to ensure that it will

have a reserve from which to deduct spread even if investment earnings dip. (*See* ECF No. 243, PAGEID # 23747 (citing ECF No. 217-11).) Plaintiffs also point out that the AIR earns income for Nationwide Life that has not been passed on to Participants. (*Id.*, PAGEID # 23755 (citing ECF No. 217-11).)

### 3. The Guaranteed Fund has no equity-wash provision.

Finally, Defendants point out that the Guaranteed Fund does not include a so-called "equity-wash provision," which is a benefit to Participants. An equity-wash provision is a transfer restriction. A typical equity-wash would require a participant who withdraws money from a stable value fund to invest in a non-competing fund (*e.g.*, an equity fund) for a period of time before the money could be re-invested in another stable value fund. (ECF No. 220-16, PAGEID # 18513.) The Guaranteed Fund does not require Participants to "wash" withdrawn money before investing it in the Plan's money market fund. Defendants characterize this as an "unheard of" benefit to Participants. (ECF No. 220, PAGEID # 17354.)

### B. BIC Oversight of the Guaranteed Fund

The BIC is tasked with monitoring the investment menu available to Plan Participants. (Plan, § 12.02.) Plan fiduciaries like the BIC commonly call on outside experts to assist with such administrative activities. (*See, e.g.*, ECF No. 217-37, PAGEID # 14105.)

In 2008, the BIC hired Callan, an independent investment consultant, to review the Plan's investment offerings. (*See* ECF No. 217-17, PAGEID # 13614.) Callan's report expressed two concerns about the Guaranteed Fund. First was a concern about the risks associated with the Nationwide enterprise being both the

Plan's sponsor and the Annuity Contract issuer. The report cited "the correlation of both the asset management and insurance feature to the health of Nationwide as a corporation." (ECF No. 217-13[4], PAGEID # 13587.) It went on to explain:

> Severe investment losses in the general account and deterioration in the firm's insurance strength are the primary risks to Nationwide as a company and therefore their employee's income potential. One of the advantages of [a different stable value vehicle] is that the management would be conducted by a separate entity . . . . These steps would help eliminate this correlation and reduce the non-investment or business risk of the Fund.

(*Id.*)

Second, Callan's report expressed concern about Nationwide Life's fees. Callan suggested that, "at the current asset level[,] top quality stable value management is available at lower fees." (*Id.*, PAGEID # 13587–88.) Callan further concluded that:

> [W]hile the [Guaranteed Fund's] 5.00% current yields are higher than the average stable value yields, the 51 basis point fee arrangement is more than twice as high as the current marketplace[,] which is already priced for distress.

(*Id.*, PAGEID # 13588.)

After Callan's review, the BIC engaged Nationwide Life to re-negotiate the Guaranteed Fund's price terms—namely, the spread. (*See* ECF No. 217-18, PAGEID # 13618.) Plaintiffs read this "2009 Revised Pricing" to say that, when

---

[4] Defendants object to Plaintiffs' use of this exhibit to support its Motion for Summary Judgment. (ECF No. 245, PAGEID # 24122.) Defendants argue that the exhibit is irrelevant, hearsay, and unauthenticated. The exhibit was authenticated as a business record in an affidavit prepared by Callan's records custodian. (ECF No. 217-53.) Defendants' objection is **OVERRULED**.

inputs like tax rates or capital costs change, the spread will also change. (ECF No. 217-19.) Defendants claim that the 2009 price adjustment took the spread to "bare bones." (ECF No. 245, PAGEID # 24129 (quoting ECF No. 220-16, PAGEID # 18560).)

The BIC retained Callan again in 2016 and 2020. But, both times, Callan was denied access to information about the Guaranteed Fund's spread. (*See* ECF No. 209-34, PAGEID # 11692; ECF No. 217-26, PAGEID # 13872; ECF No. 209-35, PAGEID # 11694; ECF No. 217-27, PAGEID # 13878.) In its 2016 report, Callan again noted two-fold concerns. First, Callan repeated its concern regarding Participants' exposure to the financial health of Nationwide as both the employer and insurer. (ECF No. 217-24, PAGEID # 13745.) And second, Callan stated that it had "no line of sight to the spread on the Guaranteed Fund," even though that information is "an important component of the analysis of any investment product." (ECF No. 217-24, PAGEID # 13749.) As to the Crediting Rate, Callan determined that "[t]he Guaranteed Fund provides a competitive rate of return relative to the next most similar product, stable value funds." (*Id.*) Callan presented the BIC with the following option to consider improving its capital preservation investment options:

> In most cases Callan generally recommends including stable value as a preferred capital preservation option. Since the Guaranteed Fund is backed up by the general assets of Nationwide, there is some risk in having both human capital (due to employment) and financial capital tied up in one firm. For this reason, the Plan could eliminate the Guaranteed fund and either continue to offer a money market fund or offer a traditional stable value fund.

(*Id.*, PAGEID # 13764.)

8

In 2020, Callan prepared draft presentations with the same dual concerns. (ECF Nos. 217-27, 217-28.) But, perhaps because of the "low interest rate environment" and a marked decrease in asset allocation to the Guaranteed Fund as compared to 2016, Callan did not propose eliminating the Guaranteed Fund. (ECF No. 217-28, PAGEID # 13888, 13904.) Instead, "Callan recommend[ed] that the Plan consider capping participants' contributions to the Guaranteed Fund." (*Id.*, PAGEID # 13904.) In support of its recommendation, Callan cited the same "lack of certainty and transparency regarding fees" and "single counterparty risk." (*Id.*)

But Callan's 2020 presentations and recommendations were never delivered to the BIC. (*See* ECF No. 217-49, PAGEID # 15099 ("We were asked to remove certain Guaranteed Fund portions of our presentation."); ECF No. 217-29, PAGEID # 13931.) Instead, the BIC amended Callan's 2020 contract to state that the BIC did not want Callan to "analyze or present any information with respect to the guaranteed fund investment option offered within the Nationwide Savings Plan, the guaranteed investment contract issued by Nationwide Life Insurance Company or stable value alternatives available in the marketplace" because the BIC had "access to information relating to the guaranteed fund option" that Callan did not. (ECF No. 209-43, PAGEID # 11879.)

In lieu of an analysis by Callan, Nationwide Senior Counsel Alan Stalnaker proposed asking "some very knowledgeable [Nationwide Financial] folks who have

assisted with the litigation[5] to prepare materials highlighting fee and performance information of the [Guaranteed Fund] compared to other products available on the market." (*Id.*) BIC Member (and Defendant) Klaus Diem responded:

> Do we not potentially increase our risk if we are not including the [Guaranteed Fund] in the Callan review? Could someone not further argue that we are abdicating our fiduciary duty by not having it reviewed as part of our ongoing cycle?

(*Id.*) Attorney Stalnaker clarified his view that the risk of having Callan present on the Guaranteed Fund was that:

> without the benefit of the full picture re: fee structure or perhaps an expert understanding of [Guaranteed Fund/Annuity Contract] products, [Callan] could potentially (once again) make what could be argued to be a recommendation to move away from the [Guaranteed Fund] in favor of a stable value product.

(*Id.*, PAGEID # 13930.)

In the end, Nationwide Financial's Keith Wild presented a "product performance update to the BIC" on the Guaranteed Fund. (ECF No. 217-50, PAGEID # 15248.) Mr. Wild's product performance update summarized the Annuity Contract's key features, account value, and returns. (ECF No. 217-35.) His presentation's only reference to fees and/or spread is the following description of the Crediting Rate: "*Portfolio rate less investment expenses, default risk charges, and* ▇ ▇." (*Id.*, PAGEID # 14078.) Mr. Wild "did not go into specific detail around" the charges against the portfolio rate; in his view, if the spread were out of line with the market, Nationwide Life "would not have been able to provide a crediting rate that's

---

[5] The "litigation" refers to this case.

above market." (ECF No. 217-50, PAGEID # 15282–83.) In other words, in Mr. Wild's view, "comparing crediting rate is inclusive of comparing expenses." (*Id.*, PAGEID # 15300.)

Mr. Wild's approach aligned with the BIC's general philosophy when it came to the Guaranteed Fund: Focus on the Crediting Rate. Indeed, Attorney Stalnaker's "counsel to the BIC from their fiduciary perspective was to focus on the crediting rate, which was net of expenses." (ECF No. 217-51, PAGEID # 15658.) Members of the BIC testified in deposition that this was in fact their approach. (*See* ECF No. 217-48, PAGEID # 14914 ("[W]e were aware that the crediting rate was net of any expenses, but because of the research we had done to identify that the crediting rate was above-market average, it didn't raise any concerns for us that the – whatever expenses were netted were out of the ordinary."); ECF No. 217-47, PAGEID # 14461 ("What was important to the participants was the guaranteed fee, and that's what we concentrated on.").)

Plaintiffs assert, through this suit, that the BIC's approach led to the Plan overpaying for the Guaranteed Fund—to the benefit of Nationwide and the detriment of Participants.

### C.    Procedural Background

Messrs. Sweeney and Marshall assert the following claims in their operative Amended Complaint:

Count I:     Breach of Fiduciary Duty (ERISA 404 [29 U.S.C. § 1104])
             Against BIC Defendants, Nationwide Mutual

Count II:    Prohibited Transaction (ERISA 406(a) [29 U.S.C. § 1106(a)])
             Against BIC Defendants, Nationwide Mutual, Nationwide Life

11

Count III:  Self-Dealing (ERISA 406(b) [29 U.S.C. § 1106(b)])
            Against BIC Defendants, Nationwide Mutual, Nationwide Life

Count IV:   Anti-Inurement (ERISA 403(c) [29 U.S.C. § 1103(c)])
            Against BIC Defendants, Nationwide Mutual, Nationwide Life

(Am. Compl., ECF No. 34.) After denying Defendants' Motion to Dismiss (ECF No. 64) and later denying Defendants' first Motion for Summary Judgment in favor of further discovery (ECF No. 158), this Court certified a Plaintiff class of all Plan Participants and beneficiaries invested in the Guaranteed Fund from March 26, 2014 through the date of final judgment in this action (the "Class Period") (ECF No. 172).

Now, Plaintiffs move for summary judgment on liability as to Counts I, II, and III, and Defendants move for summary judgment on all claims.

## II.   MOTIONS TO EXCLUDE

Both Plaintiffs and Defendants offer expert testimony, and seek to exclude all or a portion of their adversaries' expert opinions. The admissibility of expert testimony is governed by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

12

Fed. R. Evid. 702.

The Rule incorporates the Supreme Court's instruction in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), requiring the trial court to serve as a "gatekeeper," tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. But "[t]he 'gatekeeper' doctrine was designed to protect juries" and, so, is "largely irrelevant in the context of a bench trial." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004). Indeed, a "trial judge sitting alone is presumed capable of weighing evidence to sift the important from the unimportant, and even the admissible from the inadmissible when those are intertwined in a way that might counsel excluding the same evidence from consideration by a lay jury." *UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006), *aff'd*, 497 F.3d 615 (6th Cir. 2007).

Courts are afforded "considerable leeway" both in determining *whether* to admit expert opinion testimony and *how* to test its reliability and relevance to the case at bar. *Kumho Tire*, 526 U.S. at 152. The proponent of the expert testimony bears the burden of proving its admissibility. *See* Fed. R. Evid. 104(a); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008). Nonetheless, the Federal Rules of Evidence provide a "permissive backdrop," favoring the admission of expert opinion testimony. *Daubert*, 509 U.S. at 588–89.

**A.      Plaintiffs' experts satisfy the requirements of Rule 702.**

Defendants make a full-throated attack on Plaintiffs' experts Richard W. Kopcke, PhD, CFA and Marcia S. Wagner, Esq. (ECF No. 213 (redacted), ECF No. 221 (sealed).) They argue that the Court should exclude their opinions entirely because Dr. Kopcke and Attorney Wagner are unqualified as experts and because their opinions are unhelpful, irrelevant, and unreliable. The Court disagrees.

Dr. Kopcke is a former Federal Reserve economist who has spent the last eighteen years "conduct[ing] research on the costs, fees, and pricing of capital preservation funds . . . commonly offered by 401(k) plans." (ECF No. 217-11, PAGEID # 13441.) He has written on managing risk in pension plans and has an extensive work history in the insurance regulation and risk-pricing arenas. (*Id.*, PAGEID # 13547.) He offers opinions on the 2009 pricing model, the adequacy of the contract margin, and the BIC's oversight of the Guaranteed Fund. (*Id.*, *generally*.) Dr. Kopcke's opinions are helpful and relevant. As to reliability, Defendants' arguments boil down to a disagreement with Dr. Kopcke's reasoning and conclusions. That is not a basis for excluding the opinions.

Attorney Wagner has practiced law in the areas of ERISA and employee benefits for nearly forty years. (ECF No. 217-37, PAGEID # 14146.) She is a prolific author and presenter, regularly addressing issues relevant to employer-sponsored plan fiduciaries. (*Id.*, PAGEID # 14148–70, 14199–232.) Attorney Wagner both counsels plan fiduciaries and serves as a plan fiduciary. (*Id.*, PAGEID # 14101.) Her opinions focus on the BIC's processes and approach to fulfilling their fiduciary duties. (*Id.*, *generally*.) The opinions are helpful and relevant. Defendants argue

14

that Attorney Wagner's opinions are unreliable, but those arguments are not persuasive.[6] The requirements of Rule 702 are satisfied.

### B. Defendants' expert offers some impermissible legal opinions.

Plaintiffs also move to exclude portions of the Defendants' expert testimony. (ECF No. 210 (redacted), ECF No. 218 (sealed).) In particular, they argue that portions of the opinions offered by Wesley C. Whiteman, CFA and Kelly Quinn Driscoll, Esq. constitute impermissible legal opinions.

"Expert testimony on the law is excluded because the trial judge does not need the judgment of witnesses." *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984). The Court's "special legal knowledge" renders such evidence superfluous. *Id*. Opinion testimony may embrace an ultimate issue, Fed. R. Evid. 704(a), but an opinion "carefully couched in the precise language used in case law" may be suspect. *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).

The Court sees no issue with Attorney Driscoll's opinion, which necessarily touches on the law. But to the extent Mr. Whiteman opines that the Annuity Contract is a Transition Policy, or is a specifically permitted Plan investment, those

---

[6] Defendants attack Attorney Wagner by quoting extensively from the Findings of Fact and Conclusions of Law issued after a bench trial in *In re Prime Healthcare ERISA Litig.*, 8:20-cv-1529, 2024 WL 3903232 (C.D. Cal. Aug. 22, 2024). There, the court concluded that Attorney Wagner's testimony on fiduciary process was "entitled to no probative value[.]" *Id.*, at *6. The court took pains to note, however, that it did not question Attorney Wagner's "***general qualifications*** to opine on industry practice among benefits committees." *Id*. Rather, the court's decision not to credit her testimony was "***specific*** to th[e] case[.]" *Id*. That another court found reasons to discount the testimony Attorney Wagner offered during a bench trial is inapposite to the matter at hand.

are impermissible legal conclusions. (*See*, § III.B, *infra.* (analyzing whether the Annuity Contract is a Transition Policy and whether the Annuity Contract is a prohibited transaction).) The Court uses its "scalpel" to strike those limited portions of his opinion. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019).

*          *          *

Though the parties have extensively briefed the admissibility of their experts' opinion testimony, this case will not be tried to a jury. The Undersigned is confident of her ability to assign appropriate weight to the expert opinions in the context of a bench trial.

Defendants' Motion to Exclude Experts is **DENIED**; Plaintiffs' Motion to Exclude Legal Opinions is **GRANTED in part** and **DENIED in part**.

## III.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P.

16

56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. [7] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

**B.      Defendants have not proven that they are entitled to either of their claimed safe harbors.**

Defendants assert the protection of two safe harbors in this case: First, that the ERISA 408(b)(5) [29 U.S.C. § 1108(b)(5)] exemption bars Counts II, III, and IV; and second, that the Transition Policy safe harbor bars all of Plaintiffs' claims. Defendants bear the burden to prove these safe harbors apply. *See Horn v. McQueen*, 215 F. Supp. 2d 867, 876 (W.D. Ky. 2002); *Sec'y of Dep't of Lab. v. United Transp. Union*, No. 1:17 CV 923, 2020 WL 1611789, at *12 (N.D. Ohio Mar. 30,

---

[7] On cross-motions for summary judgment, like those *sub judice*, courts perform a "hat switch"—in reviewing the *defendant's* motion, the court accepts *plaintiff's* view of the facts as true and draws all reasonable inferences in favor of the *plaintiff*; but in review of the *plaintiff's* motion, the court accepts the *defendant's* view of the facts and draws all reasonable inferences in favor of the *defendant*. *Harris v. City of Saginaw, Mich.*, 62 F.4th 1028, 1032–33 (6th Cir. 2023).

2020) ("The party seeking the benefit of the ERISA [prohibited transaction] exemption has the burden of proving its applicability.").

Because their application necessarily affects the rest of the analysis, the Court begins with the safe harbors.

### 1.   ERISA 408(b)(5): Prohibited Transaction Exemption

Defendants contend that the Annuity Contract is exempt from the ERISA 406 prohibited transaction rules under ERISA 408(b)(5). That exemption says:

> The prohibitions provided in [ERISA 406] shall not apply to any . . . contract for life insurance, health insurance, or annuities with one or more insurers which are qualified to do business in a State, if the plan pays no more than adequate consideration, and if each such insurer or insurers is—
>
> (A)   the employer maintaining the plan, or
>
> (B)   a party in interest which is wholly owned (directly or indirectly) by the employer maintaining the plan, or by any person which is a party in interest with respect to the plan, but only if the total premiums and annuity considerations written by such insurers for life insurance, health insurance, or annuities for all plans (and their employers) with respect to which such insurers are parties in interest (not including premiums or annuity considerations written by the employer maintaining the plan) do not exceed 5 percent of the total premiums and annuity considerations written for all lines of insurance in that year by such insurers (not including premiums or annuity considerations written by the employer maintaining the plan).

ERISA 408(b)(5).

Plaintiffs do not dispute that the Annuity Contract is an annuity, that the insurer (Nationwide Life) is qualified to do business in Ohio, or that the 5%-of-total-premiums limit is met. They challenge only whether Nationwide Life is a qualifying insurer and whether the Plan paid "no more than adequate consideration."

18

On the first point, Plaintiffs argue that Nationwide Life is not "a party in interest which is wholly owned (directly or indirectly) by the employer" because Nationwide Fire owned a small percentage of Nationwide Life during a portion of the Class Period. (*See* § 1.A., n. 3.) But Defendants meet the alternative requirement: Nationwide Life is a wholly owned subsidiary of Nationwide Financial, which is a participating employer in the Plan and, thus, a party in interest. *See* ERISA 3(14) (defining "party in interest") [29 U.S.C. § 1002(14)].

On the second point, Plaintiffs argue that Defendants cannot show that the Plan paid no more than adequate consideration. ERISA defines "adequate consideration" to mean "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with" applicable regulations. ERISA 3(18)(B) [29 U.S.C. § 1002(18)(B)].

Defendants first argue that "the Plan does not pay **any** 'consideration' to Nationwide Life for the Annuity Contract," and no consideration is, *a fortiori*, no more than adequate. (ECF No. 220, PAGEID # 17384 (emphasis in original).) But this argument puts form over substance.

During oral argument, all parties agreed that the arithmetic here is fairly simple: If the spread goes down, the Crediting Rate goes up. (Hr'g Tr., 16:3–5, 30:1–4, 33:13–15.) And the spread is how Nationwide Life gets paid for the services it provides to the Fund. That being the case, there is no meaningful difference between setting a Crediting Rate that is net of charges, and setting a Crediting Rate *then* applying charges. Nationwide Life receives consideration for the Annuity Contract. Defendants cite no legal authority supporting their position that the

19

indirect manner in which the charges are applied (*i.e.*, in developing the Crediting Rate) renders those charges anything other than consideration.

Defendants next argue that this Court should interpret the definition of "adequate consideration" to mean only "whether the consideration is reasonable as compared to charges paid by arm's-length parties, *i.e.*, the 'fair market value.'" (ECF No. 220, PAGEID # 17353 (citing *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337, 2007 WL 2263892, at \*40 (S.D. Fla. Aug. 7, 2007), *as amended* (Aug. 10, 2007)).) In doing so, Defendants rely on an unreported decision the Southern District of Florida issued nearly twenty years ago. But the Sixth Circuit has held that "the definition of 'adequate consideration' has two distinct parts. First, there is the 'fair market value' part, then there is the 'as determined in good faith by the trustee' part." *Chao v. Hall Holding Co.*, 285 F.3d 415, 436 (6th Cir. 2002). To look only at fair market value "ignore[s] a portion of the definition of 'adequate consideration.'" *Id.* Defendants argue that *Chao* is inapposite because that case concerned the formation of an employee stock ownership plan. The Court sees no legal reason why ERISA 3(18)(B) would be read differently for purposes of the Hall Holdings ESOP and this Plan. *Chao* binds this Court.

As the *Chao* court explained, determining "adequate consideration" requires a district court to first "determin[e] fair market value" and also to "examin[e] the process that led to the determination of fair market value in light of [ERISA 404's] fiduciary duties." *Id.* at 437. Here, that means the Court asks (1) whether the Annuity Contract price (*i.e.*, the spread) is no more than fair market value, and (2) whether the process that led to the Annuity Contract price satisfied Defendants'

fiduciary duties. Genuine disputes of material fact prevent the Court from answering either question.

### a) Fair Market Value

The parties' experts disagree as to whether the spread was in-line with fair market value. For the Defendants, Mr. Whiteman opines that the default risk charge and investment office expense amounts are "reasonable" and that the contract margin "is on the lower end of the spectrum for general account stable value products." (ECF No. 220-16, PAGEID # 18504.) According to his analysis, the contract margin for similar products ranges from ▮▮▮▮▮▮▮▮▮▮ that of the Guaranteed Fund. (*Id.*) He also notes that the contract margin is ▮▮▮▮▮▮ ▮▮▮▮ than other similar products that Nationwide Life offers both to other affiliated entities and in the marketplace. (*Id.*) Mr. Whiteman further notes that the Guaranteed Fund design offers Participants two benefits not generally available in other similar products: the AIR and the lack of an equity-wash provision. (*Id.*, PAGEID # 18505.) According to Mr. Whiteman, the latter makes the Guaranteed Fund "substantially better than anything available on the open market." (*Id.*, PAGEID # 18517.)

On the other hand, Plaintiffs' expert Dr. Kopcke opines that the contract margin exceeds fair market value. (ECF 217-11, PAGEID # 13474.) According to Dr. Kopcke, a pricing model must be used to determine fair value because there is no open market price for these products. (*Id.*, PAGEID # 13473.) He concludes that the best way to determine fair market value for the Guaranteed Fund is simply to

update the inputs for the pricing model negotiated in 2009. (*Id.*) After doing so, he concludes the contract margin exceeded fair market value. (*Id.*, PAGEID # 13474.)

This 'battle of the experts' precludes summary judgment.

### b) Fiduciary Process

There is also a genuine dispute of material fact whether Defendants determined the Guaranteed Fund's fair value in good faith and in compliance with their fiduciary duties. An ERISA fiduciary's duty of prudence imposes a continuing duty to monitor investment options, including their fees. *England v. DENSO Int'l Am. Inc.*, 136 F.4th 632, 636 (6th Cir. 2025) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)). Plaintiffs offer testimony from BIC members and Attorney Stalnaker that the BIC did not monitor contract charges or the spread during the relevant period. When the BIC engaged Callan to review the Guaranteed Fund, Nationwide refused to provide Callan with information about the spread. Then, to avoid a possible recommendation that the BIC "move away from the [Guaranteed Fund]," the BIC amended Callan's engagement to exclude review of the product altogether. (ECF No. 217-29, PAGEID # 13930.)

For their part, Defendants put forth evidence that the BIC could fulfill its fiduciary duty to monitor expenses by monitoring the Crediting Rate. Defendants' expert Robert M. Cahill, Jr. opines that, in the stable value fund market, the crediting rate "is a consistent indicator of whether [the insurer] is receiving a spread that is fair, reasonable and no more than adequate." (ECF No. 220-18, PAGEID # 18647.) This echoes Mr. Wild's testimony that "comparing crediting rate is inclusive of comparing expenses." (ECF No. 217-50, PAGEID # 15300.)

22

A palpable tension is created by Defendants' position. They are adamant that the BIC complied with its fiduciary duties by evaluating only the Crediting Rate as a proxy for any charges applied against the investment earnings. Yet, in 2020, the BIC refused to let Callan evaluate the Guaranteed Fund because, without information on the fees and spread, Callan wouldn't have the "full picture." But then the BIC proceeded without any of that information on the Guaranteed Fund's fees and spread, choosing to focus on the Crediting Rate alone. This dissonance demands further exploration.

*            *            *

In view of the above, there is a genuine dispute of material fact as to whether the Plan paid no more than adequate consideration to Nationwide Life. The Court thus cannot conclude as a matter of law whether the ERISA 408(b)(5) prohibited transaction exemption applies.

### 2.    Transition Policy

Defendants next argue that the Annuity Contract qualifies for the "Transition Policy" safe harbor under 29 C.F.R. § 2550.401c–1. If the Transition Policy safe harbor requirements are satisfied, the Annuity Contract will be deemed a Plan asset, but the underlying funds and securities in Nationwide Life's general account will <u>not</u> be Plan assets. 29 C.F.R. § 2550.401c–1(a)(2).

A Transition Policy is an insurance contract, supported by assets in the insurer's general account, issued to a plan on or before December 31, 1998, and that meets certain enumerated requirements. 29 C.F.R. § 2550.401c-1(a)(2), (c)–(f), (h)(6).

23

In addition, the Transition Policy's purchase must have been "expressly authorize[d]" by an "independent plan fiduciary" who is not "an affiliate of the insurer issuing the policy." 29 C.F.R. § 2550.401c-1(b)(1). Authorization by an independent plan fiduciary is not required, however, if:

    (i)    The insurer is the employer maintaining the plan, or a party in interest which is wholly owned by the employer maintaining the plan; and

    (ii)    The requirements of [ERISA 408(b)(5)] are met.

29 C.F.R. § 2550.401c-1(b)(2).

Defendants do not argue that the Annuity Contract's purchase was authorized by an independent plan fiduciary. They further present no evidence showing the ownership of Nationwide Life at the time the Transition Policy provisions went into effect. Finally, the Court has already concluded that genuine issues of material fact prevent a finding that ERISA 408(b)(5) is met.

Defendants argue that these provisions should not factor into the Court's analysis because the Department of Labor has said that "paragraph (b) no longer has any application." But the Department's statement does not have the effect Defendants intend. The "Transition Policy" scheme was Congress's response to the Supreme Court's decision in *John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank*, 510 U.S. 86 (1993). *See* Insurance Company General Accounts, 62 Fed. Reg. 66908, 66909 (Dec. 22, 1997). The *Harris Trust* Court held that, to the extent funds in an insurer's general account were not attributable to a guaranteed component of an investment contract, those funds were plan assets and the insurer was an ERISA fiduciary. 510 U.S. at 106. This holding created a major

24

issue for insurers (like Nationwide Life) that had issued general account products (like the Annuity Contract). The Transition Policy rules afforded those insurers cover from fiduciary liability for products already issued. So, while "paragraph (b) no longer has any application" because Transition Policies can no longer be issued, *see* 65 Fed. Reg. 614, 615 (Jan. 5, 2000), the Annuity Contract must have satisfied these requirements at the time in order to qualify for the relief Congress intended to provide.

Defendants fail to establish that the Annuity Contract qualifies as a Transition Policy.

### C.      Count I: Breach of Fiduciary Duties

In Count I, Plaintiffs assert that Nationwide Mutual and the BIC breached their fiduciary duties. "[T]he duties charged to an ERISA fiduciary are the highest known to the law." *Chao*, 285 F.3d at 426 (internal quotation and citation omitted). "[E]mployers who are also plan sponsors wear two hats: one as a fiduciary in administering or managing the plan for the benefit of participants and the other as employer in performing settlor functions such as establishing, funding, amending, and terminating the trust." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000). But it is dogma that the ERISA "fiduciary with two hats [must] wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram v. Herdich*, 530 U.S. 211, 225 (2000).

The duties here at issue include the duty of loyalty, the duty of prudence, and the duty to act in accordance with the plan documents. *See* ERISA 404 [29 U.S.C. § 1104]. Under the duty of loyalty, "all decisions regarding an ERISA plan must be

25

made with an eye single to the interests of the participants and beneficiaries." *Gregg v. Transportation Workers of Am. Int'l*, 343 F.3d 833, 840 (6th Cir. 2003). Meanwhile, the duty of prudence requires "an unwavering duty to act both as a prudent person would act in a similar situation and with single-minded devotion to those same plan participants and beneficiaries." *Id.* (cleaned up). It is first and foremost "a process-driven obligation." *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 213 (6th Cir. 2024). Finally, the duty to act in accordance with plan documents is an independent obligation, but can serve as evidence of an imprudent process. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 358 n.7 (4th Cir. 2014).

Though Count I implicates three fiduciary duties, the course of conduct at issue is such that the alleged breaches are inextricably intertwined. In short, Plaintiffs assert that Nationwide Mutual and the BIC maintained the Guaranteed Fund on unreasonable terms by failing to monitor expenses and failing to adhere to (or monitor adherence to) the terms of the Plan, the Annuity Contract, and the BIC's Investment Policy Statement as they pertain to the Guaranteed Fund—all to the detriment of the Plan and for the benefit of Nationwide and its affiliates.

### 1. Oversight of Expenses

An ERISA fiduciary has an initial duty to select prudent investments, but also a "continuing duty" to monitor those investments and remove the "imprudent ones." *Parker-Hannifin*, 122 F.4th at 214 (citing *Tibble*, 575 U.S. at 529). When courts "enforce the duty of prudence, [they] focus on the fiduciary's 'real-time decision-making process, not on whether any one investment performed well in hindsight.'" *Parker-Hannifin*, at 213 (quoting *Forman v. TriHealth, Inc.*, 40 F.4th

26

443, 447 (6th Cir. 2022)). Said another way, the "duty of prudence imposes standards of *conduct* on trustees, not standards of *performance* on investments." *Parker-Hannifin*, at 226 (Murphy, J., dissenting) (emphasis in original) (internal quotations and citations omitted).[8]

Plaintiffs asserts that Defendants' approach to monitoring the Guaranteed Fund was imprudent and disloyal. Plaintiffs put forth evidence that, in reviewing the Guaranteed Fund, the BIC focused exclusively on the Crediting Rate. And despite negotiating a pricing model in 2009 that was sensitive to certain market conditions, the BIC failed to evaluate whether Nationwide Life ever adjusted the spread. What's more, the BIC refused to provide information about the spread to its independent consultant in 2016 and 2020, despite having done so (to the Plan's benefit) in 2008.

Defendants argue that the BIC closely monitored the Crediting Rate, which conveyed all relevant information about the adequacy of the spread. They also offer evidence that: (i) insurers do not generally renegotiate pricing on general account products like the Annuity Contract; (ii) the spread was in-line with market rates for

---

[8] Defendants urge the Court to require Plaintiffs to show not only that the BIC followed an imprudent process in monitoring the Guaranteed Fund, but also that the Guaranteed Fund was an objectively imprudent investment. (ECF No. 220, PAGEID # 17373 (citing *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1171 (11th Cir. 2024).) Defendants assert this requirement is case dispositive, because Plaintiffs have not identified a product available in the marketplace that has all the benefits of the Guaranteed Fund at a lower cost. But the Sixth Circuit has been clear: though it is often helpful, a plaintiff is not "required to point to a high-performing fund to demonstrate imprudence." *Parker-Hannifin*, 122 F.4th at 216. Plaintiffs are not required to identify a commercially available comparator.

inferior capital preservation products; and (iii) Nationwide Life had already reduced its pricing to "bare bones." Finally, Defendants point out that fiduciary duties do not require them to "scour the market" for the cheapest investment option on offer. (ECF No. 220, PAGEID # 17375 (citing *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (further citation omitted)).)

The parties' arguments, and the evidence cited in support of each, reveals a genuine dispute of material fact as to whether the BIC fulfilled its fiduciary duties by monitoring only the Guaranteed Fund's Crediting Rate. In light of the 2008–09 spread re-negotiation, a reasonable fact-finder could conclude that the BIC's recent failure to probe the amount and component parts of the spread was both imprudent and disloyal. *See Parker-Hannifin*, 122 F.4th at 221 ("Wasting beneficiaries' money is imprudent.") (further citation omitted). She could alternatively be persuaded by Nationwide's evidence that the BIC fulfilled its fiduciary duties to monitor the Guaranteed Fund's expenses by monitoring its Crediting Rate. The record thus does not allow for summary judgment on Count I's investment expense-monitoring theory.

### 2.    Duty to Follow Plan Documents

Plaintiffs next assert that Defendants breached their fiduciary duty to act in accordance with the Plan Section 14.05 and the Investment Policy Statement. They further assert that Defendants' failure to monitor adherence to Annuity Contract

28

Sections 2.2 and 3.3 was imprudent.[9] These provisions, and the Defendants' treatment of them in administering the Plan, implicate three questions. First, do the Plan and Annuity Contract require the spread to be paid by Nationwide Life, rather than as a deduction from investment earnings? Second, was the Investment Policy Statement a "plan document" within the meaning of ERISA during the Class period? And third, does the Annuity Contract require the Crediting Rate to be determined on an annual basis?

### a)  Legal Standard

Neither party fully explains the standard under which an ERISA 404(a)(1)(D) claim such as this should be analyzed. Plaintiffs purport to employ the "traditional methods of contract interpretation" to determine whether Defendants breached their fiduciary duties vis-à-vis the Plan documents, and cite to Ohio law on the topic. (ECF No. 217, PAGEID # 13314 (quoting *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993) and citing *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380 (Ohio 1988)).) Meanwhile, Defendants appear to urge application of the

---

[9] Defendants argue that Plaintiffs failed to exhaust administrative remedies related to, and are judicially estopped from, raising "contract-based claims." Neither argument is availing. First, Plaintiffs do not need to exhaust administrative remedies on Count I because they assert a statutory violation; not a claim for benefits. *Hitchcock v. Cumberland Univ. 403(b) DC Plan*, 851 F.3d 552, 564 (6th Cir. 2017) (holding that "ERISA plan participants . . . do not need to exhaust internal remedial procedures before proceeding to federal court when they assert statutory violations of ERISA"). Second, Plaintiffs' earlier briefing reserves the right to assert contract language as a basis for their fiduciary duty claim. (ECF No. 146, PAGEID # 6610 ("Plaintiffs do not assert a breach of contract or benefits claim *independent of their fiduciary duty claims*") (emphasis added).)

same "arbitrary and capricious" standard used in denial-of-benefit claims.[10] (ECF No. 245, PAGEID # 24141 (quoting *Belluardo v. Cox Enterprises, Inc.*, 157 F. App'x 823, 828 (6th Cir. Nov. 18, 2005)).)

The Court's own review of the caselaw shows that the Sixth Circuit defines a 404(a)(1)(D) claim as follows: "A fiduciary who in bad faith fails to follow the terms of the plan may be held liable for the consequences of his failure to do so." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 721 (6th Cir. 2000). "An essential element of such a claim is that the fiduciary in fact failed to follow the terms of the plan." *Id.* (citing *Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 170 (3d Cir. 1999)) (cleaned up).[11]

"ERISA plans are construed according to federal common law." *Massaro v. Palladino*, 19 F.4th 197, 210 (2d Cir. 2021). Accordingly, the "written terms of the plan documents control"—but "if the plan documents are ambiguous with respect to a particular term, then, under federal common law, a court may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence." *Boyer*, 986 F.2d at 1005. Contract language is ambiguous when it "is subject to two reasonable

---

[10] Although Defendants' brief references the arbitrary and capricious standard, the application here is not clear. The arbitrary and capricious standard protects a plan fiduciary's reasonable decisions from judicial intervention when the plan gives that fiduciary discretionary authority to construe plan terms. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the Plan gives that discretionary authority to the Administrative Committee—not the Benefits Investment Committee. (Plan, § 12.01(b).)

[11] The other essential element of the claim is whether the fiduciary acted in bad faith. Neither party directly addresses good faith in the context of Plaintiffs' ERISA 404(a)(1)(D) claim.

30

interpretations." *In re AmTrust Fin. Corp.*, 694 F.3d 741, 750 (6th Cir. 2012) (internal quotation and citation omitted). Though the initial determination of whether contract language is ambiguous is a matter of law, the interpretation of ambiguous contract language is a matter of fact. *Id.* at 749.

### b)      Whether the Plan and Annuity Contract require Nationwide Mutual to pay the spread.

Plaintiffs first assert that Plan § 14.05 and Annuity Contract § 2.2 required Nationwide Mutual to pay the spread, rather than allowing Nationwide Life to deduct the spread before it set the Crediting Rate.

Section 14.05 of the Plan provides in relevant part that any expenses "incurred in the administration of this Plan shall be paid from Plan asset[.]" (Plan, § 14.05(a).) But Plan administrative expenses "do not include . . . the contract charges under the insurance contract related to the guaranteed investment fund[.]" (*Id.*) The Plan goes on to say that Nationwide Mutual "shall" pay "any expenses not eligible to be paid by Plan assets[.]" (*Id.*, § 14.05(b).) The parties take diametrically opposed interpretations of this language—and both are reasonable. In Plaintiffs' view, the provision requires Nationwide Mutual to pay Nationwide Life's spread, instead of having those charges assessed against investment earnings. Dr. Kopcke's opinion supports their view. But Defendants read the provision to exclude "contract charges" from the definition of "expenses" even as the term is used in § 14.05(b). And in any event, Mr. Whiteman opines that the spread does not constitute "contract charges."

31

Annuity Contract §  2.2 requires "Employers" to make "Expense Contributions" to Nationwide Life "for taxes paid and expenses incurred by [Nationwide Life] under the" Annuity Contract. (Annuity Contract, § 2.2.) Neither "Employers" nor "Expense Contributions" are defined in the Annuity Contract. Plaintiffs use the vague language to bolster their interpretation of Plan § 14.05, arguing that the Annuity Contract contemplates Nationwide Mutual making payments to Nationwide Life to cover the cost of the Guaranteed Fund (*e.g.*, the spread). Defendants' position is that § 2.2 describes a situation that has never occurred—one in which taxes and expenses are assessed directly against Participant Contributions, thereby giving rise to the need for Expense Contributions. Given the spartan language used in the provision itself, both readings are once again reasonable.

Having concluded that both Plan § 14.05 and Annuity Contract § 2.2 are ambiguous, their construction becomes a question of fact. Both parties cite evidence supporting their readings. Thus, whether the BIC violated its fiduciary duty to act in accordance with these Plan documents cannot be decided as a matter of law.

### c) Whether the Investment Policy Statement was in effect and was followed.

Plaintiffs next assert that the BIC "ignor[ed]" a 2006 Investment Policy Statement (the "IPS"). (ECF No. 217, PAGEID # 13315.) Two factual questions preclude a decision on this record. The first is whether the IPS was, at the relevant time, an operative Plan document. Testimony indicates that the BIC did not review the IPS because its members believed the document was no longer in effect. (ECF

32

No. 209-7, PAGEID # 11449–50.) But Plaintiffs argue that the IPS was effective because the BIC never formally rescinded or revoked it.

Even assuming the IPS was in effect, the Court must determine whether the BIC acted in accordance with its terms. The IPS requires the BIC to ensure "[t]otal expense levels that are reasonable and competitive" and "consider the reasonableness and effect of the costs, with preference being given to low-cost funds unless the additional cost can be justified by other factors." (ECF No. 209-6, PAGEID # 11440.)  These requirements beg a familiar question of material fact: Did the BIC adequately monitor the expenses applied against investment earnings by monitoring the Crediting Rate alone?

### d) Whether the Annuity Contract required annual Crediting Rates.

Finally, Plaintiffs assert that the BIC failed to require Nationwide Life's compliance with Annuity Contract § 3.3. That section says:

> [Nationwide Life] will credit interest to the Deposit Fund at an effective annual rate equal to the guaranteed interest rate as declared by [Nationwide Life].
>
> The [Plan] will be advised of the guaranteed annual interest rate in advance of each calendar year. . . .

(Annuity Contract, § 3.3.) Plaintiffs read this section to require that Nationwide Life declare and guarantee a single Crediting Rate for an entire year, instead of for each quarter. But Defendants argue that the language does no more than require that the Crediting Rate is expressed in annualized terms and declared in advance of the period to which it pertains. The Court agrees with Defendants. This § 3.3 imposes certain restrictions on Nationwide Life's approach to declaring the

33

Crediting Rate, including that the rate be <u>annualized</u>; but it does not require the rate to be <u>annual</u>. Defendants are thus entitled to judgment as a matter of law on this theory of Plaintiffs' ERISA 404(a)(1)(D) claim.

### 3. Loss Causation

Finally, Defendants argue that Count I fails as a matter of law because Plaintiffs have not proven that Defendants' conduct caused losses to the Plan. In their view, it is enough that the Guaranteed Fund has produced returns. (ECF No. 220, PAGEID # 17391.) But, as discussed above, Plaintiffs contend that the BIC's and Nationwide Mutual's imprudent oversight and monitoring process caused Nationwide Life to retain spread in excess of fair market value. Plaintiffs can show recoverable damages if the Court, after a bench trial, finds that Defendants breached their fiduciary duties in monitoring the Guaranteed Fund and, as result, the Plan paid more than adequate consideration to Nationwide Life. *Accord* ERISA 409(a) (extending liability for ERISA fiduciary breach to include recoupment of losses, disgorgement of profits, and "such other equitable or remedial relief as the court may deem appropriate") [29 U.S.C. § 1109(a)].

*      *      *

Defendants' Motion for Summary Judgment is **GRANTED** to the extent Claim I is based on failure to follow Annuity Contract § 3.3.

### D. Counts II and III: Prohibited and Interested Transactions

In Counts II and III, Plaintiffs claim that the Guaranteed Fund arrangement violates ERISA's prohibitions against interested transactions and self-dealing. *See* ERISA 406(a), (b). Defendants respond that the Guaranteed Fund is exempt from

34

ERISA 406 under ERISA 408(b)(5), that the claims are barred by ERISA's six-year statute of repose, and that the claims fail because Plaintiffs cannot establish loss causation.[12]

### 1.      ERISA 408(b)(5) would apply to Count III.

As already discussed, genuine disputes of material fact prevent the Court from deciding whether ERISA 408(b)(5) applies as a defense to Counts II and III. Plaintiffs argue that, even if ERISA 408(b)(5) is satisfied, it would not serve as a defense against Count III. In their view, the exemption in 408(b)(5) only applies to transactions listed in ERISA 406(a), while Count III asserts a claim under ERISA 406(b). (ECF No. 243, PAGEID # 23751.) Upon review of the statutory text, the Court disagrees.

ERISA 408(b) begins:

> The prohibitions in [ERISA 406] shall not apply to any of the following transactions . . . .

ERISA 408(b). It speaks broadly of 406; making no distinction between that section's component parts. Furthermore, Congress specified within ERISA 408's text when it intended to distinguish between 406(a) and (b). *See, e.g.*, ERISA 408(a) (outlining different processes by which the Secretary of Labor may grant individualized exemptions from 406(a) and 406(b)). Had Congress intended 408(b) to list exemptions from 406(a) alone, it would have said so. *Cf. Harris Tr. & Sav.*

---

[12] Defendants also argue that the claims fail under the Transition Policy safe harbor. But the Court has already concluded that Defendants fail to establish as a matter of law that the Annuity Contract satisfies the Transition Policy requirements. (*See* § III.B.2., *supra.*)

*Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 254 (2000) ("In ERISA cases, as in any case of statutory construction, our analysis begins with the language of the statute . . . . And where the statutory language provides a clear answer, it ends there as well.") (cleaned up).

Plaintiffs' two arguments for the opposite conclusion are unavailing. First, Plaintiffs invoke the Sixth Circuit's decision in *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014). The *Hi-Lex* court said:

> [T]he majority of courts that have examined this statutory interpretation issue have held that [ERISA 408] applies only to transactions under [406(a)], not [406(b)].

*Hi-Lex*, 751 F.3d at 750 (collecting cases). Despite initial appearances, the court was not painting with a broad brush. Instead of speaking to ERISA 408, the court was referring to ERISA 408(b)(2) and (c)(2). Indeed, the court cited 29 C.F.R. § 2550.408b–2(a)(3) to support its position. *Id*. But that regulation applies only to 408(b)(2) and (c)(2), and does not analyze the interaction between 408(b) and 406(b) as a whole. Read in context, then, the *Hi-Lex* court's reference to "*this* statutory interpretation issue" is whether ERISA 408(b)(2) and (c)(2) apply to transactions under ERISA 406(b).

Next, Plaintiffs argue that the text of ERISA 406 supports their interpretation. ERISA 406(a) begins: "Except as provided in [ERISA 408] . . ." Meanwhile, 406(b) does not mention ERISA 408. While this discrepancy must be given meaning, the Court does not interpret it to mean that ERISA 408's exemptions do not apply to 406(b). Doing so would give meaning to 406(b)'s silence at the expense of 408(b)'s unambiguous command that "[t]he prohibitions in [ERISA

36

406] shall not apply" to the transactions listed therein. The prefatory clause in ERISA 406(a) is better read as clarifying that, should 408 and 406(a) conflict, 406(a) is subordinate to 408's exemptions.

### 2. Statute of Repose

Defendants next argue that the statute of repose bars Counts II and III. Under ERISA's statute of repose, no action may be brought six years after "the date of the last action which constituted a part of the breach or violation," or "the latest date on which the fiduciary could have cured the breach or violation." ERISA 413 [29 U.S.C. § 1113]. The Plan acquired the Annuity Contract in 1975 and restated it most recently in 2002. Defendants argue that the statute ran in 2008, well before Plaintiffs filed suit. The Court agrees—but only to the extent Plaintiffs assert prohibited transaction claims based on the initial decision to enter into the Annuity Contract or to provide the Guaranteed Fund as an investment option. *See David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013).

To the extent Plaintiffs assert that Defendants engage in prohibited transactions or self-dealing every time Nationwide Life applies charges to, or takes consideration or compensation from, earnings of the assets backing the Annuity Contract, those claims are not barred. That is because the alleged violation is a "*repeated,* rather than a *continued,* violation." *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1088 (7th Cir. 1992). Thus, the statute of repose does not bar Counts II and III to the extent those claims are based on rate setting within the six-year period before Plaintiffs filed suit.

### 3.     Loss Causation

Finally, Defendants argue that Counts II and III fail because Plaintiffs cannot show a resulting loss. But ERISA 406 violations are "*per se* violations" for which there is no loss causation requirement. *Chao*, 285 F.3d at 439.

*          *          *

Defendants' Motion for Summary Judgment is **GRANTED** to the extent Claims II and III are based on conduct outside the six-year period before Plaintiffs filed suit.

### E.     Count IV: Anti-Inurement

Finally, in Count IV, Plaintiffs assert that Defendants violated ERISA 403(c)(1), which states:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

Defendants move for summary judgment on Count IV, arguing that the claim is barred by the statue of repose and that the assets in Nationwide Life's general account are not Plan assets because the Annuity Contract is a Transition Policy.

In view of the analysis and conclusions above, Defendants' Motion for Summary Judgment is **GRANTED** to the extent Claim IV is based on conduct outside the six-year period before Plaintiffs filed suit.

### F.    Named Plaintiff Bryan Marshall's Claims

Finally, Defendants contend that Named Plaintiff Bryan Marshall released any ERISA claims he had against Defendants and his claims in this action are thus barred.

Mr. Marshall signed a Severance Payment and Release Agreement under which he released "all claims," including claims under ERISA. (ECF No. 220-25, PAGEID # 18778.) But the Release specifically preserves "any rights or claims that cannot be released[.]" (*Id.*, PAGEID # 18779.) The claims here are asserted on behalf the Plan. (*See* Am. Compl., ¶ 1 (citing ERISA  502(a)(2) [29 U.S.C. § 1132(a)(2)]).) The Sixth Circuit has held that such claims "belong to the plan." *Parker v. Tenneco, Inc.*, 114 F.4th 786, 796 (6th Cir. 2024) (citing *Hawkins v. Cintas Corp.*, 32 F.4th 625, 632–33 (6th Cir. 2022)). Following that rationale, "[t]he vast majority of courts have concluded that an individual release has no effect on an individual's ability to bring a claim on behalf of an ERISA plan under § 502(a)(2)." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 594 (3d Cir. 2009). Mr. Marshall released only his claims; he could not, and therefore did not, release the Plan's claims.[13]

Defendants' Motion for Summary Judgment as to the claims Mr. Marshall asserts on behalf of the Plan is **DENIED**.

---

[13] The Release also contains a tender-back provision, which Defendants argue requires Mr. Marshall return his severance benefits before he can challenge the release's enforceability. (ECF No. 220, PAGEID # 17396.) But Mr. Marshall challenges the *applicability* of the Release; not its enforceability.

## IV.  CONCLUSION

For these reasons, Plaintiffs' Motion for Partial Summary Judgment is **DENIED**; Defendants' Motion to Exclude is **DENIED**; Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**; and Plaintiffs' Motion to Exclude is **GRANTED in part** and **DENIED in part**. This matter will be set for a bench trial under separate cover.

The Clerk is **DIRECTED** to file this Opinion and Order under seal. The Parties are **ORDERED** to submit **within ten days** an agreed redacted version of this Opinion & Order to the Court for filing on the public docket. The agreed redacted version must be e-mailed to Morrison_Chambers@ohsd.uscourts.gov in Word format. Failure to comply with this deadline will result in this Opinion and Order being re-filed in full on the public docket.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**