# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RYAN SWEENEY, et al.,
Plaintiffs,
vs. Case No.
NATIONWIDE MUTUAL 2:20-cv-01569
INSURANCE COMPANY, et
al.,
Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

\*\*\* CONFIDENTIAL \*\*\*

REMOTE VIDEO DEPOSITION OF
BRIANNE WEYMOUTH

February 1, 2023
11:10 a.m.

Stenographically Reported By:
Deanna Amore - CRR, RPR, CSR - 084-003999
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES OF COUNSEL
(All Participants Appeared Remotely.)

On Behalf of the Plaintiffs, RYAN SWEENEY, et al.:

COHEN MILSTEIN SELLERS & TOLL
DANIEL R. SUTTER
ELEANOR FRISCH
KAI RICHTER
1100 New York Avenue NW
5th Floor
Washington, DC 20005
dsutter@cohenmilstein.com
efrisch@cohenmilstein.com
krichter@cohenmilstein.com

On Behalf of the Defendants, NATIONWIDE MUTUAL INSURANCE COMPANY, et al.:

CARPENTER LIPPS & LELAND
JEFFREY LIPPS
MICHAEL N. BEEKHUIZEN
JOSEPH KUNKEL
280 North High Street
Suite 1300
Columbus, Ohio 43215
lipps@carpenterlipps.com
beekhuizen@carpenterlipps.com
kunkel@carpenterlipps.com
- and -
JONES DAY
EVAN MILLER
51 Louisiana Avenue NW
Washington, DC 20001
emiller@jonesday.com
- and -
JONES DAY
ALEXANDRA SCHILL
2727 North Harwood Street
Suite 500
Dallas, Texas 75201
aschill@jonesday.com

APPEARANCES OF COUNSEL
(All Participants Appeared Remotely.)

On Behalf of CALLAN, LLC and the Deponent:

DLA PIPER
AMANDA MORGAN
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103
amanda.morgan@us.dlapiper.com

ALSO PRESENT:
Justin Henricksen, Legal Video Specialist
Joseph Schleppi, Nationwide Mutual Insurance Company, Senior Counsel

* * * * *

I N D E X


| WITNESS | EXAMINATION |
|---|---|
| BRIANNE WEYMOUTH | |
| EXAMINATION BY MR. SUTTER | 11 |
| EXAMINATION BY MR. LIPPS | 111 |
| FURTHER EXAMINATION BY MR. SUTTER | 132 |


EXHIBITS


| | | |
|---|---|---|
| Exhibit 1 | 10.24.2008 Callan-Nationwide Master Consulting Agreement; CALLAN_NTW0002192-205 | 31 |
| Exhibit 2 | 11.21.2019 Order 1 Master Agreement No. 524422; CALLAN_NTW0008074-081 | 34 |
| Exhibit 3 | 2.11.2020 Email Exchange Re: Callan DC Project Timing; CALLAN_NTW0007820-823 | 38 |
| Exhibit 4 | May 2020 Guaranteed Fund Review | 42 |
| Exhibit 5 | 5.11.2020 Email Exchange Re: Callan Project Deliverables; NMIC_014637-638 | 43 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | Nationwide Savings Plan Investment Structure Evaluation; CALLAN_NTWD0001884-1929 | 53 |
| Exhibit 7 | 6.17.2020 Email Exchange Re: 2016 Engagement - Follow-Up Questions; CALLAN_NTWD0008477-8480 | 63 |
| Exhibit 8 | Nationwide-Callan Statement of Work; CALLAN_NTWD0002206-212 | 65 |
| Exhibit 9 | 12.19.2016 Email Exchange Re: Follow-Up Questions; CALLAN_NTWD0000001 | 67 |
| Exhibit 10 | Nationwide Defined Contribution Consulting Project; CALLAN_NTWD0002312-2430 | 70 |
| Exhibit 11 | Managing DC Plan Investments, A Fiduciary Handbook | 81 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | 10-06-08-Scope of DC Plans' Investment Review Project; CALLAN_NTWD0004440-441 | 83 |
| Exhibit 13 | Nationwide Guaranteed Fund Supplemental Information; CALLAN_NTWD0003981-984 | 84 |
| Exhibit 14 | Nationwide Defined Contribution Retirement Plans Investment Structure Evaluation December 2008 - Draft; CALLAN_NTWD0004120-175 | 87 |
| Exhibit 15 | Amendment No. 1 to Order No. 1; NMIC_005691 | 88 |
| Exhibit 16 | 2.24.2021 Email Exchange Re: SOW/Footnote for Presentation; CALLAN_NTW0009111 | 91 |

EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 17 | 1.19.2006 Final Investment Policy Statement; CALLAN_NTWD0004626-632 | 98 |
| Exhibit 18 | 1.19.2017 Email Re: Callan Update - IPS; CALLAN_NTWD0007791-792 | 98 |
| Exhibit 19 | Fidelity Managed Account Overview; CALLAN_NTWD0008157-184 | 102 |
| Exhibit 20 | 3.9.2017 Email Exchange Re: Follow-Up Nationwide Benefits Investment Committee Presentation; CALLAN_NTWD0000077-78 | 105 |
| Exhibit 21 | 5.19.2020 Email Exchange Re: 2016 Engagement - Follow-Up Questions; CALLAN_NTWD0000255-256 | 124 |
| Exhibit 22 | 5.20.2020 Email Exchange Re: 2016 Engagement - Follow-Up Question; CALLAN_NTWD0007316-7318 | 126 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 23 | 6.17.2020 Email Exchange Re: NSP Guaranteed Rates 1994-2016.xls; CALLAN_NTWD0007307 | 128 |
| Exhibit 24 | 11.18.2016 Email Re: Data Request for Investment Review; CALLAN_NTWD0007833-836 | 130 |
| Exhibit 25 | NSP Guranteed Interest Rates 1994-2020 Quarter 2; CALLAN_NTWD0007308 | 129 |
| Exhibit 26 | NSP Guranteed Rates 1994-2016.xls; CALLAN_NTWD0007837 | 131 |

THE VIDEOGRAPHER: Good morning. We are going on the record at 11:10 a.m. on February 1, 2023.

Please note the deposition is being conducted virtually. The quality of recording depends on the quality of the camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Brianne Weymouth, taken by counsel for the plaintiff, in the matter of Ryan Sweeney, et al, versus Nationwide Mutual Insurance Company, et al., filed in the United States District Court for the Southern District of Ohio, Eastern Division, Case No. 2:20-cv-01569.

My name is Justin Henricksen, representing Veritext. I'm the videographer. The court reporter is Deanna Amore from the firm Veritext.

I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to the

proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearance and affiliation for the record beginning with the noticing attorney.

MR. SUTTER: Good morning. My name is Daniel Sutter. I am counsel for plaintiffs, from Cohen, Milstein, Sellers & Toll. I am joined by my colleagues Kai Richter and Eleanor Frisch.

MR. LIPPS: Jeff Lipps, Carpenter Lipps & Leland, representing the defendants, and I'm joined with my colleagues Michael Beekhuizen and Joe Kunkel.

MR. MILLER: Evan Miller, Jones Day, Washington DC. I'm also co-counsel for the defendants.

Ali, why don't you introduce yourself?

MS. SCHILL: Sure. Alexandra Schill, with Jones Day, counsel for defendants.

MS. MORGAN: Good morning. This is Amanda Morgan with DLA Piper. I represent Callan and the witness, Ms. Weymouth.

MR. LIPPS: I would also like to note for the record that we have an in-house counsel from

Nationwide, Joseph Schleppi, on the phone as well or on the video as well.

THE VIDEOGRAPHER: Thank you.

Will the court reporter please swear in the witness?

(Whereupon, the witness was duly sworn.)

THE STENOGRAPHER: Thank you.

You may proceed.

BRIANNE WEYMOUTH,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SUTTER:

Q. Good morning, Ms. Weymouth. And I guess my first question is I want to make sure I am pronouncing your name correctly. It's Brianne Weymouth?

A. Yes, that's correct.

Q. Thank you. I didn't want to botch that throughout the course of the day. Thank you for joining us today.

Can you please start by just stating your full name for the record?

A. Brianne Weymouth.

Q. And what's your current work address?
A. 120 North LaSalle, Suite 2400, Chicago, Illinois 60602.
Q. Thank you.
Have you ever been named as a defendant in a lawsuit before?
A. No.
Q. Have you ever participated in a deposition before?
A. No.
Q. Have you ever testified at trial before?
A. No.
Q. Okay. Because you've not participated in a deposition before, I'm just going to go over some instructions so that we can hopefully get through this quickly and efficiently today.
A deposition is similar to testifying in a court of law. The court reporter will transcribe my questions, your responses, and any objections counsel raises. The videographer will record the same.
You've taken an oath to answer truthfully under penalty of perjury. If, throughout the course of the day, you don't understand or hear my questions, please just let me know, and I will

either repeat or try to rephrase it.

To help the court reporter get a clear record of our conversation, please wait for me to complete my question before you start answering, and I will try to avoid talking over you as well.

When answering questions, please speak slowly and audibly. The court reporter can't pick up nonverbal cues like head nods.

For today's deposition, because we are doing this virtually, I'll ask for you to please refrain from using any text or communication functions like Teams chat or Zoom chat or text message during the course of the deposition.

And, finally, this isn't a marathon. If at any point you need a break, please just let me know, and we can go off the record. The only caveat is that we cannot break when there's a question pending. So you will need to respond to any pending question before we're able to go off the record.

With that, is there -- are you aware of any reason why today's deposition should not go forward?

A. No.

Q. Okay. Thank you.

So can you please describe what educational degrees you hold?
A. I have a bachelor of arts in economics and a master's of business administration.
Q. Where did you receive your bachelor's from?
A. Ohio University.
Q. And where did you receive your master's?
A. University of Chicago.
Q. Do you have any professional certifications?
A. Yes.
Q. What professional certifications do you hold?
A. The CAIA, chartered alternative investment analyst designation.
Q. Can you just describe what the CAIA certification does?
A. It provides additional education and knowledge about alternative investments.
Q. And you're currently employed by Callan; is that right?
A. Yes.
Q. How long have you worked with Callan?
A. 11 years.

Q. What's your current title?
A. Senior vice president.
Q. How long have you held the title of senior vice president?
A. About seven years.
Q. About seven years.
A. I'd have to double-check for sure but...
Q. More than five years?
A. Yes.
Q. Okay. And are you currently a shareholder at Callan?
A. Yes.
Q. In your role as senior vice president, are there any employees that report directly to you?
A. No.
Q. Who is your direct supervisor?
A. Ann O'Bradovich.
Q. What's her title?
A. Senior vice president.
Q. Is she your only supervisor?
A. Yes.
Q. Are you a member of any committees at Callan?
A. Yes.
Q. Which committees are you a member of?

A. Manager search committee.
Q. And what does the manager search committee do at Callan?
A. We review all of the manager searches that are conducted on behalf of our clients.
Q. And what do you mean by "manager searches"?
A. When our clients participate in a search to identify a new investment manager, that's what a manager search is.
Q. So it's a committee that assists clients who are looking for a new investment manager; is that correct?
A. We provide input to our colleagues who are conducting the manager searches on behalf of clients.
Q. And you're referring to colleagues within Callan; is that right?
A. Correct.
Q. Are you a member of any other committee at Callan besides the manager search committee?
A. No.
Q. Other than the senior vice president, have you held any other roles or positions at Callan?
A. Yes.

Q. What other roles or positions have you held at Callan?
A. Vice president.
Q. And was that your only other position prior to senior vice president?
A. Yes.
Q. Did you have any jobs prior to joining Callan?
A. Yes.
Q. Which jobs did you have prior to joining Callan?
A. I started my career at Marquette Associates as a research analyst.
Then I went to a firm called Richards & Tierney. I was a performance analyst at that firm.
And then I went to a firm called PNC Capital Advisors, served as a vice president of consultant relations.
Q. And is it fair to say that all of these positions have dealt with the financial services industry?
A. Yes.
Q. Did you do anything to prepare for today's deposition?

A. Yes.
Q. What did you do to prepare for today's deposition?
A. I met with my counsel.
Q. And your "counsel," you're referring to Ms. Morgan?
A. Yes.
Q. Did you speak with any other counsel besides Ms. Morgan in preparation for today's deposition?
A. No.
Q. Did you review any documents in preparation for today's deposition?
A. Yes.
Q. Did you select the documents that you reviewed for -- in preparation for today's deposition?
A. No.
Q. Did your counsel select the documents that you reviewed?
A. Yes.
Q. Do you know what a Bates label is?
A. No.
Q. A Bates label is a unique identifier that attorneys put on a document that they produce in

litigation. It's usually a string of numbers and letters in the bottom right-hand corner of a document. In this case documents were produced to plaintiffs in this matter with a Bates label that was Callan_NTWD with a bunch of numbers following that.

Do you recall whether the documents that you reviewed had a Bates label on them or not?

A. Yes.

Q. Other than your counsel, did you speak with anyone to prepare for today's deposition?

A. No.

Q. About how long did you prepare with your counsel, Ms. Morgan?

A. About three hours.

Q. Was this in one preparation session, or was this over the course of multiple days?

A. In one session.

Q. And did the session take place virtually, or did you meet in person?

A. Virtually.

Q. Did you speak with anyone from Nationwide about today's deposition?

A. No.

Q. To your knowledge, did anyone at Callan

speak to any Nationwide employees about today's deposition?
A. No.
Q. To your knowledge, did your counsel speak to any employees from Nationwide or their counsel about today's deposition?
MS. MORGAN: Objection. Calls for attorney-client privileged communications.
Instruct the witness not to answer.
BY MR. SUTTER:
Q. Are you following your attorney's advice not to answer that question for attorney-client privilege?
A. Yes.
Q. Okay. To your knowledge, have Callan and Nationwide entered into a common interest agreement relating to this case?
MS. MORGAN: Objection. May call for attorney-client privileged information. If she has that information outside of communications with counsel, she can answer. Otherwise, I instruct her not to answer if it's information from attorneys.
BY MR. SUTTER:
Q. Let me rephrase that question then.
Are you aware from a source other than

your attorneys whether Callan and Nationwide have entered into a common interest agreement relating to this case?

A. I don't know.

Q. Okay. You understand that neither you nor Callan are defendants in the case this deposition concerns; correct?

A. Yes.

Q. And you understand that you are here as a third party pursuant to a subpoena we served through your counsel; correct?

A. Yes.

Q. And you're aware that the subpoena was issued in connection with a case titled Sweeney versus Nationwide Mutual Insurance Company in the Southern District of Ohio; correct?

A. Yes.

Q. In your understanding, what does this case captioned Sweeney versus Nationwide concern?

A. My understanding is it concerns the usage of the Guaranteed Fund in the 401(k) plan.

Q. And the 401(k) plan you just mentioned is called the Nationwide Savings Plan; correct?

A. Yes.

Q. I'm going to be discussing the Nationwide

Savings Plan throughout the day. So to save us some time, I'll be refer to that as "the Plan." Will you understand what I'm referring to?

A. Yes.

Q. And you also mentioned the Guaranteed Fund. Can you please describe -- well, actually, strike that question.

Are you familiar with what the Guaranteed Fund is?

A. Yes.

Q. As you understand it, can you please describe the investment option the Guaranteed Fund is?

A. Yes, the Guaranteed Fund is a capital preservation option that provides participants with a return with little to no risk of loss.

Q. Is it your understanding that the Guaranteed Fund is backed by a group annuity contract issued by Nationwide Life Insurance Company?

A. Yes.

Q. Have you ever described the Guaranteed Fund as a capital preservation fund before or -- actually, strike that. That was going to be a confusing question.

Is it fair to describe the investment category in which the Guaranteed Fund falls the capital preservation category?
MR. LIPPS: Objection to form.
MS. MORGAN: Join.
THE WITNESS: Could you repeat the question?
BY MR. SUTTER:
Q. Sure. That was very poorly stated. You know what, strike that question altogether. That's all right.
Callan currently provides investment consulting services to Nationwide with respect to the Plan; correct?
A. No.
Q. How would you describe the relationship between Nationwide and Callan?
A. Nationwide is a project client. So they hire Callan when they would like us to conduct projects for them.
Q. So the nature of your relationship is a project-by-project basis?
A. Yes.
Q. Okay. To the best of your knowledge, how long has Callan been providing project-based services to Nationwide?

A. On and off for 15 years.
Q. To your understanding, did that relationship start in about 2008?
A. Yes.
Q. And how long have you been working on the Nationwide savings plan engagement?
A. About seven or eight years.
Q. What role do you play with respect to the Nationwide engagement?
A. I am a generalist consultant, and I manage the relationship between Nationwide and Callan.
Q. What do you mean when you say you "manage the relationship between Nationwide and Callan"?
A. I'm the single point of communication between Nationwide and Callan. I facilitate the project work that we do for Nationwide along with my specialist colleagues who are focused on the specific areas of the work that we provide.
Q. So you facilitate the relationship between Nationwide and specialist colleagues within Callan to complete a particular project?
MR. LIPPS: Objection. Asked and answered. Also form.
MS. MORGAN: Objection. Misstates prior testimony.

BY MR. SUTTER:

Q. Would you like me to restate -- repeat the question?

A. Yes, please.

Q. Just so I understand correctly, in your role, you facilitate the relationship between Nationwide and your specialist colleagues at Callan to complete projects for which Callan is hired?

MR. LIPPS: Same objection.

MS. MORGAN: Same objections.

THE WITNESS: Yes.

BY MR. SUTTER:

Q. Okay. And you mentioned specialist colleagues. Can you identify which specialist colleagues you are referring to?

A. Yes. So Ben Taylor; James Veneruso; Patrick Wisdom; and Jamie McAllister; and while she's no longer with Callan, Lori Lucas also assisted on projects in the past.

Q. And do the five individuals you named here each have a unique specialty that they assist with?

A. Sort of, yes. They each have areas that they focus, but they are all considered defined contribution specialists at Callan.

Q. Okay. You mentioned a James Veneruso.

Does he have a particular specialty that he uses to support the Nationwide engagement?

A. So he no longer works with Callan, but, yes, he was responsible for certain projects that we did.

Q. Does Ben Taylor also have a specialty that he uses to assist the Nationwide engagement?

A. Can you define "specialty"?

Q. Yeah, so I'll take a step back.

You referred to these five colleagues as specialist colleagues. So I guess the question I'm trying to ask is in what fields or topics they are specialists.

So I guess if we can go back to James Veneruso or, actually, the first foundational question I'd like to ask is when you're referring to "specialists" in this context, what are you referring to?

A. I am referring to colleagues who focus on one particular area of expertise. So where I work with clients managing client relationships, they work more specifically on what we call the research side or putting together the analysis that will then be presented to our clients.

Q. Okay. That makes sense, and perhaps that

will help my questions make a little more sense as well.

What area of expertise did James Veneruso -- or did James Veneruso have when he was working with the Nationwide engagement?

A. He contributed to the target maturity models presentation, the investment structure evaluation, probably contributed to the fee review as well. He also joined me at the presentation to the committee.

Q. And you referred to a "presentation to the committee." What is this type of presentation you're referring to?

A. For the projects that we completed in 2016 and in 2021, Jimmy and I presented our reports to the committee. So Jimmy was the subject matter expert. I managed the relationship. So the two of us together conducted the presentation in 2016 in person and then the most recent one likely over Zoom.

Q. When you said "Jimmy was the subject matter expert," what subject are you referring to?

A. In general, he was providing all of the defined contribution expertise. So while he focused on certain projects, he could also speak to

everything that we presented, you know, the entire gamut of projects that we completed.

Q. And you mentioned a Ben Taylor. What was his area of expertise?

A. The Guaranteed Fund.

Q. Did he present with you at the meeting in 2016 and 2021 that you referred to?

A. No.

Q. And you mentioned a Patrick -- sorry -- before I move on to my next question.

Is Ben Taylor still an employee at Callan?

A. Yes.

Q. And you mentioned Patrick Wisdom. What is his area of expertise?

A. Patrick assists with the investment fee valuation and the investment structure valuation.

Q. And how did he assist with these valuations?

A. So he completed the work.

Q. When you say "He completed the work," do you mean he put together the materials you used for presentation on those subjects?

A. Yes.

Q. Okay. Is he still an employee at Callan?

A. Yes.

Q. And you also mentioned -- I'm sorry -- my handwriting is terrible. One second, please.
You also mentioned a Lori Lucas; is that right?
A. Uh-huh.
Q. She's no longer at Callan; correct?
A. Correct.
Q. What was her area of expertise?
A. She led the defined contribution team.
Q. When you said "she led," do you mean she was the manager of the team?
A. Yes.
Q. Okay. Are you familiar with the committee within Nationwide called the Benefits Investment Committee?
A. Yes.
Q. I'll be referring to this as the BIC, B-I-C. Will you understand I'm referring to the Benefits Investment Committee when I use the term "BIC"?
A. Yes.
Q. In your understanding, what is the BIC?
A. My understanding is they are the internal committee that oversees the Plan.
Q. Did you work with BIC members during your

time working on projects for Nationwide?
A. No, I only presented the findings to the BIC.
Q. So when you were putting together materials that you presented to the BIC, you did not work with any members of the BIC; correct?
MR. LIPPS: Objection. Argumentative.
THE WITNESS: I don't think so.
BY MR. SUTTER:
Q. To your understanding, did the BIC hold periodic meetings?
A. I would have to speculate because I only presented at one meeting but yeah.
Q. So the only time where you attended a meeting with the BIC was when you made a presentation?
A. Yes.
Q. Okay. So you did not attend any meetings at which you were not making a presentation; is that correct?
MR. LIPPS: Objection. Asked and answered.
MS. MORGAN: Join.
THE WITNESS: Yes.
BY MR. SUTTER:
Q. And did you interact with any employees at

Nationwide in order to put together the materials that you presented to the BIC?

MS. MORGAN: Objection. Asked and answered.

THE WITNESS: Yes.

BY MR. SUTTER:

Q. Which employees of Nationwide did you work with to put together the materials that you presented to the BIC?

A. Rob Watts.

Q. Anyone else?

A. He was the main person, the main point of contact. I know other folks sent us email information, but Rob was the main contact.

Q. So when you were communicating with Nationwide about a project, you generally went through Rob Watts?

A. Yes.

Q. I'm going to be introducing an exhibit. This will be Plaintiffs' Exhibit No. 1.

(Whereupon, Exhibit 1 was marked for identification.)

BY MR. SUTTER:

Q. And it should now be in your folder. If you could please open it up and let me know when you have it up.

A. I have it up.
Q. Okay. Plaintiffs' Exhibit 1 is a document with the Bates label CALLAN_NTW0002192 and is titled "Master Consulting Agreement."
Do you see that?
A. Yes.
Q. Have you seen this document before?
A. Maybe, yeah.
Q. Do you know what a master consulting agreement is generally?
A. Yes.
Q. What is a master consulting agreement?
A. It's a contract between a client and a consultant.
Q. Do you know who the counterparties to this master consulting agreement are?
MS. MORGAN: Objection. Lack of foundation.
THE WITNESS: Yes.
BY MR. SUTTER:
Q. And who are they, in your understanding?
A. Callan Associates and Nationwide Mutual Insurance Company.
MR. LIPPS: Just note for the record that I think she's just reading it. I want it to be established as such.

BY MR. SUTTER:
Q. And if you look at Provision 1.1 of this agreement, it states that the "Supplier shall perform services specifically described in the orders agreed to in writing and signed from the parties from time to time" -- and in parenthesis -- "(each, an 'Order'), together with any other services described in this agreement (collectively, the 'Services')."
Do you see that?
A. Yes.
Q. In your understanding, do the orders listed here refer to the projects that you described earlier?
A. That's my understanding, yes.
Q. Okay. So, generally, if a client was to request that you perform a project, they would submit an order pursuant to the master consulting agreement. Is that your understanding?
MR. LIPPS: Objection to form.
MS. MORGAN: Join.
THE WITNESS: As an attorney, I don't know that I can comment on the process with respect to placing an order.

BY MR. SUTTER:
Q. Okay. I'll strike that question and rephrase it.
When you are asked to perform a project for a client, do they enter into a separate agreement with Callan requesting that project?
MS. MORGAN: Objection. Form. Overbroad.
THE WITNESS: Yes.
BY MR. SUTTER:
Q. I'm going to be entering another exhibit.
(Whereupon, Exhibit 2 was marked for identification.)
BY MR. SUTTER:
Q. Plaintiffs' Exhibit No. 2 should be in your Marked Exhibits folder. Please let me know when you have that up.
A. I have it.
Q. Plaintiffs' No. 2 is an exhibit with Bates stamp CALLAN_NTW0008074, and the title is "Order 1." Do you see that?
A. Yes.
Q. Have you seen this document before?
A. Yes.
Q. In your understanding, what is this document?

A. My understanding is that this is a contract between Callan and Nationwide to provide services to Nationwide.
Q. Okay. And if you'd please scroll to the second page of this exhibit. Is that your signature there?
A. Yes.
Q. And if you'd please scroll down to the next page, the third page of Plaintiffs' Exhibit 2, there is Exhibit A titled "Statement of Work Between Nationwide Mutual Insurance Company and Callan, LLC for Defined Contribution Consulting."
Do you see that?
A. Yes.
Q. Was this statement of work prepared by you?
A. Yes.
Q. If you please scroll down to the fifth page of Plaintiffs' Exhibit 2, it's got a little Bates stamp in the bottom ending in 8078. There's a section titled "1.2 Scope of Work - Project Description."
Do you see that?
A. Yes.
Q. Is it your understanding that this section

describes the investment review and analysis Nationwide was hiring Callan to perform on behalf of the Nationwide Savings Plan?

A. Yes.

Q. Who defined the scope of work that is set forth in the Section 1.2 of this 2019 statement of work?

A. I'm sorry. Could you repeat that?

Q. Sure.

Who defined the scope of work that is set forth in Section 1.2 of this statement of work?

A. So we received -- Callan received an RFP, request for proposal, from Nationwide requesting these items, and I put together this scope of work project description based on the services requested in that request for proposal.

Q. Okay. So just so I understand correctly, you received an RFP from Nationwide in approximately 2019. In response to that, you prepared this statement of work?

A. Yes.

MR. LIPPS: Objection to form. Foundation.

MS. MORGAN: Join.

THE WITNESS: Yes.

BY MR. SUTTER:
Q. Okay. And if you'd scroll down to -- it's actually on this page. Under "Project Execution Approach," that's Section 2, it states "Callan will perform work on project deliverables." This "includes internal review via our defined contribution committee which incorporates input from 12 senior consultants at Callan."
Do you see that?
A. Yes.
Q. What is the defined contribution committee referred to here?
A. Similar to the manager search committee that I serve on, Callan also has a committee called the defined contribution committee. It's made up of, at the time, 12 senior consultants. They review all of the work that we do for our clients related to defined contribution plans.
Q. Are you a member of this committee?
A. No.
Q. In connection with the work you performed pursuant to this statement of work, did you receive input from Callan's defined contribution committee?
A. Yes.
Q. On the next page of Plaintiffs' Exhibit 2,

this Bates stamp ending in 8079, there's a section entitled "4.1 Customer Responsibilities."
Do you see that?
A. Yes.
Q. In your understanding, is Nationwide Mutual Insurance Company the customer described here?
A. Yes.
Q. And pursuant to this statement of work, one of Nationwide Mutual's responsibilities included providing Callan with all documents and data that you requested; correct?
A. Yes.
Q. Introducing another exhibit.
(Whereupon, Exhibit 3 was marked for identification.)
BY MR. SUTTER:
Q. Plaintiffs' Exhibit 3 should now be in your Marked Exhibits folder. Please let me know when you have it up.
A. I have it.
Q. Plaintiffs' Exhibit 3 is an email from you to Robert Watts with the Bates stamp CALLAN_NTW0007820. Do you see that?
A. Yes.

Q. Do you have any reason to believe this is not a true and correct copy of an email chain between you and Robert Watts?
A. No.
Q. And the subject line of this email is "Callan DC Project Timing." Do you see that?
A. Yes.
Q. To the best of your knowledge, is the Callan DC project referred to here the consulting project described in the 2019 statement of work that we reviewed at Exhibit 2?
A. Yes.
Q. Please scroll to the top of the second page. There is an email from February 10, 2020, from you to Robert Watts, in which you stated "Here is the initial request that we sent."
Do you see that?
A. Yes.
Q. And is it your understanding that this -- you were making a request here regarding the Guaranteed Fund in the Nationwide Savings Plan?
A. Yes.
Q. And Item 5 of this request is "Spread or target spread if available." Do you see that?
A. Yes.

Q. What is a spread as used here?
A. So a spread refers to the rate of return of the underlying assets of the fund minus the rate of return paid out to participants incorporating operating costs.
Q. You referred to "operating costs." What are you referring to here?
A. Just the costs to manage a portfolio related to trading, et cetera, that sort of thing.
Q. And you also mentioned a "target spread" in this Item 5. What is a target spread?
A. I don't know.
Q. Did you prepare this list with the input of any individuals at Callan?
A. Yes.
Q. Who from Callan helped you put this list together?
A. Ben Taylor.
Q. And you mentioned before his area of expertise was the Guaranteed Fund?
A. Yes.
Q. This email also requested a crediting rate formula. Do you see that in Item 6?
A. Yes.
Q. What is a crediting rate formula?

A. I don't know -- I don't know exactly what they're asking for with that.

Q. And this Item 6, would that have been put together with help from Ben Taylor?

A. Yes.

Q. Is there anyone else from Callan who would have helped you put this list together?

A. No.

Q. Okay. Following this request on February 10, 2022, did Robert Watts provide you with the crediting rate formula for the Guaranteed Fund?

A. I'm not sure off the top of my head. I'd have to look back to see. I don't think so.

Q. Following this request, did Robert Watts ever provide you details about the spread or target spread for the Guaranteed Fund?

A. No.

Q. Following this request, did anyone from Nationwide provide you with details about the spread or target spread for the Guaranteed Fund?

A. No.

Q. Okay. I'll be entering another exhibit.

(Whereupon, Exhibit 4 was marked for identification.)

BY MR. SUTTER:

Q. Plaintiffs' Exhibit 4 should now be in your Marked Exhibits folder, and please let me know when you have it up.
A. I have it.
Q. This is a presentation titled "Guaranteed Fund Review" dated May 2022 -- 2020. My apologies.
Do you see that?
A. Yes.
Q. Have you seen this presentation before?
A. Yes.
Q. To your understanding, was it prepared pursuant to the 2019 statement of work that we reviewed at Exhibit 2?
A. Yes.
Q. Who prepared this presentation?
A. Ben Taylor and Patrick Wisdom.
Q. Were you involved in the preparation of this presentation?
A. I reviewed the presentation.
Q. Did you do anything else to help prepare this presentation?

A. No.
Q. Did you provide this May 2020 Guaranteed Fund review to employees of Nationwide?
MR. LIPPS: Objection. Form.
THE WITNESS: I'm not sure. I just can't remember if we sent it to them or not.
BY MR. SUTTER:
Q. I'm going to introduce another exhibit.
(Whereupon, Exhibit 5 was marked for identification.)
BY MR. SUTTER:
Q. It should be in -- Plaintiffs' Exhibit 5 is in the Marked Exhibits folder. Please let me know when you have it up.
A. I have it.
Q. And Plaintiffs' Exhibit 5 is an email -- includes an email on the bottom of the first page from you to Robert Watts, dated April 29, 2020, and the subject matter is "Callan Project Deliverables."
Do you see that?
A. Yes.
Q. If you scroll up to the top, there are attachments that Robert Watts forwarded to Allen Stalnaker. Do you see that?

A. Yes.
Q. And one of those attachments is Nationwide Guaranteed Review.2020.pdf. Do you see that?
A. Yes.
Q. Does this refresh your recollection about whether you sent the 2020 Guaranteed Fund review to employees of Nationwide?
MR. LIPPS: Objection to form.
MS. MORGAN: Join.
THE WITNESS: Yes.
BY MR. SUTTER:
Q. So I'll just ask my question again.
Did you provide the 2020 Guaranteed Fund review to employees of Nationwide?
A. Yes.
Q. And you mentioned earlier that you presented -- let me strike that and rephrase.
You mentioned before you made presentations to employees of Nationwide; correct?
A. Yes.
Q. And specifically you made presentations to the BIC; is that right?
A. Yes.
Q. Did you present this Guaranteed Fund

review to the BIC?
A. No.
Q. Did you present it to anyone?
A. We may have discussed it with Rob Watts.
Q. What did you discuss with Rob Watts regarding this presentation?
A. I don't remember the exact call that we had, but if I sent these -- per this email I sent these deliverables, I asked to set up a time. We may have had a phone call to discuss all of the deliverables to get feedback.
Q. Do you recall having a phone call with Rob Watts about these deliverables?
A. I don't recall the exact phone call, no.
Q. Do you recall generally discussing this presentation with Rob Watts?
MS. MORGAN: Objection. Asked and answered.
MR. LIPPS: Same objection.
THE WITNESS: I don't remember exactly what the calls -- what we discussed on each call.
BY MR. SUTTER:
Q. You don't recall one way or the other whether you discussed this presentation with Rob Watts?
A. Correct.

Q. If could you, please, return back to Plaintiffs' Exhibit 4.
A. Okay.
Q. On the second page of the presentation -- it's internally paginated 1 -- there's a slide titled "Guaranteed Fund Overview."
Do you see that?
A. Yes.
Q. And it states "Callan evaluated the suitability of the Guaranteed Fund" in the third bullet. Do you see that?
A. Yes.
Q. What -- do you know what was meant by "suitability" in this bullet point?
MS. MORGAN: Objection. Lack of foundation.
MR. LIPPS: Same objection.
THE WITNESS: Yes. Whether the Guaranteed Fund is an appropriate investment for a 401(k) plan.
BY MR. SUTTER:
Q. Did you discuss the suitability of the Guaranteed Fund with either Patrick Wisdom or James Veneruso?
A. Yes.
Q. Do you recall what you discussed with them?

A. I don't remember exact conversations, but when we prepared investment structure review, we did discuss whether the Guaranteed Fund fit -- where it fit within the Plan, in the Plan lineup.

Q. And do you recall -- strike that question.

The three bullet points that were under -- within this Bullet 3, it states "To evaluate the suitability of the Guaranteed Fund, we have pursued the following steps," and then it lists three bullet points. Do you see that?

A. Yes.

Q. Who selected the three steps that are specified here to evaluate the suitability of the Guaranteed Fund?

A. Ben Taylor.

Q. Ben Taylor.

Did you talk to Mr. Taylor about why he selected these steps to evaluate the Guaranteed Fund?

A. No.

Q. Did you speak with Mr. Taylor when he was preparing this presentation -- strike that.

To your understanding, did Mr. Taylor evaluate the investment characteristics and the performance of the investment option in connection

with this presentation?
A. Yes.
Q. To your understanding, did Mr. Taylor evaluate the spread and the fees of the Guaranteed Fund in connection with this presentation?
A. He did not.
Q. When you said "he did not," is it your understanding that he was not -- he did not because he did not have a line of sight into the fees and spread for the Guaranteed Fund?
MS. MORGAN: Objection.
(Simultaneous speaking.)
MR. LIPPS: Objection. Leading.
THE WITNESS: Yes.
BY MR. SUTTER:
Q. Did you discuss --
MS. MORGAN: My objection was leading on the last question. It didn't make it into the record correctly.
MR. LIPPS: I had an objection as to form which was leading as well.
BY MR. SUTTER:
Q. Do you know why Mr. Taylor did not evaluate the fees and spread for the

Guaranteed Fund?
A. Yes.
MR. LIPPS: Objection. Foundation.
MS. MORGAN: Join.
BY MR. SUTTER:
Q. Why did Mr. Taylor not evaluate the fees and spread of the Guaranteed Fund in connection with the May 2020 Guaranteed Fund review presentation?
MR. LIPPS: Same objection. Also potentially hearsay depending on the answer.
MS. MORGAN: Join.
THE WITNESS: Can you repeat the question?
MR. SUTTER: Sure.
And I'll also ask Mr. Lipps if you please refrain from speaking objections. You can note your form objections for the record.
BY MR. SUTTER:
Q. So my --
(Simultaneous speaking.)
MR. LIPPS: Form.
BY MR. SUTTER:
Q. So my question was why did Mr. Taylor not evaluate the fees and spread of the Guaranteed Fund in connection with the May 2020 Guaranteed Fund

review presentation?
MR. LIPPS: Objection. Form and foundation.
MS. MORGAN: Join.
THE WITNESS: We were not provided with that information.
BY MR. SUTTER:
Q. Okay. If you'd please scroll to the last page of this exhibit. There is a bullet point at the bottom that says "Importantly, fees are not reflected in this analysis."
Do you see that?
A. Yes.
Q. Did you discuss this bullet point with Mr. Taylor when he was putting together this presentation?
A. Yes.
Q. Based on your discussions with Mr. Taylor, do you understand why he put this bullet point in the presentation?
A. Yes.
Q. In your understanding, why did Mr. Taylor put this bullet point in this presentation that it stated that "Fees are not reflected in this analysis"?
A. We were not provided with that

information.
Q. Okay. We'll be turning to another exhibit in just a moment.
A. Would it be possible to take a break?
Q. Sure. That's fine.
MR. SUTTER: How about we go off the record?
THE VIDEOGRAPHER: We are going off the record at 12:11 p.m. This is the end of Media Unit 1.
(A short break was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 12:22 p.m. This is the beginning of Media Unit 2.
BY MR. SUTTER:
Q. Welcome back. While we were off the record, your counsel indicated that you wanted to amend one of your responses to provide a more fulsome answer to a question I had asked.
A. Yes.
I did have an additional meeting with my counsel to prepare for this deposition.
Q. Okay. When did that meeting take place?
A. Yesterday.
Q. How long did that last?
A. 30 minutes.
Q. Okay. Was there anything else that you

wanted to add at this point?
A. No.
Q. All right. Thank you.
So before we went off the record, we were talking about the May 2020 Guaranteed Fund review presentation; correct?
A. Yes.
Q. And you had testified that you did not ultimately make that presentation to the BIC; right?
A. Yes.
Q. Do you know why that presentation ultimately was not provided to the BIC?
A. Nationwide requested that we not make the presentation.
Q. Who from Nationwide made that request?
A. Rob Watts.
Q. Do you recall when he made that request to you?
A. I don't recall the exact date.
Q. Do you recall whether it was in early -- strike that.
Do you recall whether it was in early 2020?
A. It would have been -- I would have to look

at emails to determine the time of the request.

Q. Did he make this request to you over email?

A. No.

Q. How -- did he make the request to you over phone?

A. Yes.

Q. Okay. All right. So I'm going to be entering a new exhibit, which will be Plaintiffs' Exhibit 6.

(Whereupon, Exhibit 6 was marked for identification.)

BY MR. SUTTER:

Q. All right. So Plaintiffs' Exhibit 6 should be in your Marked Exhibits folder. Please let me know when you have that up.

A. I have it up.

Q. All right. Thank you.

So Plaintiffs' Exhibit 6 is a document with Bates stamp ending in 1884, and it is titled "Nationwide Savings Plan Investment Structure Evaluation" dated May 2020.

Do you see that?

A. Yes.

Q. Have you seen this presentation before?

A. Yes.
Q. What is it?
A. It's our investment structure evaluation.
Q. And what is an investment structure evaluation?
A. This is when we look at the options offered in a 401(k) and analyze the lineup and provide feedback to clients on their lineup and any changes they could consider.
Q. And just so I make sure I have this right, by "lineup," you're referring to the investment options that are available for plan participants to select in a plan?
A. Yes.
Q. Okay. To your understanding, was this presentation prepared pursuant to the 2019 statement of work that we reviewed at Exhibit 2?
A. Yes.
Q. Did you provide this presentation to anyone from Nationwide?
A. Yes.
Q. To whom did you provide it?
A. So I likely -- I assume I sent this to Rob Watts. Based on the date of May 2020, I also think this is likely a draft that we put together

prior to the final presentation.
Q. What makes you think it's a draft?
A. Because I recall that the meeting was originally supposed to take place in May 2020, but due to COVID restrictions, I think it was pushed back.
Q. Do you recall how far into the future it had been pushed from May 2020?
A. I don't.
Q. Okay. Did you present an investment structure evaluation to the employees of Nationwide in May 2020?
MS. MORGAN: Objection. Form.
THE WITNESS: I -- go ahead.
BY MR. SUTTER:
Q. I was going to actually rephrase my question. It was likely confusing in light of your prior testimony.
So just so I understand, you did not present this to the BIC in May 2020; is that correct?
MR. LIPPS: Objection. Asked and answered.
THE WITNESS: That's my recollection.
BY MR. SUTTER:
Q. Okay. Were you involved in the

preparation of the investment structure evaluation here?

A. Yes.

Q. What was your involvement in its preparation?

A. I would have provided input on some of the alternative lineup that we put out for consideration.

Q. Did any other Callan employees assist in the preparation of this investment structure evaluation?

A. Yes.

Q. Which employees of Callan?

A. Jimmy Veneruso and Patrick Wisdom.

Q. Did anyone from Nationwide help you put together this presentation?

A. No.

Q. I'm going to please direct your attention to -- it's going to be the 21st page of Plaintiffs' Exhibit 6. Make sure I have it right. I'm sorry. It's the internally paginated 21. It's the 22nd page of the PDF, and it's got a Bates stamp that ends in 1905.

MR. LIPPS: So page 22?

MR. SUTTER: Yeah. If you look at the little

scroll bar in the bottom of the window, it's 22 of 46, but the internal page number is 21.
MR. LIPPS: I got it. It says "Core Options - Capital Preservation"?
MR. SUTTER: That's the page.
MR. LIPPS: Thank you.
BY MR. SUTTER:
Q. Have you navigated to that?
A. Yeah.
Q. Great. Thank you.
Okay. So this slide is titled "Tier II Core Options - Capital Preservation." Do you see that?
A. Yes.
Q. Is it your understanding that the Guaranteed Fund is a capital preservation-type investment option?
A. Yes.
Q. Okay. In the first bullet, it states that "The Nationwide Guaranteed Fund is a fixed account product without an explicit fee; rather, the provider retains a portion of the investment gains and credits the rest to the participants."
Do you see that?
A. Yes.

And I'd like to point out that this was never presented to the Nationwide BIC. This was an internal draft that we had worked on.
Q. Why did you not present this version of the investment structure evaluation to the BIC?
A. We were asked to remove certain Guaranteed Fund portions of our presentation.
Q. When you say you were "asked to remove," were you asked -- who asked you to remove portions of the presentation?
A. Rob Watts.
Q. Did he make this request to you over the phone?
A. I think so.
Q. Okay. Well, in this draft you had -- sorry. I lost my page. Give me one moment. Okay. I'm sorry.
In the next major bullet it states that "The Guaranteed Fund most recently credited 3.1 percent." Do you see that?
A. Yes.
Q. And under that there are three bullet points, the middle of which is "Fee Transparency." Do you see that?
A. Yes.

Q. It states here "There was a lack of certainty and transparency regarding fees." What did you mean by a "lack of certainty regarding fees"?

MR. LIPPS: Objection. Foundation.

THE WITNESS: So what we're trying to convey here is the difference between explicit fees and spread products.

BY MR. SUTTER:

Q. And it's your understanding that the Guaranteed Fund is a spread product; correct?

A. Yes.

Q. Where did you gain that understanding?

A. Because it's a Guaranteed Fund, and that's how these types of vehicles operate.

Q. It's your understanding that guaranteed funds typically operate as a spread product?

MR. LIPPS: Objection to form.

THE WITNESS: Yes.

BY MR. SUTTER:

Q. So the comment here about a lack of transparency regarding fees relate to this being a spread product. Is that --

A. Yes.

Q. And you had requested from Nationwide

information regarding the fees associated with the Guaranteed Fund; correct?

A. We requested the spread.

Q. And it's your understanding that the spread -- the amount of spread are the fees that you're referencing in this bullet point?

MR. LIPPS: Objection. Form. Mischaracterization.

THE WITNESS: There's a distinction between spread and fee. So we requested spread.

BY MR. SUTTER:

Q. Okay. And what's the distinction in your understanding?

A. So fees are collected regardless of -- fees are specified, and they're automatically collected. As I mentioned earlier, when I mention "spread," the spread is the difference between the rate of return on the assets minus the rate of return paid to participants.

Q. So with the spread, the amount of fees is variable depending on the rate of return?

A. Yes, spread could be positive or negative.

Q. Did you ultimately discuss the lack of certainty and transparency regarding the fees of the Guaranteed Fund with the BIC either in 2020 or

2021?
A. No.
Q. And you did not discuss the lack of certainty or transparency regarding the fees of the Guaranteed Fund with the BIC after Robert Watts requested that you remove these portions of the investment evaluation?
MS. MORGAN: Objection. Asked and answered.
MR. LIPPS: Same objection.
THE WITNESS: Can you restate that question?
BY MR. SUTTER:
Q. Sure. Sure.

Defendants' Objection 61:13-23
Asked and answered

You did not discuss this -- you did not discuss the lack of transparency or certainty regarding fees of the Guaranteed Fund after Robert Watts requested that you remove this portion of the presentation from the investment structure evaluation?
MS. MORGAN: Objection. Form. Objection. Asked and answered.
MR. LIPPS: Same objections.
THE WITNESS: Did not -- I did not discuss this with the BIC.
BY MR. SUTTER:
Q. On this slide, you also note "Single

counterparty risk." Do you see that?
A. Yes.
Q. What is a single counterparty risk that you're referring to here?
A. Because this is a fixed account product provided by Nationwide, the product is insured or would be guaranteed by Nationwide. So the risk lies completely with Nationwide.
Q. So is this a form of credit risk that you're describing here?
MR. LIPPS: Objection to form.
MS. MORGAN: Join.
THE WITNESS: I'd say insurance risk or counterparty risk.
BY MR. SUTTER:
Q. Okay. There's a green box here titled "Consideration: For the outlined reasons, Callan recommends that the Plan consider capping participants' contributions to the Guaranteed Fund."
Do you see that?
A. Yes.
Q. What did you mean by "capping participants' contributions to the Guaranteed Fund"?

A. That would mean not allowing additional contributions to the fund.
Q. Did you present this recommendation to the BIC in either 2020 or 2021?
A. We did not present it in 2021. I don't know what the presentation from 2016 said.
Q. I'm going to introduce a new exhibit.
(Whereupon, Exhibit 7 was marked for identification.)
BY MR. SUTTER:
Q. Okay. Plaintiffs' Exhibit 7 should now be in your Marked Exhibits folder.
A. I have it.
Q. Okay. This is an email chain from you to Robert Watts dated June 17, 2020, with Bates stamp CALLAN_NTWD000477 [sic]. Do you see that?
A. 8477?
Q. 8477, correct.
A. Yeah.
Q. Thank you.
Do you recall this email?
A. Yes.
Q. In the third email down from the top of this chain, you sent an email to Robert Watts in which you stated, "Do you have a few minutes for a

quick call to discuss the Guaranteed Fund analysis?"
Do you see that?
A. Yes.
Q. Did you ultimately have this call with Robert Watts?
A. I don't know for sure. It looks like I sent a conference line for it. So I would have to make an assumption or speculate.
Q. Do you recall having a discussion with Robert Watts on or around June 17, 2020, about the Guaranteed Fund?
A. We had likely a number of calls as we worked through the project. So I can't remember exactly what was -- what calls I had in June of 2020, nor do I remember what this particular call was about.
Q. Okay. So you mentioned earlier a 2016 presentation. Do you recall that?
A. Yes.
Q. So 2020 was not the first instance where you were asked to review the Guaranteed Fund by Nationwide; is that correct?
MS. MORGAN: Objection. Misstates prior testimony.

THE WITNESS: Sorry. Could you repeat the question?

BY MR. SUTTER:

Q. Sure.

You know what, I think it would be easier if I actually enter a new exhibit. So if you give me one moment, please.

(Whereupon, Exhibit 8 was marked for identification.)

BY MR. SUTTER:

Q. Plaintiffs' Exhibit 8 should now be in your Marked Exhibits folder.

A. I see it.

Q. Okay. This is a document titled "Statement of Work Between Nationwide Mutual Insurance Company and Callan Associates for Defined Contribution Consulting," and it has CALLAN_NTWD0002206.

Do you see that?

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. In your understanding, what is this document?

A. This is the statement of work related to

the project we conducted in 2016 for Nationwide.
Q. Did you prepare this statement of work?
A. Yes.
Q. Was this statement of work also prepared in response to a request for proposal that Nationwide had issued?
A. Yes.
Q. If you'd please scroll down to the fourth page with the Bates stamp ending in 2209.
At the bottom of that page and the top of the next one there's a Section 4.1 entitled "Customer's Responsibilities."
Do you see that?
A. Yes.
Q. In your understanding is Nationwide Mutual the customer described here?
A. Yes.
Q. Pursuant to this statement of work, one of Nationwide Mutual's responsibilities included "Providing all requested documents and data to Callan in a timely manner"; is that correct?
A. Yes.
Q. I'm entering another exhibit.

(Whereupon, Exhibit 9 was marked for identification.)

BY MR. SUTTER:

Q. Plaintiffs' Exhibit 9 should now be in your Marked Exhibits folder. Please let me know when you have it up.

A. I have it.

Q. Great. Thank you.

Plaintiffs' Exhibit 9 is a December 19, 2016, email between you and a Joseph E. Burke with Bates stamp CALLAN_NTWD0000001.

Do you see that?

A. Yes.

Q. Who is Joseph Burke?

A. An employee of Nationwide.

Q. Did he hold -- in your understanding, did he hold a similar role to Robert Watts at this time, 2016?

A. I don't know what his role was. Rob was still at this point in time my point person at Nationwide that I spoke with.

Q. Okay. So in the bottom of this email, you sent -- bottom of this chain, rather, you sent an email to Mr. Burke in which you stated we have a

few additional questions on the Guaranteed Fund.
Do you see that?
A. Yes.
Q. Do you recall why you directed this question at Mr. Burke?
A. He had provided us some other information for the study.
Q. Okay. So he was a previous point of contact for materials relating to Callan's review of the Guaranteed Fund; is that right?
MR. LIPPS: Objection to form.
THE WITNESS: That's my understanding, yes.
BY MR. SUTTER:
Q. And you noted that a few additional questions came out of our committee review. Do you see that?
A. Yes.
Q. What committee review are you referring to here?
A. That's the Callan defined contribution committee review of the project.
Q. Okay. And one of the items -- additional questions that came out of that committee review were whether it was possible to get the spread or average spread declared across the company.

Do you see that?
A. Yes.
Q. Did Nationwide ever provide you the spread or average spread declared against the company for the Guaranteed Fund in response to this request in December of 2016?
A. No. It was -- Nationwide said that -- they did not provide it. It's proprietary to the company.
Q. Who mentioned to you that it was proprietary to the company?
A. I think Rob might have mentioned that. I don't know. I shouldn't say. I can't remember the exact conversation at the time.
Q. So you don't recall with specificity who told you that the spread for the Guaranteed Fund was proprietary to Nationwide?
A. So in 2016 I don't remember who would have said that.
Q. Okay. I'll be entering another exhibit. Bear with me for one moment, please.
(Whereupon, Exhibit 10 was marked for identification.)
MR. SUTTER: I apologize. This one is taking a little bit longer than normal to load. Seems that

the Exhibit Share is frozen. Can we just hop off the record for a minute while I can just make sure there's no technical issue here?

THE VIDEOGRAPHER: Okay. We are going off the record at 12:53 p.m. This is the end of Media Unit 2.

(A short break was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:00 p.m. This is the beginning of Media Unit 3.

(Whereupon, Exhibit 10 was marked for identification.)

BY MR. SUTTER:

Q. Thank you for your patience, and my apologies for the technical difficulty.

But Plaintiffs' Exhibit 10 should now be in your Marked Exhibits folder. Please let me know when you have that up.

A. I have it up.

Q. Thanks. Plaintiffs' Exhibit 10 is a document entitled "Nationwide Defined Contribution Consulting Project" dated February 2017 with Bates stamp CALLAN_NTWD0002312.

Have you seen this presentation before?

A. Yes.

Q. There are six names on the title page of this presentation. Were these the individuals that were involved in preparing this presentation?
A. Yes.
Q. You had mentioned before that you had made a presentation about the Guaranteed Fund in 2016. Were you referring to this presentation?
A. Yes.

Defendants' Objection 71:9-16
Foundation/witness speculating

Q. You provided this presentation to employees of Nationwide in -- at some point; correct?
MR. LIPPS: Objection to form.
THE WITNESS: I assume that this is the presentation, but there were multiple drafts. So I can only assume that this would be -- would have been the final.
BY MR. SUTTER:
Q. So let me rephrase my question, then. You -- did you provide a final version of the Defined Contribution Consulting Project to employees of Nationwide around February 2017?
A. We provided a final presentation. I have to say I don't remember the exact date of the meeting, but it would have been in 2017.
Q. Okay.

A. Yes.
Q. Did you present a final version of a Defined Contribution Consulting Project to Nationwide in 2017?
A. Yes.
Q. To whom did you present it?
A. The BIC.
Q. Were there any other Callan employees with you at that presentation?
A. Yes.
Q. Which employees?
A. Jimmy Veneruso.
Q. Anyone else?
A. No.
Q. Do you recall whether all of the BIC members were present at the meeting at which you presented a final version of this presentation?
A. No, I don't.
Q. Okay. On the eighth slide in this presentation, Plaintiffs' Exhibit 10, there's a summary slide. Do you see that?
A. Yes.
Q. And it states in the final slide -- or I'm sorry -- the final bullet "Importantly, fees are not reflected in this analysis."

Do you see that?
A. Yes.
Q. Do you recall why fees were not reflected in this analysis?
A. We were not provided with the spread.
Q. And you requested that Nationwide provide you the spread for purposes of this presentation; correct?
A. Yes.
Q. If you would, please, scroll to -- I apologize. It's far down -- the 85th page that has Bates stamp ending in 2396. Unfortunately, they don't have an easy way to navigate.
MR. LIPPS: Did you say it's Slide 85 in the presentation?
MR. SUTTER: Yes, Slide 85 ending in Bates stamp 2396. The title of the slide is "Key Functions of a DC Plan Fiduciary."
THE WITNESS: Okay. I have it.
BY MR. SUTTER:
Q. Great.
So on the Slide 85 of Plaintiffs' Exhibit 10, there's a slide that is titled "Key Functions of a DC Plan Fiduciary." Why did you include this slide in the presentation you made to

the BIC?
MS. MORGAN: Objection. Lack of foundation.
THE WITNESS: I think it was just to educate them on the key functions of the DC plan fiduciary.
BY MR. SUTTER:
Q. Was it your understanding that the BIC was a fiduciary to the Nationwide Savings Plan?
MS. MORGAN: Objection. Lack of foundation.
MR. LIPPS: Same objection.
THE WITNESS: Yes.
BY MR. SUTTER:
Q. Did you or -- did you create this list or was it taken from institutional material at Callan?
A. This was taken from material at Callan. I personally did not create this list.
Q. Okay. Are you familiar with the material from which this -- these bullet points came from?
MS. MORGAN: Objection. Form.
THE WITNESS: I'm not sure what I -- what you mean by "the material this came from."
BY MR. SUTTER:
Q. Do you know what the source of these bullet points was?
MS. MORGAN: Objection. Lack of foundation.
THE WITNESS: I would have to say from

something else that Callan put together. So I don't know what the original source outside Callan would have been.

BY MR. SUTTER:

Q. Okay. So I just want to quickly tick through a few of these key areas to see if I -- make sure I understand them.

The second bullet point is to "Apply and periodically review the investment policy statement."

In your understanding, what is an "investment policy statement"?

A. I describe it as the roadmap to understanding the investments and the policy of a plan.

Q. Another bullet point here is to "Review and monitor manager performance." Is it -- in your experience, is it best practices for a fiduciary to regularly review fund performance?

MR. LIPPS: Objection to form to the extent it calls for a legal conclusion.

MS. MORGAN: Same objection.

THE WITNESS: My understanding as an investment consultant is that fiduciaries should review and monitor investment manager performance.

BY MR. SUTTER:
Q. In your experience as an investment consultant, do you understand that -- is it your view that it's best practices for fiduciaries to thoroughly document and review their monitoring process of investment funds?
MR. LIPPS: Objection to form.
MS. MORGAN: Same objection.
THE WITNESS: Yes.
BY MR. SUTTER:
Q. And as part of a review process of investment manager performance, is it typical, based on your experience, for plan fiduciaries to evaluate the performance of a fund against the designated benchmark?
A. Yes.
Q. During your projects -- working projects with the BIC, had you observed the BIC comparing the performance of the Guaranteed Fund against a benchmark?
MR. LIPPS: Objection. Foundation.
MS. MORGAN: Objection. Form.
THE WITNESS: That was not part of our scope with regular investment performance review.

BY MR. SUTTER:
Q. Were you ever requested to compare the performance of the Guaranteed Fund against the benchmark by the Benefits Investment Committee?
A. Yes.
Q. When were you requested to do that?
A. In this review that we provided in 2016-2017 time frame.
Q. Did you identify a benchmark that the BIC could use to compare the performance of the Guaranteed Fund -- strike that.
Did you identify a benchmark that the BIC could use to evaluate the performance of the Guaranteed Fund?
A. I just need a couple minutes to scroll through the presentation.
Q. Uh-huh.
A. Could you repeat the question?
Q. Sure.
Did you identify a benchmark that the BIC could use to evaluate the performance of the Guaranteed Fund?
A. We identified a peer group of investment alternatives, not a benchmark.
Q. And the peer group your -- what is this

peer group that you're referring to?
A. We compared the Guaranteed Fund to the Callan Stable Value peer group.
Q. Okay. So and the -- when you state a Stable Value fund, what are you referring to -- or strike that. Let me rephrase that question.
What type of fund is a Stable Value fund that's included in this peer group that you're referring to?
A. A Stable Value fund is a capital preservation option that is backed by insurance wrap that does not allow the market -- or the NAV to go below 1, and then it also provides a crediting rate.
Q. Is the Guaranteed Fund a Stable Value fund that would be included within this peer group?
A. No.
Q. Do you know why it would not be included within this peer group?
A. So the Stable Value peer group is made up of Stable Value funds that submit data to our database. The Guaranteed Fund is not a Stable Value fund. So it would not be part of that peer group.
Q. So the Guaranteed Fund is different than

the Stable Value funds that are included in the peer group you used for benchmarking; is that correct?
A. Yes.
Q. Okay. And another key area here is to "Monitor and benchmark plan fees." Do you see that?
A. Yes. I'm scrolling back to that page.
Q. I'm sorry. It was page 85. I understand this is an onerous system.
A. It's just loading.
Q. No problem.
A. Okay.
Q. So what does monitoring and benchmarking plan fees involve in your experience?
A. So there's a few different fees that are a part of DC plans. There's the investment manager fees, so the investment options, what they charge, and then there's administration fees for the recordkeeper.
Q. And based on your experience, have you found it prudent to regularly compare provider fees with competitors and document that process?
MS. MORGAN: Objection. Form. Compound.
THE WITNESS: Yes.

BY MR. SUTTER:
Q. Could you please turn to page 89 of the presentation with Bates stamp ending in 2400?
There's a Footnote No. 3 underneath this chart that says "Callan is conducting a separate in-depth analysis of the Nationwide Guaranteed Fund Annuity. See document for further detail."
Do you see that?
A. Yes.
MR. LIPPS: What slide are we on? I'm sorry.
MR. SUTTER: It's Slide 89 with the Bates stamp ending in 2400.
MR. LIPPS: Thank you.
BY MR. SUTTER:
Q. If you please scroll to the top of this document -- I'm sorry for making you jump around a lot. It's much easier in hard copy. So this is page 4 with Bates stamp ending in 2315.
A. Got it. Yes.
Q. So the in-depth analysis of the Nationwide Guaranteed Fund annuity that was referenced in that footnote, does that refer to the overview of the Guaranteed Fund and the analysis that follows in the next four pages?
A. Yes.

Q. Okay. I'm going introduce another exhibit.

(Whereupon, Exhibit 11 was marked for identification.)

BY MR. SUTTER:

Q. Plaintiffs' Exhibit 11 should be in your Marked Exhibits folder.

A. Yes, I see it.

Q. This is a document titled "Managing DC Plan Investments," "A Fiduciary Handbook." I'll represent to you that this was not produced to us by either Callan or a defendant in this matter. It was publicly available, and the metadata indicates that the author is Jackie Hoagland.

Have you seen this document before?

A. Yes.

Q. In what context have you seen it?

A. It's a research piece that Callan produced.

Q. If you please turn to the internal pagination 4. It's the fourth page on the document viewer. It says "ERISA Section 404(c)" at the top.

A. Which page?

Q. So it's the fourth page if you're looking at the scroll bar at the bottom and --

A. Yeah.
Q. So there's a chart in the middle or a section in the middle of this page called "Key Sections of a DC Plan Fiduciary."
Do you see this?
A. Uh-huh.
Q. And there are eight key areas listed here. Do you see that?
A. Yes.
Q. Do you know whether this document is the source of the eight key areas that were included in the 2017 presentation that we referred to earlier?
MS. MORGAN: Objection. Calls for speculation. Lack of foundation.
MR. LIPPS: Also, objection. Foundation.
THE WITNESS: I do believe this would be the source of the information.
BY MR. SUTTER:
Q. Okay. Thank you.
We're going to -- that's the only question I had for that.

Defendants' Objection 82:22-83:8
Foundation

Is it your understanding that Callan reviewed the Guaranteed Fund in 2008?
MR. LIPPS: Objection. Foundation.
MS. MORGAN: Same objection.

THE WITNESS: Yes.
BY MR. SUTTER:
Q. What is the basis of your understanding that there was a review of the Guaranteed Fund by Callan in 2008?
A. When we bid on the project in 2016, I knew at that time that we had done this before for Nationwide.
Q. I am going to be entering a new exhibit, which will be Plaintiffs' Exhibit 12.
(Whereupon, Exhibit 12 was marked for identification.)
BY MR. SUTTER:
Q. Please let me know when you have that up.
A. Okay.
Q. This is a document titled "10-6-08 Scope of DC Plans' investment review project," and it has Bates stamp CALLAN_NTWD0004440.
Do you see that?
A. Yes.
Q. Have you seen this document before?
A. I don't think so. Not that I can remember.
Q. Okay. Prior to you working on the Callan engagement -- I'm sorry -- on the Nationwide

engagement during your time at Callan, do you know the name of any employees who worked with the Nationwide account?

A. Yes.

Q. What were their names?

A. Kevin Dolsen.

Q. Did you work with him at all during your time at Callan?

A. Yes.

Q. Do you recall approximately which years you worked with him at Callan?

A. 2011 to -- he left in 2014 or 2015.

Q. Did you work with him at all on the Nationwide engagement?

A. Not this one, no.

Q. Okay. Did you work with him at all on any Nationwide engagement?

A. No.

Q. Okay. I'll be entering another exhibit.

(Whereupon, Exhibit 13 was marked for identification.)

BY MR. SUTTER:

Q. Plaintiffs' Exhibit 13 should be in your Marked Exhibits folder.

A. I see it.

Q. Plaintiffs' Exhibit 13 is a document titled "Nationwide Guaranteed Fund Supplemental Information," and its Bates stamp is CALLAN_NTWD0003981.
Have you seen this document before?
A. Yes.
Q. In what context have you seen this document?
A. I reviewed this, looked at it at one point either I think as part of understanding what we had done previously for Nationwide.
Q. Do you recall approximately which year you reviewed this?
A. I might have looked at it before the 2015 or 2016 project. We revamped how we did the review after -- since this particular version. So the projects that I worked on were a completely different format.
Q. When you say "revamped," what do you mean by that?
A. My colleague Ben Taylor, who conducted the studies, he wasn't at Callan at the time this was done either, and so when he came over, he brought his expertise. And so when he conducted the projects, he put together a new, you know,

analysis, way, to present that information.
Q. So you revamped the format of the information and how it was presented to the client; is that correct?
MR. LIPPS: Objection. Asked and answered.
THE WITNESS: The format, the information included, and how it was presented.
BY MR. SUTTER:
Q. At the bottom of the first page, it states this document states "The total published fee is 71 basis points. The fee breakdown for this product is as follows," and then there's a table with various information.
Do you see that?
A. Yes.
Q. Do you know where Callan got this data?
MS. MORGAN: Objection. Speculation. Lack of foundation.
MR. LIPPS: Same objections.
THE WITNESS: No, I don't know.
BY MR. SUTTER:
Q. During your time working on the Nationwide engagement, have you spoken to anyone in Callan or Nationwide about this data?
A. No.

Q. All right. I'll be entering another exhibit.

MR. MILLER: This is Evan Miller. While you're doing so, I just wanted to announce that I have to leave the deposition now, and I want to make sure that the record would so note. Thank you.

MR. SUTTER: Take care, Evan.

(Whereupon, Exhibit 14 was marked for identification.)

BY MR. SUTTER:

Q. Apologies, again. The document is taking a while to load. Should just be a few more seconds here.

Okay. Plaintiffs' Exhibit 14 should now be in your Marked Exhibits folder.

A. Okay.

Q. All right. Plaintiffs' Exhibit 14 is a document entitled "Nationwide Defined Contribution Retirement Plans, Investment Structure Evaluation December 2008," and has Bates stamp CALLAN_NTWD0004120.

Have you seen this presentation before?

A. No.

Q. During your time working on the Nationwide account, had you spoken to Kevin Dolsen about

presentations he made to Nationwide in 2008?
A. No.
Q. During your time working -- strike that.
While presenting to the BIC in 2017, did work Nationwide did for the BIC in 2008 ever become a topic of discussion?
A. The work that Callan did for the BIC?
Q. Correct.
A. No.
Q. So you did not discuss any evaluation Callan did for the BIC in 2008 with members of the BIC?
MR. LIPPS: Objection. Asked and answered.
MS. MORGAN: Same objection.
THE WITNESS: No, I did not.
BY MR. SUTTER:
Q. Okay. I'm going to set that aside and move to another exhibit.
(Whereupon, Exhibit 15 was marked for identification.)
BY MR. SUTTER:
Q. Plaintiffs' Exhibit 15 should now be in your Marked Exhibits folder. Please let me know when you have that up.
A. Okay.

Q. All right. Plaintiffs' Exhibit 15 is a document titled "Amendment No. 1 to Order No. 1" with Bates stamp NMIC_005691. I'll represent to you this document was produced to us by defendants in this action and not by Callan.
Are you -- have you seen this document before?
A. Yes.
Q. What is it?
A. It's an amendment to the -- I think the statement of work.
Q. Do you know who proposed this amendment?
A. Nationwide.
Q. Did Nationwide disclose to you why they were proposing this amendment?
A. No.
Q. Do you recall when they proposed this amendment to you?
A. All I know it was signed in April 2021. So it would have been before that. I don't know the exact time.
Q. Do you have any reason to believe the date included here was not the date on which you signed this document?
A. Can you just rephrase that?

I want to make sure I answer it correctly.
Q. Sure.
Do you have any reason to believe that the date underneath your signature was not the date that you signed this document?
A. No.
Q. Did you discuss the -- this amendment with any individual employees at Nationwide?
A. Yes.
Q. Who did you discuss with amendment with?
A. Rob Watts.
Q. Did you discuss this amendment with any other Nationwide employees?
A. Not that I recall.
Q. What did you and Rob Watts discuss about this amendment?
A. We discussed that they wanted to make this amendment to the contract, and I believe that he proposed some language to include that we agreed on.
Q. And the language you're referring to is included in the addendum here; is that correct?
MR. LIPPS: Note my objection.
THE WITNESS: I think the language may have been for something else that we discussed. This

looks like a pretty legal -- like was put together by legal. So -- let me just see. I think the language Rob and I discussed was for something else. I apologize. This looks like this was provided to us and then we reviewed it and signed it.

BY MR. SUTTER:

Q. Okay. The language you were referring to that you discussed with Mr. Watts, do you recall what that language concerned?

A. I think it may have been a footnote to include in a presentation.

Q. The footnote you're referring to, does that concern the Guaranteed Fund?

A. Yes. So it would be similar to some of the addendum language here but just notifying, you know, what we were asked to do, just clarifying that.

Q. I'll be entering another exhibit.

(Whereupon, Exhibit 16 was marked for identification.)

BY MR. SUTTER:

Q. Plaintiffs' Exhibit 16 should now be in your Marked Exhibits folder. Please let me know when you have that up.

A. Okay.
Q. Plaintiffs' Exhibit 16 is an email from you to Robert Watts dated February 24, 2021.
Do you see that?
A. Yes.
Q. In it, if you go to the first email in this chain, Robert writes "Pursuant to our conversation last week regarding concluding the work effort from last week, I think we should establish an amendment to our SOW."
Do you see that?
A. Yes.
Q. Do you understand SOW to refer to a statement of work?
A. Yes.
Q. And the conversations Robert notes here, are those the same conversations we were just discussing in connection with the amendment itself?
A. This email exchange is what I was referencing.
Q. Okay. Do you recall whether you had a discussion with him over the phone in addition to an email exchange?
A. I would have to rely on what this email says, that we had a conversation.

Q. Independent of this email, you do not recall what was discussed on a phone call with Robert Watts on or around February 16 or the week prior to February 16, 2021?

MS. MORGAN: Objection. Form.

THE WITNESS: I don't recall what the phone conversation was about.

BY MR. SUTTER:

Q. Okay. So the amendment here indicates that the customer and the Benefits Investment Committee have access to information relating to the Guaranteed Fund option that the supplier does not. Do you see that?

A. Uh-huh, yes.

Q. During any presentations you made to the Benefits Investment Committee, did you observe the BIC discussing information relating to the Guaranteed Fund that you did not have prior access to?

MR. LIPPS: Objection. Form.

MS. MORGAN: Same objection.

THE WITNESS: No, I did not witness any discussions.

BY MR. SUTTER:

Q. After the 2021 amendment to Callan's

statement of work, did you stop attempting to analyze the fees spread and crediting rate formula of the Guaranteed Fund?

A. Yes.

Q. Okay. Did you advise or consult any retirement plans other than the Nationwide Savings Plan?

A. Yes.

Q. Approximately how many others?

A. When you say "retirement plans," what do you mean by that?

Q. Any plan, public or private, that invests money to the benefit of retirees or participants.

A. About six or seven other clients.

Q. And I understand that, you know, Callan has an interest in maintaining confidentiality. So I don't want you to necessarily disclose the identity of these clients, but approximately how large are these six or -- strike that.

Of these six or seven clients, do you know how many of them have over a billion dollars in assets under management?

A. All of them except two.

Q. The two that don't, do you recall approximately how large they are?

A. One is about 150 million. The other one is about the same.
Q. Do any of these clients have more than $10 billion of assets under management?
A. Yes.
Q. Approximately how many?
A. Two.
Q. Do any of your clients, the six or seven that you described here, use experience rated general account products like the Guaranteed Fund in their plans?
MS. MORGAN: I'd like to note an objection on behalf of Callan to this entire line of questioning and instruct the witness that many of these relationships are governed by confidentiality provisions in Callan's contract with its clients. To the extent that information is not publicly available, I would instruct the witness not to reveal it.
BY MR. SUTTER:
Q. Are you able to answer my question while following your counsel's advice?
A. No.
Q. Okay. And I'm going to ask another question, and I'll give your counsel an opportunity

to object.
In your years of experience advising or consulting for retirement plans, have any of your clients ever amended your contract to stop you from analyzing investment options that you've previously been critical of?
MS. MORGAN: Same objections.
MR. LIPPS: Objection to form. Mischaracterization.
THE WITNESS: I think that's confidential.
BY MR. SUTTER:
Q. So you're not answering that on advice of counsel?
A. Correct.
Q. Okay. We're going to revert back to Plaintiffs' Exhibit 2. Please let me know when you have that up.
A. Okay.
Q. In Plaintiffs' Exhibit 2, go to Bates label 8078, back to the scope of work, which is Section 1.2.
A. Okay.
Q. One of the items under the scope of work is to "Review the current investment policy statement for defined contribution plans."

Do you see that?
A. Yes.
Q. In your understanding, did the Nationwide Savings Plan have an investment policy statement?
A. Yes.
Q. I'm entering another exhibit.
(Whereupon, Exhibit 17 was marked for identification.)
BY MR. SUTTER:
Q. Plaintiffs' Exhibit 17 should be in your Marked Exhibits folder. Please let me know when you have that up.
A. Okay.
Q. Plaintiffs' Exhibit 17 is a document titled "The Nationwide Savings Plan, The Nationwide Life Insurance Company of America Producers Pension Plan Investment Policy Statement Final 1-19-06."
Have you seen this document before?
A. I don't think so.
Q. If you please scroll to the fifth page of this document, there's a signature, and underneath it you'll see the name David Verbance.
Do you see that?
A. Yes.
MR. LIPPS: What page?

MR. SUTTER: The fifth page.
BY MR. SUTTER:
Q. During your work with the investment benefits committee, did you ever interact with an individual David Verbance?
A. No, not that I'm aware of.
Q. You mentioned before it was your understanding the Nationwide Savings Plan had an investment policy statement. Is it your understanding that they had an investment policy statement other than the one that is marked as Plaintiffs' Exhibit 17?
A. I think so. That's my -- yeah, it would be speculative. I don't know off the top of my head.
Q. I'm entering another exhibit.
(Whereupon, Exhibit 18 was marked for identification.)
BY MR. SUTTER:
Q. Plaintiffs' Exhibit 18 should be in your Marked Exhibits folder. Please let me know when you have that up.
A. I have it.
Q. Plaintiffs' Exhibit 18 is an email from you to burkej12@nationwide.com, and its Bates stamp

is CALLAN_NTWD0007791.

Do you know the name of the individual who has this email address at Nationwide?

A. I believe it's Joe Burke.

Q. The subject line for this email is Callan Update -- Callan -- strike that. My apologies.

The subject of this email is "Callan Update - IPS." Do you see that?

A. Yes.

Q. And it includes an attachment titled "Nationwide DC IPS Callan Update."

I'll represent to you that starting at the second page of this exhibit is the document that was attached as the Nationwide DC IPS Callan Update.

If you please scroll to the second page, have you seen this document before?

A. I can't remember this specific document, but it looks like I emailed it to somebody. So I probably have seen it before.

Q. Do you recall drafting this document for Nationwide?

A. I don't remember working on this, but it was 2017. So it's like five or six years ago. So I don't remember exactly working on this.

Q. Okay.
A. But yeah.
Q. If you please scroll down to -- it's the fourth page of the exhibit. It's internal pagination 1, Bates Stamp 7794. Do you see that there's a comment bubble there within the brackets "[WB1]"? Do you see that?
A. Yes.
Q. Is WB1 you?
A. I think so.
Q. Do you know of anyone else who would have worked on a document like this with the initials WB, BW?
A. No.
Q. So on the next page, there's a comment that states -- it's the final comment in the comment box, and it states "Not in current policy. Confirm that these are the responsibilities of the staff."
Do you see that?
A. Yes.
Q. Do you know what current policy -- let me strike that.
Can you recall what the current policy you're referring to here is?

A. I don't know. I just -- I don't remember this particular project or presentation the way I remember the other ones that you've presented so far, but it's -- looks like I worked on it, and I believe that I likely worked on this.

Q. Okay. I won't strain your memory too much, and I will move to another exhibit. If you'd, actually, please turn back to Plaintiffs' Exhibit 2 again.

A. Okay.

Q. If you go back to the Scope of Work section at the fifth page, Bates stamp 08078.

A. Uh-huh.

Q. And within the -- it's the last item in the Scope of Work section, it says "Analyze specific providers related to managed accounts."

Do you see that?

A. Yes.

Q. What is a managed account?

A. So a managed account is where plan participants in a 401(k) plan can delegate the management of their account to a company that is contracted to do that.

Q. Okay. Do you know what prompted the request that you analyze specific providers related

to managed accounts?
A. No.
Q. We'll be looking at another exhibit.
(Whereupon, Exhibit 19 was marked for identification.)
BY MR. SUTTER:
Q. The formatting is a little strange here. All right. Plaintiffs' Exhibit 19 should be in your Marked Exhibits folder, and the orientation is likely the wrong one. So I think there's an option to rotate it.
A. Okay.
Q. Do you have that document up?
A. Yes.
MS. MORGAN: I apologize. Where do I find the rotate option?
MR. SUTTER: So if you scroll down to near the bottom of the exhibit, there's a little -- a scroll bar appears that has page 1 of 28 and --
MS. MORGAN: I see it. Thank you. Thanks so much.
MR. SUTTER: No problem.
BY MR. SUTTER:
Q. So this is Plaintiffs' Exhibit 19. It's a document with Bates stamp CALLAN_NTWD0008157, and

it's titled "Fidelity Managed Account Overview."
Are you familiar with this presentation?
A. I don't remember seeing it.
Q. Do you know -- let me strike that.
Do you know why this would be in Callan's business records?
A. It may have been sent to us by Nationwide for informational purposes.
Q. Are there any individuals that you work with at Callan on the Nationwide engagement whose area of expertise would include managed accounts?
A. Yes.
Q. Who is that?
A. Jamie McAllister.
Q. Okay. Do you recall ever discussing this presentation with Nationwide, employees of Nationwide?
A. I don't recall having a discussion.
Q. Okay. If you please scroll to the sixth internal page of this presentation, the title is "Nationwide - Do It Yourself Participants."
A. Okay.
Q. And you'll see a chart here with ages and then a column for zero percent equity and 100 percent equity.

Do you see that?
A. Yes.
Q. Do you understand this first row to indicate that 41 percent of participants between the age of 20 through 29 had 41 percent of their accounts invested in no equity?
A. This was a presentation put together by Fidelity. So I don't want to speculate on what information they're trying to show. I don't know exactly what they're saying here. So I don't really want to speak to it as though I can somehow interpret that data properly.
Q. During your work with Nationwide, did you ever review the allocation of participants' money across the various investment options in the Plan?
A. So we -- I know we looked at the total amount of assets in each option. I believe we looked at that. For the managed account portion, we simply provided educational information on managed accounts.
Q. Okay. So you didn't do any analysis specific to the Nationwide Savings Plan participants as it related to managed accounts?
MR. LIPPS: Objection to form.
THE WITNESS: I don't believe we did anything

like this.
BY MR. SUTTER:
Q. Based on your experience with the Plan, are you aware of any reason why large percentages of individuals have no equity allocated to their individual accounts?
MS. MORGAN: Objection. Calls for speculation. Lack of foundation.
MR. LIPPS: Same objection.
THE WITNESS: So I only worked with Nationwide twice to do project work. So I don't know.
BY MR. SUTTER:
Q. Okay. I'm going to mark an exhibit, and this may be the last exhibit.
(Whereupon, Exhibit 20 was marked for identification.)
BY MR. SUTTER:
Q. Plaintiffs' Exhibit 20 should be in your Marked Exhibits folder. Just let me know when you have that up.
A. Okay.
Q. So Plaintiffs' Exhibit 20 is an email chain between you and Roger Stalnaker, the top email, dated March 9, 2017, and has Bates stamp CALLAN_NTWD0000077. If we go to the bottom, the

last email on the chain, so the one on the bottom of the exhibit, there's an email from Roger on May 1, 2017, to you.
Do you see that?
A. Yes.
Q. In this email, Roger refers to white label funds. Do you see that?
A. Yes.
Q. Do you know what white label fund he is referring to in his email to you?
A. He's referring to a version of a white label fund that's multi-manager in nature, not a specific fund that's in the lineup.
Q. Did you have discussions with the BIC about using a multi-manager white-labeled fund in the Plan?
A. Yes. My understanding is it was one of the alternative options that we showed the committee for consideration.
Q. When you say an "alternative option," you're referring to an alternative option to the Guaranteed Fund?
A. No, I am referring to, in the investment structure valuation, considering what the investment lineup would look like if multi-manager

white label funds were added.
Q. Just so I make sure we're not talking past each other, you're referring to the use of a multi-manager fund for, say, the large cap slot within a plan?
A. Yes.
Q. Okay. And were you expressing your view here that only an investment manager can create a white labeled fund?
A. No.
Q. What were you conveying to Allen in your email?
And I apologize. I believe I'm switching between Roger and Allen.
A. Yeah. Let me just read through it for a moment.
Okay. Can you repeat the question?
Q. Sure.
Were you expressing your view to Mr. Stalnaker that only an investment manager can create a white labeled fund?
A. No.
Q. What were you trying to convey to Mr. Stalnaker?
A. At the time of this conversation, I stated

in my email on Thursday, March 9, that as an investment consultant without lawyers, I was simply conveying that I had heard different attorneys at clients have differing opinions on the level of responsibility, and so, as I state here, in the second-to-last paragraph of my email on March 9, that I -- the reason for mentioning this is that we want to make sure that these discussions happen early on in the decision-making process. So simply letting them know that they would want to figure out, you know, if they were comfortable with adding multi-manager white label funds before actually going through all the process of doing it.

Q. Okay. I think I understand that.

So if you can just give me, I am going to say, ten minutes to just go through my outline, make sure I've got everything covered, and then we can come back and the record, and, hopefully, I'll be able to end my questioning if you just give me a few minutes to make sure I'm all set. Okay?

MR. SUTTER: So can we please go off the record?

THE VIDEOGRAPHER: We are going off the record at 2:08 p.m. This is the end of Media Unit 3.

(A short break was taken.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 2:20 p.m. This is the beginning of Media Unit 5 [sic].
MR. SUTTER: Thank you.
BY MR. SUTTER:
Q. So I just have a couple more questions that I would like to ask. If you would, please, pull back up Plaintiffs' Exhibit No. 9, and let me know when you have that up.
A. Okay.
Q. If you just take a minute or a few seconds, however long you need to review this document, and let me know when you've had a chance to review it.
A. Okay.
Q. All right. To the best of your knowledge, is this an accurate copy of an email chain between you and Joseph Burke on December 19, 2016?
A. Yes.
Q. Okay. So I am going to ask you now to pull up Plaintiffs' Exhibit 13, please. Let me know when you have that up.
A. Okay.
Q. So Plaintiffs' Exhibit 13 is again the document entitled "Nationwide Guaranteed Fund

Supplemental Information." You mentioned earlier you had reviewed this document at one point as part of understanding what you had done previously for Nationwide. Do you recall that testimony?
A. Yes.
Q. When you reviewed this document previously, did you get it from Callan's business records for the Nationwide Savings Plan engagement?
A. Yes.
Q. Okay. Then my final question relates to Plaintiffs' Exhibit 14, if you could please pull that up.
A. Okay.
Q. Plaintiffs' Exhibit 14, again, is a document entitled "Nationwide Defined Contribution Retirements Plan Investment Structure Evaluation." Had you also reviewed this document at one point as part of understanding what you had done previously for Nationwide?
MR. LIPPS: Objection. Asked and answered.
THE WITNESS: I don't know.
MR. SUTTER: Okay. So that's my only questions. So I thank you very much for taking the time to sit for today's deposition, and I have no further questions.

MR. LIPPS: I have a few that I'd like to ask of the witness.

EXAMINATION

BY MR. LIPPS:

Q. Let me introduce myself, Ms. Weymouth. My name is Jeffrey Lipps, and I represent the defendants in this case. I have a few questions, and I'd like to follow up based on your earlier examination by Mr. Sutter.

First of all, Ben Taylor is still an employee of Callan; is that right?

A. Yes.

Q. And do I understand -- is Ben Taylor a member of the defined contribution committee?

A. No. He's a member of the team of specialists that work on -- for defined contribution plans. The committee is only made up of generalist consultants.

Q. And among the members of your team at Callan that worked on these two reports or two projects that you were involved in, was Mr. Taylor the one that was the most knowledgeable about the Guaranteed Fund?

MR. SUTTER: Objection to form.

THE WITNESS: Yes.

BY MR. LIPPS:
Q. Now, let me show you or direct your attention back to Exhibit 4 that you were shown earlier. Let me know when you have that in front of you.
A. I have it.
Q. And I direct your attention to Slide 2 of that report which says "Guaranteed Fund Overview."
A. Yes.
Q. And this is a slide that you would have reviewed in connection with the work you were doing in May of 2020; is that right?
A. Yes.
Q. Can you tell me what the box with the rating agency and ratings is intended to communicate?
A. So that's intended to show that Nationwide is a highly rated insurance company.
Q. And you would have done similar reviews of the rating of -- would you have done similar reviews of the rating of Nationwide Life as an insurance company in connection with the 2017 report?
A. Yes, I believe so.
Q. And the report that was put together in

2021 prior to the amendment, would you have also looked at the rating of Nationwide life?

MR. SUTTER: Objection to form.

THE WITNESS: This -- what we are looking at here is a draft of what would have -- yeah -- would have been presented in 2021. So...

BY MR. LIPPS:

Q. I'm focused on your internal work that you were doing. You would have -- in connection with looking at the capital preservation options in the Plan, you would have taken into account the rating of Nationwide Life --

MR. SUTTER: Objection to form and foundation.

THE WITNESS: I believe so.

BY MR. LIPPS:

Q. And do you agree or disagree that based on the information that you had at all times when you worked on these projects for Nationwide, Nationwide Life was a highly rated insurance agency? Do you agree with that?

MR. SUTTER: Objection to form and foundation.

THE WITNESS: So seeing this in our 2020 presentation, yes, I would have to refer back to the 2017 to confirm.

BY MR. LIPPS:
Q. Now, let me direct your attention to Slide 4 in Exhibit 4.
A. Okay.
Q. And can you tell me what that box is intended to portray on that slide?
A. So this is a chart showing the returns of the Guaranteed Fund versus the Callan universe of Stable Value funds.
Q. And is it -- what does it show about that comparison between the general investment fund and the Stable Value funds?
A. The Nationwide Guaranteed Fund performed better than the Callan universe of Stable Value funds.
Q. And there's a second paragraph in the -- or paragraph under the first bullet that says "As the graph demonstrates, the rolling fourth quarter returns for the Guaranteed Fund have traditionally exceeded those of the Stable Value products by a rather wide margin."
Do you see that?
A. Yes.
Q. And when you reviewed this, was that a statement you agreed with?

A. Yes.
Q. And does the chart reflect that rather wide margin?
MR. SUTTER: Objection to form.
THE WITNESS: Yes.
BY MR. LIPPS:
Q. And do I understand that the chart on -- or the graph line on Nationwide Guaranteed Fund, that was based on crediting rate information that was provided to Callan in connection with the projects?
A. Yes.
Q. Now, I'd like to direct your attention to Exhibit 10. Do you have that in front of you?
A. Yes.
Q. And if we go to Slide 5, do you have that in front of you?
A. Yes.
Q. And that's -- this is from the 2017 project report; is that right?
A. Uh-huh. Correct. Yes.
Q. And did I understand from your prior testimony to believe that this was a final version of the report?
A. Yes.

Q. And what does this Slide 5 report on the rating of Nationwide Life as a --
A. It shows that Nationwide is highly rated.
Q. Now, let me direct your attention to Slide 7 in Exhibit 10.
A. Okay.
Q. And can you tell me what the chart on page 7 is intended to portray?
A. The chart shows the performance of the Nationwide Guaranteed Fund versus Callan's Stable Value universe.
Q. And what is the NRSGA line?
A. That's an abbreviation for Nationwide Guaranteed Fund, and I don't know what that stands for.
Q. Okay. But that line would be the actual historic performance in terms of crediting rates available to the investors in that fund over the period reflected here; is that right?
A. Yes, that was the information that was provided to us.
Q. And how does the performance of the Guaranteed Fund compare to the peer group Stable Value funds that were presented in this report?
MR. SUTTER: Objection to form.

THE WITNESS: The Guaranteed Fund outperforms the Stable Value options.

BY MR. LIPPS:

Q. So do you agree that if the Guaranteed Fund had been eliminated and one of the peer group's Stable Value funds had been selected as an option, the performance would have been less than what they actually received under the Guaranteed Fund?

MR. SUTTER: Objection to form and foundation.

THE WITNESS: It would be likely.

BY MR. LIPPS:

Q. Likely that it was less?

A. Correct.

Q. For 2012, 2013, 2014, 2015, and 2016, had it selected the Stable Value funds shown on this chart as opposed to Guaranteed Fund, the returns would have been less for the participants; is that right?

MR. SUTTER: Objection to form and foundation.

THE WITNESS: The lines that we are showing are peer group medians. So there is a potential that Nationwide could have invested with a manager that was at the top of the peer group consistently, but I think that's unlikely.

BY MR. LIPPS:
Q. Okay. If you look on that same slide, the second bullet says "As a mutual company, Nationwide doesn't file disclosure of spread, complicating comparisons of the returns to other annuities."
Do you see that?
A. Yes.
Q. And is there at Callan a data bank of spreads from insurance companies on their annuities?
A. We could only collect spreads from companies that disclose it.
Q. Not all companies disclose them, do they?
A. Correct.
Q. Now, on Slide 8 under the last bullet, the first hashmark says "Revenues from fixed annuities are retained in the form of spread rather than direct investment fees."
Do you see that?
A. Yes.
Q. And tell me again what the reference is to a direct investment fee.
A. A direct investment fee would be a percentage of dollar amount agreed on that would be regularly deducted from the investment option from

participants.

Q. Is that what you described earlier as investment manager fees or administrative fees for recordkeeping?

A. No. That would be -- an example would be if you had a large cap fund and the fee was 0.60 percent, that's regularly taken out of that investment fee or investment fund fee.

Q. Based on your work on these two projects, there were no fees that you observed deducted from the crediting rate after it was declared; right?

MR. SUTTER: Objection to form and foundation.

THE WITNESS: That's my understanding.

BY MR. LIPPS:

Q. And from a capital preservation standpoint, based on the returns and your familiarity with the guaranteed investment fund, there wasn't any deterioration at all of any of the capital that was invested in that fund; correct?

MR. SUTTER: Objection to form.

THE WITNESS: Correct.

BY MR. LIPPS:

Q. There were always positive returns based on the historic information; correct?

A. Correct.

Q. And you saw no fees that were deducted from those crediting rates once they are declared?
MR. SUTTER: Objection to form and foundation.
THE WITNESS: That's correct.
BY MR. LIPPS:
Q. Now, let me direct your attention to Exhibit 16.
A. Okay.
Q. Do you have that in front of you?
A. Uh-huh.
Q. Now, that is the email exchange that you had with Mr. Watts regarding what ultimately became that amendment that we saw earlier; is that right?
A. Yes.
Q. And there is a footnote at the bottom that says "We have been instructed that the Benefits Investment Committee has access to material and data relating to the Guaranteed Fund option not generally available to advisors like Callan, and, therefore, this report does not offer analysis relating to such option for Stable Value alternatives."
Do you see that?
A. Yes.
Q. And were you ever privy to any of this

data and material that was referenced in this footnote that the BIC had access to?

A. I don't think so.

Q. Now, you went to two presentations in front of the BIC; is that right?

A. One in person, one was over Zoom.

Q. Let's start with the one in person. Did you simply go into the BIC meeting when your presentation was being made, or were you there for the entirety of the meeting?

A. I believe it was just during our presentation.

Q. And with the one that was remote, did you attend the entire BIC meeting remotely or just during the period of time you were presenting?

A. Just during the period of time that we presented.

Q. And those are the only two formal interactions that you had with the BIC committee; is that right?

A. Yes.

Q. And so any discussion that may have occurred in front of the BIC regarding the Guaranteed Fund based on the information that was referenced in that footnote, you wouldn't have been

privy to; correct?
MR. SUTTER: Objection to form.
THE WITNESS: That's -- yes, that's my understanding.
BY MR. LIPPS:
Q. I think you were asked a question about whether you had had a conversation with a Nationwide person in which the person indicated that the information on spread was proprietary.
Was that conversation with Rob Watts in either 2020 or 2021?
A. So I can't recall if that was a Nationwide employee or if that was internally with a Callan employee.
Q. That was the other question I was going to ask you. Do you recall having a conversation or email exchange with Mr. Taylor, for example, in which he indicated that this type of spread information would be proprietary as to mutual funds -- mutual insurance companies?
A. Yes, I do believe that he put a footnote or put a bullet point in the presentation about mutuals not disclosing this information, and we discussed that because I had just questions about that for him.

Q. Now, with respect to Exhibit 10, I would like you to turn to Slide 119.
A. Okay.
Q. And you'll see that the first disclaimer on that page is "This report is for informational purposes only and should not be construed as legal or tax advice on any matter."
Do you see that?
A. Yes.
Q. Is that your understanding as to whether or not Callan intends to communicate any legal advice in these reports?
A. Sorry. Can you rephrase that or repeat the question?
Q. Yeah.
To the extent anybody believes that there's legal advice being provided by Callan, that is not the case; right?
MR. SUTTER: Objection to form.
THE WITNESS: That's correct.
BY MR. LIPPS:
Q. And you were asked some questions about a slide relating to duties or fiduciaries. Do you remember that?
A. Yes.

Q. Was that slide put in for informational purposes or to provide legal advice?
A. For informational purposes.
Q. And is this disclaimer that we're looking at that says "This report is for informational purposes only and should not be construed as legal or tax advice on any matter," is that a standard disclaimer that you applied to the reports that you generated on the Nationwide projects?
A. Yes.
Q. Now, I want to show you a couple additional exhibits if I can manage to accomplish that.
(Whereupon, Exhibit 21 was marked for identification.)
BY MR. LIPPS:
Q. I understand Exhibit 21 may now be in your shared exhibits.
A. Yes.
Q. Do you recognize this as an email string between you and Mr. Watts and then internally on May 19 of 2020?
A. Yes.
Q. And if you look at the middle email, the one at 11:21 a.m., Mr. Watts was asking you whether

you recalled a discussion that occurred in the 2017 presentation. Do you see that?
A. Yes.
Q. And am I correct that you then consulted with -- I'm not going to pronounce his name right -- I'll just say Jimmy V. and Ben Taylor to see what their recollection was?
A. Yes.
Q. And does the May 19, 2020, email, 1:01 p.m., give you Mr. Taylor's recollection about the presentation?
A. Yes.
Q. And let me direct your attention to the last paragraph in that email. He says "The other item that I've mentioned on this topic is the spread become relevant in terms of total revenues paid to administrative entities (like the recordkeeper) but it is also not a fee. So there are different needs for reflecting it in various analytical pieces."
Do you see that?
A. Yes.
Q. And is that consistent with your understanding that spread is different than a fee in a defined contribution plan?

A. Yes.
Q. And Mr. Taylor or Jimmy V. never communicated any view on spread versus administrative fees different than what's in this email, have they?
A. I don't believe so.
Q. Now, let me direct your attention to the next exhibit that I'm going to load in. It will be 22.
(Whereupon, Exhibit 22 was marked for identification.)
BY MR. LIPPS:
Q. I think it should be in your folder. Exhibit 22.
A. Okay.
Q. Do you recognize this as an email exchange that you had with Mr. Watts beginning on May 19 and continuing through May 20 of 2020?
A. Yes.
Q. And this is -- to your best recollection, this is a true and accurate copy of that email thread?
A. Yes.
Q. Now, in the top email, very first email on the first page of this thread, it says, "Yes, for

the spread. We meant the fees pay to the contract provider. We included a bullet point in the presentation that states that since Nationwide is a mutual, this information is proprietary."

Do you see that?

A. Yes.

Q. And that was -- was that based on both the conversation you had with Mr. Watts and internally?

A. I would have to say it was likely based on a conversation I had internally with Ben, and I'm not sure if I had a conversation with Mr. Watts on that specifically. Again, this is something I heard from Ben.

Q. In this email you were not communicating any disagreement with that information being proprietary, were you?

A. No.

Q. And other insurance companies with their annuities have likewise not provided spread information on the grounds it was proprietary, to your knowledge; right?

MR. SUTTER: Objection to form. Foundation.

THE WITNESS: My knowledge is that other mutuals have not provided this information.

BY MR. LIPPS:
Q. And then it also says in that email, "We are also" -- "We also were aware that the crediting rates were net of fees so we compared them to net of fee Stable Value providers."
Do you see that?
A. Yes.
Q. And in this sentence were you communicating that once a crediting rate is announced, there are no fees applied against that?
MR. SUTTER: Objection to form and foundation.
THE WITNESS: Yes.
BY MR. LIPPS:
Q. Now, I want to just show you two other quick exhibits. So I'll let you know once they are loaded.
(Whereupon, Exhibit 23 was marked for identification.)
BY MR. LIPPS:
Q. Let me direct your attention to Exhibit 23 in the folder.
A. Okay.
Q. And it is -- at least the first email at the top is from Mr. Watts to you on June 17 of 2020. Do you see that?

A. Yes.
Q. And the attachment says NSP Guaranteed Rates, 1994 through 2020, Quarter 2?
A. Yes.
Q. What did you say?
I'm talking to my assistant here.
(Technical discussion off the record.)
(Whereupon, Exhibit 25 was marked for identification.)
BY MR. LIPPS:
Q. Okay. So Exhibit 23, is this a true and accurate email exchange between -- at least the top one -- between you and Mr. Watts in which he provided you an attachment of the NSP Guaranteed rates during that period of time reflected on the email?
A. I believe so.
Q. All right. And then I want to direct your attention to Exhibit 25, and this was produced by Callan in native form with the cover sheet 7308, and then it had attached to it rates running from the first quarter of 94 through the second quarter of 2020. Do you see that? At least the rates?
A. Yes.

Q. And can you confirm that those are rates that were provided under the cover of this email, the June 17 email?
A. It looks like it. I assume they are.
Q. Okay. Certainly the time period is consistent with what the attachment says. Would you agree?
A. Correct.
Q. Now we have another one that I want to show you. So why don't you take a look at Exhibit 24.
(Whereupon, Exhibit 24 was marked for identification.)
THE WITNESS: Okay.
BY MR. LIPPS:
Q. And do you recognize this as an email that you received from Mr. Burke on November 6 -- November 18 of 2016 with attachments?
A. Yes.
Q. And do you see one of the attachments is the NSP guaranteed rates 1994 through 2016?
A. Yes.
Q. And I'd like to direct your attention then to Exhibit 26. I apologize we are doing it this way.

(Whereupon, Exhibit 26 was
marked for identification.)
BY MR. LIPPS:
Q. And ask you if you can confirm that Exhibit 26 is the attachment that went with this email providing the rates -- crediting rates for the Guaranteed Fund from 1994 through 2016.
A. Yes.
Q. And for the reports in 2017 and the work that was done in 2020, were these crediting rates used for comparison to this Stable Value peer groups?
MR. SUTTER: Objection to form.
THE WITNESS: Yes.
BY MR. LIPPS:
Q. And those rates were used when the report made the observation that there was a wide margin between the Guaranteed Investment Fund returns and those of the peer group Stable Values?
MR. SUTTER: Objection to form.
THE WITNESS: Yes.
MR. LIPPS: Why don't you give me just a minute? I think I may be done. I want to consult. Can we take about a five-minute break?
THE VIDEOGRAPHER: Okay. We are going off the

record at 2:56 p.m.

(A short break was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:00 p.m.

MR. LIPPS: Ms. Weymouth, thank you for your time. I don't have any further questions at this time, and I appreciate your indulgence.

MR. SUTTER: I'll have just about one or two more questions to follow up on what Mr. Lipps asked you.

FURTHER EXAMINATION

BY MR. SUTTER:

Q. You and Mr. Lipps were discussing the difference -- the differentiation between the fees and the spreads; correct?

A. Yes.

Q. Earlier today you had testified that the spread refers to the rate of return of the underlying asset of the Guaranteed Fund minus the rate of return paid out to participants including operating costs. Do you recall that?

A. Yes.

Q. Other than operating costs, are you aware of any other costs that are incorporated into the spread that is assessed against the rate of return

paid to the Guaranteed Fund?
MR. LIPPS: Objection. Foundation.
THE WITNESS: "Operating costs" is an all-encompassing term, the cost of running the fund.
BY MR. SUTTER:
Q. Please direct your attention to Plaintiffs' Exhibit 13. Bear with me for one moment. The document is not loading on my system.
MR. LIPPS: Are you speaking, Dan? I am speaking under my breath. The document is still not loading. So I'm expressing some frustration at technology. So my apologies for that.
BY MR. SUTTER:
Q. So back on Plaintiffs' Exhibit 13, if you could, please, direct your attention to the second page ending in Bates 3982. There's a chart with a series of categories including "Actuarial," "Surplus/Risk Charges," "Investment Expense."
Do you see that?
A. Yes.
Q. So it's your understanding that operating costs for a Guaranteed Fund can include these types of costs including the surplus/risk charge and investment expenses?

MR. LIPPS: Objection. Without foundation.
MS. MORGAN: Join.
THE WITNESS: I have to say that I'm not -- I wasn't involved with this project. So I'm not sure exactly what all of these fees represent. So I just don't know which of these would be included because I don't have knowledge of this specifically.
BY MR. SUTTER:
Q. Based on your experience consulting with investment -- with defined contribution plans, retirement plans, is it your understanding that the spread often includes risk charge?
MR. LIPPS: Objection. Without foundation.
MS. MORGAN: Join.
THE WITNESS: I really don't know.
BY MR. SUTTER:
Q. Do you have any reason to believe or do you have any basis to believe that the expenses listed on the second page of Plaintiffs' Exhibit 13 are not included within the spread assessed against the Guaranteed Fund?
MR. LIPPS: Objection. Speculation. Without foundation.
MS. MORGAN: Same objections.

THE WITNESS: I don't know.
BY MR. SUTTER:
Q. You don't know one way or the other what types of costs were included within the spread assessed against the Guaranteed Fund; is that right?
MR. LIPPS: Objection. Asked and answered.
MR. SUTTER: Those are the only questions I have for you. I'm done.
THE STENOGRAPHER: I didn't get the answer to the last question. This is the court reporter.
(Whereupon, the record was read.)
THE WITNESS: Yes.
THE STENOGRAPHER: Thank you.
MS. MORGAN: Before we go off the record when everyone is finished with their questioning, I'd like to designate this testimony as confidential.
MR. LIPPS: I was going to say the same thing, Amanda. Under the protective order that we've been operating, I understand that this is considered confidential, and transcripts are considered confidential for 20 business days, and at that point I think we have to designate what portions are confidential. But as I understand it, it is

confidential now and for 20 days after the transcript is produced.

MS. MORGAN: If that's everyone's collective understanding, then it would be best to treat it as confidential so we can review and designate the specific portions with specificity.

MR. SUTTER: I will certainly treat it as confidential.

MR. LIPPS: Yes, we will too.

What's the time period on getting the transcript?

THE STENOGRAPHER: Turn around is ten business days.

MR. LIPPS: That should be fine. If we need it expedited, we'll let you know. We have some other briefing that this may be material to.

MR. SUTTER: How about we get off the record to work on these administrative matters?

THE VIDEOGRAPHER: Okay. We are getting off the record at 3:06 p.m. This is the end of Media Unit 5. The total number of media units used was five and will be retained by Veritext Legal Solutions.

C E R T I F I C A T E

I, DEANNA AMORE, a Shorthand Reporter and notary public, within and for the State of Illinois, County of DuPage, do hereby certify:

That BRIANNE WEYMOUTH, the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of February 2023.



Deanna M. Amore, CRR, RPR, CSR

Amanda Morgan, Esq.
amanda.morgan@us.dlapiper.com

February 8, 2023

RE: Sweeney, Ryan Et Al v. Nationwide Et Al

2/1/2023, Brianne Weymouth (#5681825)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-midatlantic@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Sweeney, Ryan Et Al v. Nationwide Mutual Insurance Company Et Al

Brianne Weymouth (#5681825)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________ _______________

Brianne Weymouth Date

Sweeney, Ryan Et Al v. Nationwide Mutual Insurance Company Et Al
Brianne Weymouth (#5681825)

ACKNOWLEDGEMENT OF DEPONENT

I, Brianne Weymouth, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Brianne Weymouth Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 2:3,10 10:9 10:12 17:15

**0**

**0.60** 119:7
**005691** 6:18 89:3
**014637-638** 4:24
**01569** 1:7 9:18
**08078** 101:12
**084-003999** 1:24

**1**

**1** 1:18 4:8,12 6:17,18 9:2,12 31:19,20 32:2 34:20 46:5 51:8 78:13 89:2,2 100:5 102:19 106:3
**1-19-06** 97:17
**1.1** 33:2
**1.19.2006** 7:3
**1.19.2017** 7:7
**1.2** 35:21 36:6 36:11
**1.2.** 96:21
**10** 5:17 39:14 41:10 69:22 70:11,16,20 72:20 73:23 95:4 115:14 116:5 123:1
**10-06-08** 6:3
**10-6-08** 83:16
**10.24.2008** 4:8
**100** 103:25
**102** 7:10
**105** 7:13
**11** 4:4 5:21 14:25 81:3,6
**11.18.2016** 8:7
**11.21.2019** 4:12
**1100** 2:5
**111** 4:5
**119** 123:2
**11:10** 1:19 9:2
**11:21** 124:25
**12** 6:3 37:8,16 83:10,11
**12.19.2016** 5:14
**120** 12:2
**12384** 137:20
**124** 7:18
**126** 7:22
**128** 8:3
**129** 8:11
**12:11** 51:8
**12:22** 51:11
**12:53** 70:5
**13** 6:7 84:20,23 85:1 109:21,24 133:8,15 134:20
**130** 8:7
**1300** 2:13
**131** 8:14
**132** 4:6
**14** 6:11 87:8,14 87:17 110:11 110:14
**15** 6:17 24:1 88:19,22 89:1
**150** 95:1
**16** 6:19 91:20 91:23 92:2 93:3,4 120:7
**1650** 3:4
**17** 7:3 63:15 64:11 97:7,10 97:14 98:12 128:25 130:3
**18** 7:7 98:17,20 98:24 130:18
**1884** 53:20
**19** 7:10 67:10 102:4,8,24 109:18 124:22 125:9 126:17
**1905** 56:23
**19103** 3:5
**1994** 129:3 130:21 131:7
**1994-2016.xls** 8:5,15
**1994-2020** 8:12
**1:00** 70:9
**1:01** 125:10

**2**

**2** 4:12 8:13 34:11,14,18 35:9,19 37:4 37:25 39:11 42:17 51:12 54:17 70:6 96:16,19 101:9 112:7 129:3
**2.11.2020** 4:15
**2.24.2021** 6:19
**2/1/2023** 138:5
**20** 7:13 104:5 105:15,18,22 126:18 135:23 136:1 140:15
**20001** 2:17
**20005** 2:6
**2008** 6:15 24:3 82:23 83:5 87:20 88:1,5 88:11
**2011** 84:12
**2012** 117:15
**2013** 117:15
**2014** 84:12 117:15
**2015** 84:12 85:14 117:15
**2016** 5:8 7:19 7:23 27:14,18 28:7 63:6 64:18 66:1 67:10,19 69:6 69:18 71:6 83:6 85:15 109:18 117:15 130:18,21 131:7

**2016-2017** 77:8
**2017** 70:22 71:21,24 72:4 82:12 88:4 99:24 105:24 106:3 112:22 113:24 115:19 125:1 131:9
**2019** 36:6,19 39:10 42:16 54:16
**2020** 4:19 39:14 42:9 43:2,18 44:7 44:14 49:8,25 52:5,24 53:22 54:24 55:4,8 55:12,20 60:25 63:4,15 64:11 64:16,21 112:12 113:22 122:11 124:22 125:9 126:18 128:25 129:3 129:24 131:10
**2021** 27:15 28:7 61:1 63:4 63:5 89:19 92:3 93:4,25 113:1,6 122:11
**2022** 41:10 42:9
**2023** 1:18 9:2 137:17 138:3
**21** 7:18 56:21 57:2 124:14,17
**21st** 56:19
**22** 7:22 56:24 57:1 126:9,10 126:14
**2209** 66:9
**22nd** 56:21
**23** 8:3 128:17 128:20 129:12
**2315** 80:18
**2396** 73:12,17
**24** 8:7 92:3 130:11,12
**2400** 12:2 80:3 80:12
**25** 8:11 129:9 129:20
**26** 8:14 130:24 131:1,5
**2727** 2:20
**28** 102:19
**280** 2:12
**29** 43:18 104:5
**2:08** 108:24
**2:20** 1:7 9:18 109:2
**2:56** 132:1

**3**

**3** 4:15 38:15,18 38:22 47:7 70:10 80:4 108:24
**3.1** 58:20
**3.9.2017** 7:13
**30** 51:24 138:17
**31** 4:8
**34** 4:12
**38** 4:15
**3982** 133:17
**3:00** 132:4
**3:06** 136:20

**4**

**4** 4:19 42:1,4 46:2 80:18 81:21 112:3 114:3,3
**4.1** 38:2 66:11
**401** 21:21,22 46:18 54:7 101:21
**404** 81:22
**41** 104:4,5
**42** 4:19
**43** 4:21
**43215** 2:13
**46** 57:2

**5**

**5** 4:21 39:23 40:11 43:9,12 43:16 109:3 115:16 116:1 136:21
**5.11.2020** 4:21
**5.19.2020** 7:18
**5.20.2020** 7:22
**500** 2:20
**5000** 3:4
**51** 2:17
**524422** 4:13
**53** 5:3
**5681825** 138:5 139:2 140:2
**5th** 2:6

**6**

**6** 5:3 40:23 41:3 53:10,11 53:14,19 56:20 130:17
**6.17.2020** 5:7 8:3
**60602** 12:3
**63** 5:7
**65** 5:11
**67** 5:14
**6th** 137:17

**7**

**7** 5:7 63:8,11 116:5,8
**70** 5:17
**71** 86:11
**7308** 129:21
**75201** 2:21
**7794** 100:5

**8**

**8** 5:11 65:8,11 118:15 138:3
**8078** 35:20 96:20

**8079** 38:1
**81** 5:21
**83** 6:3
**84** 6:7
**8477** 63:17,18
**85** 73:14,16,22 79:9
**85th** 73:11
**87** 6:11
**88** 6:17
**89** 80:2,11

**9**

**9** 5:14 67:1,4,9 105:24 108:1,6 109:8
**91** 6:19
**94** 129:23
**98** 7:3,7

**a**

**a.m.** 1:19 9:2 124:25
**abbreviation** 116:13
**able** 13:19 95:21 108:19
**above** 138:6 140:7
**access** 93:11,18 120:17 121:2
**accomplish** 124:12
**account** 7:10 57:20 62:5 84:3 87:25 95:10 101:19 101:20,22 103:1 104:18 113:11
**accounts** 101:16 102:1 103:11 104:6 104:20,23 105:6
**accuracy** 138:9
**accurate** 109:17 126:21 129:13
**acknowledge...** 140:3
**acknowledg...** 138:12
**action** 9:23 89:5 137:12
**actual** 116:16
**actually** 22:6 22:24 26:15 37:3 55:16 65:6 101:8 108:12 117:8
**actuarial** 133:18
**add** 52:1
**added** 107:1
**addendum** 90:22 91:16
**adding** 108:11
**addition** 92:22
**additional** 14:19 51:19 63:1 68:1,14 68:22 124:12
**additions** 140:6
**address** 12:1 99:3
**administration** 14:4 79:19
**administrative** 119:3 125:17 126:4 136:18
**advice** 20:11 95:22 96:12 123:7,12,17 124:2,7
**advise** 94:5
**advising** 96:2
**advisors** 17:18 120:19
**affiliation** 10:5
**age** 104:5
**agency** 112:15 113:20
**ages** 103:23
**ago** 99:24
**agree** 9:10 113:16,20 117:4 130:7
**agreed** 33:5 90:19 114:25 118:24
**agreement** 4:10 4:13 20:16 21:2 32:4,10 32:12,16 33:3 33:8,19 34:6
**ahead** 55:14
**al** 1:4,9 2:2,9 9:15,16 138:4 138:4 139:1,1 140:1,1
**alexandra** 2:19 10:19
**ali** 10:18
**allen** 43:25 107:11,14
**allocated** 105:5
**allocation** 104:14
**allotted** 138:20
**allow** 78:12
**allowing** 63:1
**alternative** 14:15,20 56:7 106:18,20,21
**alternatives** 77:24 120:22
**altogether** 23:9
**amanda** 3:4 10:22 135:20 138:1
**amanda.morg...** 3:5 138:2
**amend** 51:16
**amended** 96:4
**amendment** 6:17 89:2,10 89:12,15,18 90:7,10,12,16 90:18 92:10,18 93:9,25 113:1

120:13
**america** 97:16
**amore** 1:24 9:21 137:3,21
**amount** 60:5,20 104:17 118:24
**analysis** 26:23 36:1 50:10,24 64:2 72:25 73:4 80:6,20 80:23 86:1 104:21 120:20
**analyst** 14:16 17:13,15
**analytical** 125:20
**analyze** 54:7 94:2 101:15,25
**analyzing** 96:5
**ann** 15:17
**announce** 87:4
**announced** 128:10
**annuities** 118:5 118:10,16 127:19
**annuity** 22:18 80:7,21
**answer** 12:22 20:9,12,21,22 49:11 51:17 90:1 95:21 135:10
**answered** 24:22 30:21 31:3 45:17 55:22 61:8,20 86:5 88:13 110:20 135:7
**answering** 13:4 13:6 96:12
**anybody** 123:16
**apologies** 42:10 70:15 87:11 99:6 133:13
**apologize** 69:24 73:11 91:4 102:15 107:13 130:24
**appearance** 10:2,4
**appearances** 2:1 3:1
**appeared** 2:1 3:1
**appears** 102:19
**appended** 140:7
**applicable** 138:8
**applied** 124:8 128:10
**apply** 75:8
**appreciate** 132:7
**approach** 37:4
**appropriate** 46:18
**approximately** 36:19 84:10 85:12 94:9,18 94:25 95:6
**april** 43:18 89:19
**area** 26:20 27:3 28:4,14 29:8 40:19 79:5 103:11
**areas** 24:18 25:22 75:6 82:7,11
**argumentative** 30:7
**arts** 14:3
**aschill** 2:21
**aside** 88:17
**asked** 24:22 30:21 31:3 34:4 45:9,17 51:17 55:22 58:6,8,9,9 61:8 61:20 64:22 86:5 88:13 91:17 110:20 122:6 123:22 132:9 135:7
**asking** 41:2 124:25
**assessed** 132:25 134:21 135:5
**asset** 132:19
**assets** 40:3 60:18 94:22 95:4 104:17
**assist** 25:21 26:7 28:17 56:9
**assistant** 129:6
**assisted** 25:19
**assists** 16:11 28:15
**associated** 60:1
**associates** 17:13 32:21 65:16
**assume** 54:23 71:13,15 130:4
**assumption** 64:9
**attached** 99:14 129:22 138:11
**attachment** 99:10 129:2,15 130:6 131:5
**attachments** 43:24 44:2 130:18,20
**attempting** 94:1
**attend** 30:18 121:14
**attended** 30:14
**attention** 56:18 112:3,7 114:2 115:13 116:4 120:6 125:13 126:7 128:20 129:20 130:23

133:7,16
**attorney** 10:6 20:8,12,19 33:22 138:13
**attorney's** 20:11
**attorneys** 18:25 20:22 21:1 108:3
**audibly** 13:7
**audio** 9:9
**author** 81:14
**automatically** 60:15
**available** 39:24 54:12 81:13 95:18 116:18 120:19 138:6
**avenue** 2:5,17
**average** 68:25 69:4
**avoid** 13:5
**aware** 13:21 20:25 21:13 98:6 105:4 128:3 132:23

**b**

**b** 29:18
**bachelor** 14:3
**bachelor's** 14:5
**back** 26:9,14 41:14 46:1 51:10,14 55:6 70:8 79:8 96:15,20 101:8 101:11 108:18 109:1,8 112:3 113:23 132:3 133:15
**backed** 22:18 78:11
**bank** 118:8
**bar** 57:1 81:25 102:19
**based** 23:24 36:15 50:17 54:24 76:13 79:21 105:3 111:8 113:16 115:9 119:9,16 119:23 121:24 127:7,9 134:10
**basis** 23:21 83:3 86:11 134:19
**bates** 18:22,24 19:4,8 32:3 34:19 35:20 38:1,23 53:20 56:22 63:15 66:9 67:11 70:22 73:12,17 80:3,11,18 83:18 85:3 87:20 89:3 96:19 98:25 100:5 101:12 102:25 105:24 133:17
**bear** 69:21 133:8
**beekhuizen** 2:11,14 10:13
**beginning** 10:5 51:11 70:9 109:3 126:17
**behalf** 2:2,9 3:2 16:5,15 36:2 95:13
**believe** 39:1 82:16 89:22 90:3,18 99:4 101:5 104:17 104:25 107:13 112:24 113:14 115:23 121:11 122:21 126:6 129:18 134:18 134:19
**believes** 123:16
**ben** 25:16 26:6 28:3,11 40:18 41:4 42:20 47:15,16 85:21 111:10,13 125:6 127:10 127:13
**benchmark** 76:15,20 77:4 77:9,12,20,24 79:6
**benchmarking** 79:2,14
**benefit** 94:13
**benefits** 7:15 29:14,19 77:4 93:10,16 98:4 120:16
**best** 23:23 39:8 75:18 76:4 109:16 126:20 136:4
**better** 114:14
**bic** 29:17,20,22 29:25 30:3,5,6 30:10,15 31:2 31:8 44:23 45:1 52:9,13 55:20 58:2,5 60:25 61:5,23 63:4 72:7,15 74:1,6 76:18 76:18 77:9,12 77:20 88:4,5,7 88:11,12 93:17 106:14 121:2,5 121:8,14,19,23
**bid** 83:6
**billion** 94:21 95:4
**bit** 69:25
**blood** 137:12
**botch** 11:20
**bottom** 19:2 35:20 43:17 50:9 57:1 66:10 67:23,24 81:25 86:9

102:18 105:25 106:1 120:15
**box** 62:16 100:17 112:14 114:5
**brackets** 100:6
**break** 13:15,17 51:4,9 70:7 108:25 131:24 132:2
**breakdown** 86:11
**breath** 133:11
**brianne** 1:15 4:3 9:13 11:10 11:17,25 137:6 138:5 139:2,24 140:2,4,12
**briefing** 136:16
**brought** 85:23
**bubble** 100:6
**bullet** 46:11,14 47:6,7,10 50:8 50:13,18,22 57:19 58:18,22 60:6 72:24 74:17,23 75:8 75:16 114:17 118:3,15 122:22 127:2
**bunch** 19:5
**burke** 67:11,15 67:25 68:5 99:4 109:18 130:17
**burkej12** 98:25
**business** 14:4 103:6 110:7 135:23 136:12
**bw** 100:13

**c**

**c** 29:18 81:22 137:1,1
**caia** 14:15,17
**call** 20:18 26:22 45:7,10 45:12,14,20 64:1,5,17 93:2
**callan** 3:2 4:9 4:11,14,16,18 4:22 5:6,10,11 5:13,16,20 6:6 6:10,16,22 7:6 7:8,9,12,17,21 7:25 8:6,10,13 8:16 10:22 14:21,24 15:11 15:23 16:3,18 16:21,24 17:2 17:8,11 19:5 19:25 20:15 21:1,6 23:11 23:16,18,24 24:11,13,15,20 25:7,8,18,24 26:3 28:11,24 29:6 32:3,21 34:6,19 35:2 35:12 36:2,12 37:4,8,14 38:11,24 39:6 39:9 40:14,16 41:6 43:19 46:9 56:9,13 62:17 63:16 65:16,18 66:21 67:12 68:20 70:23 72:8 74:13,14 75:1 75:3 78:3 80:5 81:12,18 82:22 83:5,18,24 84:1,8,11 85:4 85:22 86:16,23 87:21 88:7,11 89:5 94:15 95:13 99:1,5,6 99:8,11,14 102:25 103:10 105:25 111:11 111:20 114:8 114:14 115:10 118:8 120:19 122:13 123:11 123:17 129:21
**callan's** 37:23 68:9 93:25 95:16 103:5 110:7 116:10
**called** 11:11 17:14,17 21:23 29:14 37:14 82:3
**calls** 20:7 45:20 64:13,15 75:21 82:13 105:7
**camera** 9:5
**cap** 107:4 119:6
**capital** 17:18 22:14,23 23:3 57:4,12,16 78:10 113:10 119:15,19
**capping** 62:18 62:23
**captioned** 21:19
**care** 87:7
**career** 17:12
**carpenter** 2:10 10:11
**carpenterlipp...** 2:14,14,15
**case** 1:6 9:18 19:3 20:17 21:3,6,14,18 111:7 123:18
**categories** 133:18
**category** 23:2,3
**caveat** 13:17
**certain** 26:4 27:25 58:6
**certainly** 130:5 136:7
**certainty** 59:2 59:3 60:24 61:4,14

**certification** 14:18
**certifications** 14:11,13
**certify** 137:5,11
**cetera** 40:9
**chain** 39:2 63:14,24 67:24 92:7 105:23 106:1 109:17
**chance** 109:13
**change** 139:4,7 139:10,13,16 139:19
**changes** 54:9 138:10 140:6
**characteristics** 47:24
**charge** 79:18 133:24 134:13
**charges** 133:19
**chart** 80:5 82:2 103:23 114:7 115:2,7 116:7 116:9 117:17 133:17
**chartered** 14:15
**chat** 13:12,12
**check** 15:7
**chicago** 12:2 14:9
**clarifying** 91:17
**clear** 13:2
**client** 20:8,12 20:19 23:17 26:21 32:13 33:16 34:5 86:3
**clients** 16:5,8 16:11,16 26:21 26:24 37:17 54:8 94:14,18 94:20 95:3,8 95:16 96:4 108:4
**cohen** 2:3 10:9
**cohenmilstei...** 2:7,7,8
**colleague** 85:21
**colleagues** 10:10,13 16:14 16:17 24:17,20 25:7,14,15 26:10,11,19
**collect** 118:11
**collected** 60:14 60:16
**collective** 136:3
**collectively** 33:8
**columbus** 2:13
**column** 103:24
**come** 108:18
**comfortable** 108:11
**comment** 33:23 59:21 100:6,15 100:16,17
**committee** 7:16 16:1,2,11,20,21 27:10,12,16 29:13,15,19,24 37:7,11,13,14 37:15,19,23 68:15,18,21,23 77:4 93:11,16 98:4 106:19 111:14,17 120:17 121:19
**committees** 15:22,25
**common** 20:16 21:2
**communicate** 112:16 123:11
**communicated** 126:3
**communicating** 31:14 127:14 128:9
**communication** 13:11 24:14
**communicati...** 20:8,20
**companies** 118:9,12,13 122:20 127:18
**company** 1:8 2:9 3:8 9:15 21:15 22:20 32:22 35:11 38:6 65:16 68:25 69:4,9 69:11 97:16 101:22 112:18 112:22 118:3 139:1 140:1
**compare** 77:2 77:10 79:22 116:23
**compared** 78:2 128:4
**comparing** 76:18
**comparison** 114:11 131:11
**comparisons** 118:5
**competitors** 79:23
**complete** 13:4 24:21 25:8 140:8
**completed** 27:14 28:2,19 28:20 138:17
**completely** 62:8 85:17
**complicating** 118:4
**compound** 79:24
**concern** 21:19 91:14
**concerned** 91:10

**concerns** 21:7 21:20
**concluding** 92:8
**conclusion** 75:21
**conduct** 23:18
**conducted** 9:4 16:5 27:18 66:1 85:21,24
**conducting** 16:15 80:5
**conference** 64:8
**confidential** 1:13 96:10 135:18,22,23 135:25 136:1,5 136:8
**confidentiality** 94:16 95:15
**confirm** 100:18 113:24 130:1 131:4
**confusing** 22:25 55:17
**connection** 9:6 21:14 37:21 47:25 48:5 49:7,25 92:18 112:11,22 113:9 115:10
**consider** 54:9 62:18
**consideration** 56:8 62:17 106:19
**considered** 25:23 135:21 135:22
**considering** 106:24
**consistent** 125:23 130:6
**consistently** 117:24
**construed** 123:6 124:6
**consult** 94:5 131:23
**consultant** 17:19 24:10 32:14 75:24 76:3 108:2
**consultants** 37:8,16 111:18
**consulted** 125:4
**consulting** 4:10 5:18 23:12 32:4,9,12,16 33:18 35:12 39:9 65:17 70:22 71:20 72:3 96:3 134:10
**contact** 31:12 31:13 68:9
**context** 26:17 81:17 85:7
**continue** 9:9
**continuing** 126:18
**contract** 22:19 32:13 35:2 90:18 95:16 96:4 127:1
**contracted** 101:23
**contributed** 27:6,8
**contribution** 5:18 6:12 25:24 27:24 29:9 35:12 37:7,11,15,18 37:23 65:17 68:20 70:21 71:20 72:3 87:18 96:25 110:15 111:14 111:17 125:25 134:11
**contributions** 62:19,24 63:2
**conversation** 13:3 69:14 92:8,25 93:7 107:25 122:7 122:10,16 127:8,10,11
**conversations** 47:1 92:16,17
**convey** 59:6 107:23
**conveying** 107:11 108:3
**copies** 138:14
**copy** 39:2 80:17 109:17 126:21
**core** 57:3,12
**corner** 19:2
**correct** 11:19 16:13,19 21:7 21:11,16,23 23:13 29:6,7 30:6,20 38:12 39:2 44:20 45:25 52:6 55:21 59:11 60:2 63:18 64:23 66:21 71:11 73:8 79:3 86:4 88:8 90:22 96:14 115:21 117:14 118:14 119:19 119:21,24,25 120:4 122:1 123:20 125:4 130:8 132:15 140:8
**corrections** 140:6
**correctly** 11:17 25:5 36:17 48:20 90:1

**cost** 133:4
**costs** 40:5,6,8 132:21,23,24 133:3,23,24 135:4
**counsel** 2:1 3:1 3:8 9:13 10:3,8 10:16,20,25 12:20 18:4,5,8 18:19 19:10,14 20:4,5,21 21:11 51:15,20 95:25 96:13 138:14
**counsel's** 95:22
**counterparties** 32:15
**counterparty** 62:1,3,14
**county** 137:5
**couple** 77:15 109:6 124:11
**course** 11:21 12:24 13:13 19:17
**court** 1:1 9:16 9:20 11:4 12:18,18 13:2 13:7 135:11
**cover** 129:21 130:2
**covered** 108:17
**covid** 55:5
**create** 74:12,15 107:8,21
**credit** 62:9
**credited** 58:19
**crediting** 40:22 40:25 41:11 78:14 94:2 115:9 116:17 119:11 120:2 128:4,9 131:6 131:10
**credits** 57:23
**critical** 96:6
**crr** 1:24 137:21
**cs** 138:15
**csr** 1:24 137:21
**cues** 13:8
**current** 12:1 15:1 96:24 100:17,22,24
**currently** 14:21 15:10 23:11
**customer** 38:2 38:6 66:16 93:10
**customer's** 66:12
**cv** 1:7 9:18

**d**

**d** 4:1
**dallas** 2:21
**dan** 133:10
**daniel** 2:4 10:8
**data** 8:7 38:12 66:20 78:21 86:16,24 104:12 118:8 120:18 121:1
**database** 78:22
**date** 52:20 54:24 71:23 89:22,23 90:4 90:4 139:24 140:12
**dated** 42:9 43:18 53:22 63:15 70:22 92:3 105:24
**david** 97:22 98:5
**day** 2:16,19 10:15,20 11:21 12:24 22:1 137:17 140:15
**days** 19:17 135:23 136:1 136:13 138:17
**dc** 2:6,17 4:16 5:21 6:3 10:16 39:6,9 73:18 73:24 74:4 79:17 81:9 82:4 83:17 99:11,14
**dealt** 17:21
**deanna** 1:24 9:21 137:3,21
**december** 6:15 67:10 69:6 87:20 109:18
**decision** 108:9
**declare** 140:4
**declared** 68:25 69:4 119:11 120:2
**deducted** 118:25 119:10 120:1
**deemed** 140:6
**defendant** 12:5 81:12
**defendants** 1:10 2:9 10:12 10:17,20 21:6 89:4 111:7
**define** 26:8
**defined** 5:17 6:11 25:23 27:24 29:9 35:12 36:5,10 37:6,11,15,18 37:23 65:16 68:20 70:21 71:20 72:3 87:18 96:25 110:15 111:14 111:16 125:25 134:11
**degrees** 14:2
**delegate** 101:21
**deliverables** 4:23 37:5 43:20 45:9,11 45:13
**demonstrates** 114:18

**depending** 49:11 60:21
**depends** 9:5
**deponent** 3:2 138:13 140:3
**deposing** 138:13
**deposition** 1:14 9:3,13 12:8,14 12:17 13:9,13 13:22 17:25 18:3,10,13,17 19:11,23 20:2 20:6 21:6 51:20 87:5 110:24
**depth** 80:6,20
**describe** 14:1 14:17 22:6,12 23:1,15 75:13
**described** 22:22 33:4,8 33:14 38:6 39:10 66:16 95:9 119:2
**describes** 36:1
**describing** 62:10
**description** 5:2 6:2 7:2 8:2 35:22 36:15
**designate** 135:18,24 136:5
**designated** 76:15
**designation** 14:16
**detail** 80:7
**details** 41:16 41:20
**deterioration** 119:18
**determine** 53:1
**difference** 59:7 60:17 132:14
**different** 78:25 79:16 85:18 108:3 125:19 125:24 126:4
**differentiation** 132:14
**differing** 108:4
**difficulty** 70:15
**direct** 15:16 56:18 112:2,7 114:2 115:13 116:4 118:18 118:22,23 120:6 125:13 126:7 128:20 129:19 130:23 133:7,16
**directed** 68:4
**directly** 15:14
**disagree** 113:16
**disagreement** 127:15
**disclaimer** 123:4 124:4,8
**disclose** 89:14 94:17 118:12 118:13
**disclosing** 122:23
**disclosure** 118:4
**discuss** 45:5,10 46:20 47:3 48:17 50:13 60:23 61:3,13 61:14,22 64:1 88:10 90:7,10 90:12,15
**discussed** 45:4 45:20,23 46:24 90:17,25 91:3 91:9 93:2 122:24
**discussing** 21:25 45:15 92:18 93:17 103:15 132:13
**discussion** 64:10 88:6 92:22 103:18 121:22 125:1 129:7
**discussions** 50:17 93:23 106:14 108:8
**distinction** 60:9 60:12
**district** 1:1,2 9:16,17 21:16
**division** 1:3 9:18
**dla** 3:3 10:22
**document** 18:25 19:3 32:2,7 34:22 34:25 53:19 65:14,21,24 70:21 76:5 79:23 80:7,16 81:9,15,21 82:10 83:16,21 85:1,5,8 86:10 87:11,18 89:2 89:4,6,24 90:5 97:14,18,21 99:13,17,18,21 100:12 102:13 102:25 109:13 109:25 110:2,6 110:15,17 133:9,11
**documents** 18:12,15,19 19:3,7 38:11 66:20
**doing** 13:10 87:4 108:13 112:11 113:9 130:24
**dollar** 118:24
**dollars** 94:21

**dolsen** 84:6 87:25
**double** 15:7
**draft** 6:15 54:25 55:2 58:3,15 113:5
**drafting** 99:21
**drafts** 71:14
**dsutter** 2:7
**due** 55:5
**duly** 11:7,11 137:8
**dupage** 137:5
**duties** 123:23

**e**

**e** 4:1 67:11 137:1,1 139:3 139:3,3
**earlier** 33:14 44:17 60:16 64:18 82:12 110:1 111:8 112:4 119:2 120:13 132:17
**early** 52:21,23 108:9
**easier** 65:5 80:17
**eastern** 1:3 9:17
**easy** 73:13
**economics** 14:3
**educate** 74:3
**education** 14:19
**educational** 14:2 104:19
**efficiently** 12:16
**effort** 92:9
**efrisch** 2:7
**eight** 24:7 82:7 82:11
**eighth** 72:19
**either** 13:1 46:21 60:25 63:4 81:12 85:10,23 122:11
**eleanor** 2:4 10:10
**eliminated** 117:5
**email** 4:15,21 5:7,14 6:19 7:7 7:13,18,22 8:3 8:7 31:12 38:22 39:2,5 39:14 40:22 43:16,17 45:8 53:3 63:14,21 63:23,24 67:10 67:23,25 92:2 92:6,19,23,24 93:1 98:24 99:3,5,7 105:22,24 106:1,2,6,10 107:12 108:1,6 109:17 120:11 122:17 124:20 124:24 125:9 125:14 126:5 126:16,21,24 126:24 127:14 128:2,23 129:13,17 130:2,3,16 131:6
**emailed** 99:19
**emails** 53:1
**emiller** 2:18
**employed** 14:21
**employee** 28:11 28:24 67:16 111:11 122:13 122:14
**employees** 15:14 20:1,5 30:25 31:6 43:3 44:8,15 44:20 55:11 56:9,13 71:10 71:21 72:8,11 84:2 90:8,13 103:16
**encompassing** 133:4
**ends** 56:23
**engagement** 5:8 7:19,23 24:6,9 26:2,7 27:5 83:25 84:1,14,17 86:23 103:10 110:8
**enter** 34:5 65:6
**entered** 20:16 21:2
**entering** 34:10 41:23 53:9 66:23 69:20 83:9 84:19 87:1 91:19 97:6 98:16
**entire** 28:1 95:13 121:14
**entirety** 121:10
**entities** 125:17
**entitled** 38:2 66:11 70:21 87:18 109:25 110:15
**equity** 103:24 103:25 104:6 105:5
**erisa** 81:22
**errata** 138:11 138:13,17
**esq** 138:1
**establish** 92:10
**established** 32:25
**et** 1:4,8 2:2,9 9:15,16 40:9 138:4,4 139:1 139:1 140:1,1
**evaluate** 47:7 47:13,18,24

48:4,25 49:6 49:24 76:14 77:13,21
**evaluated** 46:9
**evaluation** 5:5 6:14 27:8 53:22 54:3,5 55:11 56:1,11 58:5 61:7,18 87:19 88:10 110:16
**evan** 2:16 10:15 87:3,7
**everyone's** 136:3
**exact** 45:7,14 47:1 52:20 69:14 71:23 89:21
**exactly** 41:1 45:19 64:15 99:25 104:10 134:5
**examination** 4:2,4,5,6 11:13 111:3,9 132:11 137:7
**examined** 11:12
**example** 119:5 122:17
**exceeded** 114:20
**except** 94:23
**exchange** 4:15 4:21 5:7,14 6:19 7:13,18 7:22 8:3 92:19 92:23 120:11 122:17 126:16 129:13
**execution** 37:3
**exhibit** 4:8,12 4:15,19,21 5:3 5:7,11,14,17,21 6:3,7,11,17,19 7:3,7,10,13,18 7:22 8:3,7,11 8:14 31:18,19 31:20 32:2 34:10,11,14,18 35:5,9,10,19 37:25 38:14,15 38:18,22 39:11 41:23 42:1,4 42:17 43:8,9 43:12,16 46:2 50:8 51:2 53:9 53:10,11,14,19 54:17 56:20 63:7,8,11 65:6 65:8,11 66:23 67:1,4,9 69:20 69:22 70:1,11 70:16,20 72:20 73:23 81:2,3,6 83:9,10,11 84:19,20,23 85:1 87:2,8,14 87:17 88:18,19 88:22 89:1 91:19,20,23 92:2 96:16,19 97:6,7,10,14 98:12,16,17,20 98:24 99:13 100:4 101:7,9 102:3,4,8,18,24 105:13,14,15 105:18,22 106:2 109:8,21 109:24 110:11 110:14 112:3 114:3 115:14 116:5 120:7 123:1 124:14 124:17 126:8 126:10,14 128:17,20 129:9,12,20 130:11,12,24 131:1,5 133:8 133:15 134:20
**exhibits** 4:7 5:1 6:1 7:1 8:1 34:15 38:19 42:5 43:13 53:15 63:12 65:12 67:5 70:17 81:7 84:24 87:15 88:23 91:24 97:11 98:21 102:9 105:19 124:12,18 128:15
**expedited** 136:15
**expense** 133:19
**expenses** 133:25 134:19
**experience** 75:18 76:2,13 79:15,21 95:9 96:2 105:3 134:10
**expert** 27:17,22
**expertise** 26:20 27:3,24 28:4 28:14 29:8 40:20 85:24 103:11
**explicit** 57:21 59:7
**expressing** 107:7,19 133:12
**extent** 75:20 95:17 123:16

**f**

**f** 137:1
**facilitate** 24:15 24:19 25:6
**fails** 138:19
**fair** 17:20 23:1
**falls** 23:2
**familiar** 22:8 29:13 74:16 103:2

**familiarity** 119:17
**far** 55:7 73:11 101:4
**february** 1:18 9:2 39:14 41:10 70:22 71:21 92:3 93:3,4 137:17 138:3
**fee** 27:8 28:15 57:21 58:23 60:10 86:10,11 118:22,23 119:6,8,8 125:18,24 128:5
**feedback** 45:11 54:8
**fees** 48:4,10,25 49:6,24 50:9 50:23 59:2,4,7 59:22 60:1,5 60:14,15,20,24 61:4,15 72:24 73:3 79:6,15 79:16,18,19,22 94:2 118:18 119:3,3,10 120:1 126:4 127:1 128:4,10 132:14 134:5
**fidelity** 7:10 103:1 104:8
**fiduciaries** 75:24 76:4,13 123:23
**fiduciary** 5:22 73:18,24 74:4 74:7 75:18 81:10 82:4
**fields** 26:12
**fifth** 35:18 97:20 98:1 101:12
**figure** 108:10
**file** 118:4
**filed** 9:16
**final** 7:3 55:1 71:16,19,22 72:2,17,23,24 97:17 100:16 110:10 115:23
**finally** 13:14
**financial** 17:21
**financially** 9:23
**find** 102:15
**findings** 30:2
**fine** 51:5 136:14
**finished** 135:17
**firm** 9:21 17:14 17:16,17
**first** 11:11,16 26:15 43:17 57:19 64:21 86:9 92:6 104:3 111:10 114:17 118:16 123:4 126:24 126:25 128:23 129:23 137:7
**fit** 47:3,4
**five** 15:8 25:20 26:10 99:24 131:24 136:22
**fixed** 57:20 62:5 118:16
**floor** 2:6
**focus** 25:23 26:19
**focused** 24:17 27:25 113:8
**folder** 31:23 34:15 38:19 42:5 43:13 53:15 63:12 65:12 67:5 70:17 81:7 84:24 87:15 88:23 91:24 97:11 98:21 102:9 105:19 126:13 128:21
**folks** 31:12
**follow** 5:9,15 7:14,20,24 111:8 132:9
**following** 19:5 20:11 41:9,15 41:19 47:9 95:22
**follows** 11:12 80:23 86:12
**footnote** 6:20 80:4,22 91:11 91:13 120:15 121:2,25 122:21
**foregoing** 140:5
**form** 23:4 24:23 33:20 34:7 36:22 43:4 44:9 48:21 49:17,21 50:2 55:13 59:18 60:7 61:19 62:9,11 68:11 71:12 74:18 75:20 76:7,22 79:24 93:5,20 96:8 104:24 111:24 113:3,13,21 115:4 116:25 117:10,20 118:17 119:12 119:20 120:3 122:2 123:19 127:22 128:11 129:21 131:13 131:20
**formal** 121:18
**format** 85:18 86:2,6
**formatting** 102:7

**formula** 40:23 40:25 41:11 94:2
**forth** 36:6,11 137:7
**forward** 13:23
**forwarded** 43:24
**found** 79:22
**foundation** 32:17 36:22 46:15 49:3 50:2 59:5 74:2 74:8,24 76:21 82:14,15,24 86:18 105:8 113:13,21 117:10,20 119:12 120:3 127:22 128:11 133:2 134:1,14 134:24
**foundational** 26:15
**four** 80:24
**fourth** 66:8 81:21,24 100:4 114:18
**frame** 77:8
**frisch** 2:4 10:10
**front** 112:4 115:14,17 120:9 121:5,23
**frozen** 70:1
**frustration** 133:12
**full** 11:24
**fulsome** 51:17
**functions** 13:12 73:18,24 74:4
**fund** 4:19 6:8 21:21 22:6,9 22:12,14,18,23 22:23 23:2 28:5 39:21 40:3,20 41:12 41:17,21 42:9 43:3 44:7,14 44:25 46:6,10 46:17,21 47:3 47:8,14,19 48:5,11 49:1,7 49:8,24,25 52:5 57:16,20 58:7,19 59:11 59:14 60:2,25 61:5,15 62:20 62:25 63:2 64:1,12,22 68:1,10 69:5 69:16 71:6 75:19 76:14,19 77:3,11,14,22 78:2,5,7,7,10 78:15,15,22,23 78:25 80:6,21 80:23 82:23 83:4 85:2 91:14 93:12,18 94:3 95:10 106:9,12,13,15 106:22 107:4,9 107:21 109:25 111:23 112:8 114:8,11,13,19 115:8 116:10 116:14,18,23 117:1,5,9,17 119:6,8,17,19 120:18 121:24 131:7,18 132:19 133:1,5 133:23 134:22 135:5
**funds** 59:17 76:6 78:21 79:1 106:7 107:1 108:12 114:9,12,15 116:24 117:6 117:16 122:20
**further** 4:6 80:7 110:25 132:6,11 137:11
**future** 55:7

**g**

**gain** 59:13
**gains** 57:22
**gamut** 28:2
**general** 27:23 95:10 114:11
**generalist** 24:10 111:18
**generally** 31:15 32:10 33:16 45:15 120:19
**generated** 124:9
**getting** 136:10 136:19
**give** 58:16 65:6 95:25 108:15 108:19 125:10 131:22
**given** 137:9 140:9
**go** 9:10 12:14 13:16,19,22 26:14 51:6 55:14 78:13 92:6 96:19 101:11 105:25 108:16,21 115:16 121:8 135:16
**going** 9:1 12:14 21:25 22:24 31:18 34:10 43:8 51:7 53:8 55:16 56:18,19 63:7 70:4 81:1 82:20 83:9 88:17 95:24 96:15 105:13 108:13,15,23 109:20 122:15 125:5 126:8 131:25 135:19

**good** 9:1 10:7 10:21 11:15
**governed** 95:15
**graph** 114:18 115:8
**great** 57:10 67:8 73:21
**green** 62:16
**grounds** 127:20
**group** 22:18 77:23,25 78:1 78:3,8,16,19,20 78:24 79:2 116:23 117:22 117:24 131:19
**group's** 117:6
**groups** 131:12
**guaranteed** 4:19 6:7 8:4 21:21 22:5,8 22:12,14,18,22 23:2 28:5 39:21 40:20 41:12,17,21 42:9 43:2 44:3 44:7,14,25 46:6,10,17,21 47:3,8,14,19 48:5,11 49:1,7 49:8,24,25 52:5 57:16,20 58:6,19 59:11 59:14,16 60:2 60:25 61:5,15 62:7,20,25 64:1,12,22 68:1,10 69:5 69:16 71:6 76:19 77:3,11 77:14,22 78:2 78:15,22,25 80:6,21,23 82:23 83:4 85:2 91:14 93:12,18 94:3 95:10 106:22 109:25 111:23 112:8 114:8,13 114:19 115:8 116:10,14,23 117:1,4,9,17 119:17 120:18 121:24 129:2 129:15 130:21 131:7,18 132:19 133:1 133:23 134:22 135:5
**guess** 11:15 26:11,14
**guranteed** 8:11 8:14

**h**

**h** 139:3
**hand** 19:2 137:17
**handbook** 5:23 81:10
**handwriting** 29:2
**happen** 108:8
**hard** 80:17
**harwood** 2:20
**hashmark** 118:16
**head** 13:8 41:13 98:15
**hear** 12:24
**heard** 9:7 108:3 127:13
**hearsay** 49:11
**held** 15:3 16:24 17:2
**help** 13:2 27:1 41:4 42:24 56:15
**helped** 40:16 41:7
**henricksen** 3:7 9:19
**hereinbefore** 137:7
**hereto** 140:7
**hereunto** 137:16
**high** 2:12
**highly** 112:18 113:19 116:3
**hire** 23:18
**hired** 25:8
**hiring** 36:2
**historic** 116:17 119:24
**hoagland** 81:14
**hold** 14:2,14 30:10 67:17,18
**hop** 70:1
**hopefully** 12:15 108:18
**hours** 19:15
**house** 10:25
**huh** 29:5 77:17 82:6 93:14 101:13 115:21 120:10

**i**

**identification** 31:21 34:12 38:16 42:2 43:10 53:12 63:9 65:9 67:2 69:23 70:12 81:4 83:12 84:21 87:9 88:20 91:21 97:8 98:18 102:5 105:16 124:15 126:11 128:18 129:10 130:13 131:2
**identified** 77:23
**identifier** 18:24
**identify** 16:9 25:14 77:9,12 77:20
**identity** 94:18
**ii** 57:11

**illinois** 12:3 137:5
**importantly** 50:9 72:24
**include** 73:25 90:19 91:12 103:11 133:23
**included** 38:11 66:19 78:8,16 78:18 79:1 82:11 86:7 89:23 90:22 127:2 134:6,21 135:4
**includes** 37:6 43:17 99:10 134:13
**including** 10:3 132:20 133:18 133:24
**incorporated** 132:24
**incorporates** 37:7
**incorporating** 40:4
**independent** 93:1
**indicate** 104:4
**indicated** 51:15 122:8,18
**indicates** 81:13 93:9
**individual** 90:8 98:5 99:2 105:6
**individuals** 25:20 40:14 71:2 103:9 105:5
**indulgence** 132:7
**industry** 17:22
**information** 6:9 20:19,20 20:22 31:13 50:5 51:1 60:1 68:6 82:17 85:3 86:1,3,6 86:13 93:11,17 95:17 104:9,19 110:1 113:17 115:9 116:20 119:24 121:24 122:9,19,23 127:4,15,20,24
**informational** 103:8 123:5 124:1,3,5
**initial** 39:16
**initials** 100:12
**input** 16:14 37:7,23 40:13 56:6
**instance** 64:21
**institutional** 74:13
**instruct** 20:9 20:21 95:14,18
**instructed** 120:16
**instructions** 12:15
**insurance** 1:8 2:9 3:7 9:15 21:15 22:19 32:22 35:11 38:6 62:13 65:16 78:11 97:16 112:18 112:22 113:19 118:9 122:20 127:18 139:1 140:1
**insured** 62:6
**intended** 112:15,17 114:6 116:8
**intends** 123:11
**interact** 30:25 98:4
**interactions** 121:19
**interest** 8:11 20:16 21:2 94:16
**interested** 9:23 137:13
**internal** 29:23 37:6 57:2 58:3 81:20 100:4 103:20 113:8
**internally** 46:5 56:21 122:13 124:21 127:8 127:10
**internet** 9:5
**interpret** 104:12
**introduce** 10:18 43:8 63:7 81:1 111:5
**introducing** 31:18 38:14
**invested** 104:6 117:23 119:19
**investment** 5:4 6:4,13 7:4,15 8:8 14:15 16:9 16:12 22:12 23:1,11 27:7 28:15,16 29:14 29:19 36:1 46:18 47:2,24 47:25 53:21 54:3,4,11 55:10 56:1,10 57:17,22 58:5 61:7,17 75:9 75:12,23,25 76:2,6,12,24 77:4,23 79:17 79:18 83:17 87:19 93:10,16 96:5,24 97:4 97:17 98:3,9 98:10 104:15 106:23,25

107:8,20 108:2 110:16 114:11 118:18,22,23 118:25 119:3,8 119:8,17 120:17 131:18 133:19,25 134:11
**investments** 5:22 14:20 75:14 81:10
**investors** 116:18
**invests** 94:12
**involve** 79:15
**involved** 42:21 55:25 71:3 111:21 134:4
**involvement** 56:4
**ips** 7:8 99:8,11 99:14
**issue** 70:3
**issued** 21:14 22:19 66:6
**item** 39:23 40:11,23 41:3 101:14 125:15
**items** 36:14 68:22 96:23

**j**

**jackie** 81:14
**james** 25:16,25 26:14 27:4,4 46:22
**jamie** 25:17 103:14
**jeff** 10:11
**jeffrey** 2:11 111:6
**jimmy** 27:15,16 27:21 56:14 72:12 125:6 126:2
**jobs** 17:7,10
**joe** 10:14 99:4
**join** 23:5 30:22 33:21 36:23 44:10 49:4,12 50:3 62:12 134:2,15
**joined** 10:9,13 27:9
**joining** 11:22 17:7,10
**jones** 2:16,19 10:15,20
**jonesday.com** 2:18,21
**joseph** 2:12 3:7 11:1 67:11,15 109:18
**jump** 80:16
**june** 63:15 64:11,16 128:25 130:3
**justin** 3:7 9:19

**k**

**k** 21:21,22 46:18 54:7 101:21
**kai** 2:5 10:10
**kevin** 84:6 87:25
**key** 73:18,23 74:4 75:6 79:5 82:3,7,11
**knew** 83:7
**know** 12:25 13:16 18:22 21:4 23:9 28:1 31:12,24 32:9 32:15 33:22 34:15 38:19 40:12 41:1,1 42:5 43:14 46:13 48:24 52:12 53:16 63:6 64:7 65:5 67:5,20 69:13 70:17 74:22 75:2 78:18 82:10 83:14 84:1 85:25 86:16,20 88:23 89:12,19,20 91:17,24 94:15 94:20 96:16 97:11 98:14,21 99:2 100:11,22 101:1,24 103:4 103:5 104:9,16 105:11,19 106:9 108:10 108:11 109:9 109:13,22 110:21 112:4 116:14 128:15 134:6,16 135:1 135:3 136:15
**knowledge** 14:20 19:25 20:4,15 23:23 39:8 109:16 127:21,23 134:7
**knowledgeable** 111:22
**krichter** 2:8
**kunkel** 2:12,15 10:14

**l**

**label** 18:22,24 19:4,8 32:3 96:20 106:6,9 106:12 107:1 108:12
**labeled** 106:15 107:9,21
**lack** 32:17 46:15 59:1,3 59:21 60:23 61:3,14 74:2,8 74:24 82:14 86:17 105:8
**language** 90:19 90:21,24 91:3

91:8,10,16
**large** 94:19,25 105:4 107:4 119:6
**lasalle** 12:2
**law** 12:18
**lawsuit** 12:6
**lawyers** 108:2
**leading** 48:14 48:18,22
**leave** 87:5
**led** 29:9,10
**left** 84:12
**legal** 3:7 75:21 91:1,2 123:6 123:11,17 124:2,6 136:22 138:23
**leland** 2:10 10:12
**letters** 19:2
**letting** 108:10
**level** 108:4
**lies** 62:8
**life** 22:19 97:16 112:21 113:2 113:12,19 116:2
**light** 55:17
**likely** 27:19 54:23,25 55:17 64:13 101:5 102:10 117:11 117:13 127:9
**likewise** 127:19
**line** 39:5 48:10 64:8 95:13 99:5 115:8 116:12,16 139:4,7,10,13 139:16,19
**lines** 117:21
**lineup** 47:4 54:7,8,11 56:7 106:13,25
**lipps** 2:10,11 2:14 4:5 10:11 10:11,12,24 23:4 24:22 25:9 30:7,21 32:23 33:20 36:22 43:4 44:9 45:18 46:16 48:14,21 49:3,10,15,21 50:2 55:22 56:24 57:3,6 59:5,18 60:7 61:9,21 62:11 68:11 71:12 73:14 74:9 75:20 76:7,21 80:10,13 82:15 82:24 86:5,19 88:13 90:23 93:20 96:8 97:25 104:24 105:9 110:20 111:1,4,6 112:1 113:7,15 114:1 115:6 117:3,12 118:1 119:14,22 120:5 122:5 123:21 124:16 126:12 128:1 128:13,19 129:11 130:15 131:3,15,22 132:5,9,13 133:2,10 134:1 134:14,23 135:7,19 136:9 136:14
**list** 40:13,16 41:7 74:12,15
**listed** 33:13 82:7 134:20
**lists** 47:9
**litigation** 19:1
**little** 22:16 27:1 35:19 56:25 69:25 102:7,18
**llc** 3:2 35:12
**load** 69:25 87:12 126:8
**loaded** 128:16
**loading** 79:11 133:9,12
**long** 14:24 15:3 19:13 23:24 24:5 51:23 109:12
**longer** 25:18 26:3 29:6 69:25
**look** 33:2 41:14 52:25 54:6 56:25 106:25 118:2 124:24 130:10
**looked** 85:9,14 104:16,18 113:2
**looking** 16:12 81:24 102:3 113:4,10 124:4
**looks** 64:7 91:1 91:4 99:19 101:4 130:4
**lori** 25:18 29:3
**loss** 22:16
**lost** 58:16
**lot** 80:17
**louisiana** 2:17
**lucas** 25:18 29:3

**m**

**m** 137:21
**made** 30:15 37:15 44:19,22 52:16,18 71:5 73:25 78:20 88:1 93:15 111:17 121:9 131:17 140:5
**main** 31:11,11 31:13

**maintaining** 94:16
**major** 58:18
**make** 11:16 27:1 48:19 52:9,14 53:2,5 54:10 56:20 58:12 64:9 70:2 75:7 87:5 90:1,17 107:2 108:8,17,20
**makes** 26:25 55:2
**making** 30:19 39:20 80:16 108:9
**manage** 24:10 24:12 40:8 124:12
**managed** 7:10 27:17 101:16 101:19,20 102:1 103:1,11 104:18,20,23
**management** 94:22 95:4 101:22
**manager** 16:1,2 16:4,6,9,10,12 16:15,21 29:11 37:13 75:17,25 76:12 79:17 106:12,15,25 107:4,8,20 108:12 117:23 119:3
**managing** 5:21 26:21 81:9
**manner** 66:21
**marathon** 13:14
**march** 105:24 108:1,6
**margin** 114:21 115:3 131:17
**mark** 105:13
**marked** 31:21 34:12,15 38:16 38:19 42:2,5 43:10,13 53:12 53:15 63:9,12 65:9,12 67:2,5 69:23 70:12,17 81:4,7 83:12 84:21,24 87:9 87:15 88:20,23 91:21,24 97:8 97:11 98:11,18 98:21 102:5,9 105:16,19 124:15 126:11 128:18 129:10 130:13 131:2
**market** 3:4 78:12
**marquette** 17:12
**marriage** 137:13
**master** 4:9,12 32:4,9,12,16 33:18
**master's** 14:4,8
**material** 74:13 74:14,16,20 120:17 121:1 136:16
**materials** 28:21 30:5 31:1,7 68:9
**matter** 9:14 19:4 27:16,22 43:19 81:12 123:7 124:7 137:14
**matters** 136:18
**maturity** 27:6
**mcallister** 25:17 103:14
**mean** 16:6 24:12 28:21 29:10 59:3 62:23 63:1 74:20 85:19 94:11
**meant** 46:13 127:1
**media** 9:12 51:8,12 70:6 70:10 108:24 109:3 136:20 136:21
**medians** 117:22
**meet** 19:20
**meeting** 28:6 30:13,15 51:19 51:21 55:3 71:24 72:16 121:8,10,14
**meetings** 30:11 30:18
**member** 15:22 15:25 16:20 37:19 111:14 111:15
**members** 29:25 30:6 72:16 88:11 111:19
**memory** 101:6
**mention** 60:16
**mentioned** 21:22 22:5 25:13,25 28:3 28:9,13 29:1,3 40:10,19 44:17 44:19 60:16 64:18 69:10,12 71:5 98:7 110:1 125:15
**mentioning** 108:7
**message** 13:13
**met** 18:4
**metadata** 81:13
**michael** 2:11 10:13
**midatlantic** 138:15

**middle** 58:23 82:2,3 124:24
**miller** 2:16 10:15,15 87:3 87:3
**million** 95:1
**milstein** 2:3 10:9
**minus** 40:3 60:18 132:19
**minute** 70:2 109:11 131:23 131:24
**minutes** 51:24 63:25 77:15 108:16,20
**mischaracteri...** 60:8 96:9
**misstates** 24:24 64:24
**models** 27:7
**moment** 51:3 58:16 65:7 69:21 107:16 133:9
**money** 94:13 104:14
**monitor** 75:17 75:25 79:6
**monitoring** 76:5 79:14
**morgan** 3:4 10:21,22 18:6 18:9 19:14 20:7,18 23:5 24:24 25:10 30:22 31:3 32:17 33:21 34:7 36:23 44:10 45:17 46:15 48:12,18 49:4,12 50:3 55:13 61:8,19 62:12 64:24 74:2,8,18,24 75:22 76:8,22 79:24 82:13,25 86:17 88:14 93:5,21 95:12 96:7 102:15,20 105:7 134:2,15 134:25 135:16 136:3 138:1
**morning** 9:1 10:7,21 11:15
**move** 28:10 88:18 101:7
**multi** 106:12,15 106:25 107:4 108:12
**multiple** 19:17 71:14
**mutual** 1:7 2:9 3:7 9:15 21:15 32:21 35:11 38:6 65:15 66:16 118:3 122:19,20 127:4 139:1 140:1
**mutual's** 38:10 66:19
**mutuals** 122:23 127:24

**n**

**n** 2:11 4:1
**name** 9:19 10:7 11:17,24 84:2 97:22 99:2 111:6 125:5
**named** 12:5 25:20
**names** 71:1 84:5
**nationwide** 1:7 2:9 3:7 4:9 5:3 5:11,17 6:7,11 7:14 9:15 11:1 19:22 20:1,5 20:16 21:1,15 21:19,23,25 22:19 23:12,16 23:17,25 24:6 24:9,11,13,15 24:16,20 25:7 26:2,7 27:5 29:14 30:1 31:1,6,15 32:21 35:2,3 35:11 36:2,3 36:13,18 38:5 38:10 39:21 41:20 43:3 44:3,8,15,20 52:14,16 53:21 54:20 55:11 56:15 57:20 58:2 59:25 62:6,7,8 64:23 65:15 66:1,6 66:16,19 67:16 67:22 69:3,7 69:17 70:21 71:10,21 72:4 73:6 74:7 80:6 80:20 83:8,25 84:3,14,17 85:2,11 86:22 86:24 87:18,24 88:1,5 89:13 89:14 90:8,13 94:6 97:3,15 97:15 98:8 99:3,11,14,22 103:7,10,16,17 103:21 104:13 104:22 105:10 109:25 110:4,8 110:15,19 112:17,21 113:2,12,18,19 114:13 115:8 116:2,3,10,13 117:23 118:3 122:8,12 124:9 127:3 138:4 139:1 140:1
**nationwide.c...** 98:25

**native** 129:21
**nature** 23:20 106:12
**nav** 78:12
**navigate** 73:13
**navigated** 57:8
**near** 102:17
**necessarily** 94:17
**necessary** 140:6
**need** 13:15,18 77:15 109:12 136:14
**needs** 125:19
**negative** 60:22
**neither** 21:5
**net** 128:4,5
**never** 58:2 126:2
**new** 2:5 16:9,12 53:9 63:7 65:6 83:9 85:25
**nmic** 4:24 6:18 89:3
**nods** 13:8
**nonverbal** 13:8
**normal** 69:25
**north** 2:12,20 12:2
**notary** 137:4 140:13,19
**note** 9:3 10:24 32:23 49:16 61:25 87:6 90:23 95:12 138:10
**noted** 68:14 140:7
**notes** 92:16
**noticing** 10:6
**notifying** 91:16
**november** 130:17,18
**nrsga** 116:12
**nsp** 8:4,11,14 129:2,15 130:21
**ntw0002192** 32:3
**ntw0002192-...** 4:11
**ntw0007820** 38:24
**ntw0007820-...** 4:18
**ntw0008074** 34:19
**ntw0008074-...** 4:14
**ntw0009111** 6:22
**ntwd** 19:5
**ntwd0000001** 5:16 67:12
**ntwd0000077** 105:25
**ntwd000007...** 7:17
**ntwd000025...** 7:21
**ntwd000188...** 5:6
**ntwd0002206** 65:18
**ntwd000220...** 5:13
**ntwd0002312** 70:23
**ntwd000231...** 5:20
**ntwd0003981** 85:4
**ntwd000398...** 6:10
**ntwd0004120** 87:21
**ntwd000412...** 6:16
**ntwd0004440** 83:18
**ntwd000444...** 6:6
**ntwd000462...** 7:6
**ntwd000477** 63:16
**ntwd0007307** 8:6
**ntwd0007308** 8:13
**ntwd000731...** 7:25
**ntwd0007791** 99:1
**ntwd000779...** 7:9
**ntwd000783...** 8:10
**ntwd0007837** 8:16
**ntwd0008157** 102:25
**ntwd000815...** 7:12
**ntwd000847...** 5:10
**number** 5:2 6:2 7:2 8:2 57:2 64:13 136:21
**numbers** 19:1,5
**nw** 2:5,17

**o**

**o'bradovich** 15:17
**oath** 12:22
**object** 96:1
**objection** 20:7 20:18 23:4 24:22,24 25:9 30:7,21 31:3 32:17 33:20 34:7 36:22 43:4 44:9 45:17,18 46:15 46:16 48:12,14 48:18,21 49:3 49:10 50:2

55:13,22 59:5 59:18 60:7 61:8,9,19,19 62:11 64:24 68:11 71:12 74:2,8,9,18,24 75:20,22 76:7 76:8,21,22 79:24 82:13,15 82:24,25 86:5 86:17 88:13,14 90:23 93:5,20 93:21 95:12 96:8 104:24 105:7,9 110:20 111:24 113:3 113:13,21 115:4 116:25 117:10,20 119:12,20 120:3 122:2 123:19 127:22 128:11 131:13 131:20 133:2 134:1,14,23 135:7
**objections** 9:25 12:19 25:10 49:16,17 61:21 86:19 96:7 134:25
**observation** 131:17
**observe** 93:16
**observed** 76:18 119:10
**occurred** 121:23 125:1
**offer** 120:20
**offered** 54:7
**ohio** 1:2 2:13 9:17 14:7 21:16
**okay** 12:13 13:25 15:10 20:15 21:5 23:23 25:13,25 26:25 28:24 29:13 30:18 32:2 33:16 34:2 35:4 36:17 37:2 41:9,23 46:3 50:7 51:2,21 51:25 53:8 54:15 55:10,25 57:11,19 58:15 58:16 60:12 62:16 63:11,14 64:18 65:14 67:23 68:8,22 69:20 70:4 71:25 72:19 73:19 74:16 75:5 78:4 79:5 79:13 81:1 82:19 83:15,24 84:16,19 87:14 87:16 88:17,25 91:8 92:1,21 93:9 94:5 95:24 96:15,18 96:22 97:13 100:1 101:6,10 101:24 102:12 103:15,19,22 104:21 105:13 105:21 107:7 107:17 108:14 108:20 109:1 109:10,15,20 109:23 110:10 110:13,22 114:4 116:6,16 118:2 120:8 123:3 126:15 128:22 129:12 130:5,14 131:25 136:19
**once** 120:2 128:9,15
**onerous** 79:10
**ones** 101:3
**open** 31:24
**operate** 59:15 59:17
**operating** 40:5 40:6 132:21,23 133:3,22 135:21
**opinions** 108:4
**opportunity** 95:25
**opposed** 117:17
**option** 22:12,15 47:25 57:17 78:11 93:12 102:10,16 104:17 106:20 106:21 117:7 118:25 120:18 120:21
**options** 54:6,12 57:3,12 79:18 96:5 104:15 106:18 113:10 117:2
**order** 4:12 6:17 31:1 33:7,18 33:24 34:20 89:2 135:20
**orders** 33:5,12
**orientation** 102:9
**original** 75:2
**originally** 55:4
**outcome** 9:24 137:14
**outline** 108:16
**outlined** 62:17
**outperforms** 117:1
**outside** 20:20 75:2
**overbroad** 34:7
**oversees** 29:24
**overview** 7:11 46:6 80:22

103:1 112:8

**p**

**p.m.** 51:8,11 70:5,9 108:24 109:2 125:10 132:1,4 136:20
**page** 5:2 6:2 7:2 8:2 35:5,9 35:9,19 37:3 37:25 39:14 43:17 46:4 50:8 56:19,22 56:24 57:2,5 58:16 66:9,10 71:1 73:11 79:8,9 80:2,18 81:21,23,24 82:3 86:9 97:20,25 98:1 99:13,16 100:4 100:15 101:12 102:19 103:20 116:8 123:5 126:25 133:17 134:20 139:4,7 139:10,13,16 139:19
**pages** 80:24
**paginated** 46:5 56:21
**pagination** 81:21 100:5
**paid** 40:4 60:19 125:17 132:20 133:1
**paragraph** 108:6 114:16 114:17 125:14
**parenthesis** 33:6
**part** 76:11,23 78:23 79:17 85:10 110:2,18
**participants** 2:1 3:1 9:6 22:15 40:4 54:12 57:23 60:19 62:19,24 94:13 101:21 103:21 104:4 104:14,23 117:18 119:1 132:20
**participate** 16:8
**participated** 12:8,13
**particular** 24:21 26:1,20 64:17 85:16 101:2
**parties** 9:10 33:6 137:12
**party** 9:22 21:10
**past** 25:19 107:2
**patience** 70:14
**patrick** 25:17 28:9,13,15
42:20 46:21 56:14
**pay** 127:1
**pdf** 56:22
**peer** 77:23,25 78:1,3,8,16,19 78:20,23 79:2 116:23 117:5 117:22,24 131:11,19
**penalty** 12:23
**pending** 13:18 13:19
**pennsylvania** 3:5
**pension** 97:16
**percent** 58:20 103:24,25 104:4,5 119:7
**percentage** 118:24
**percentages** 105:4
**perform** 33:4 33:17 34:4 36:2 37:5
**performance** 17:15 47:25 75:17,19,25 76:12,14,19,24 77:3,10,13,21 116:9,17,22 117:7
**performed** 37:21 114:13
**period** 116:19 121:15,16 129:16 130:5 136:10
**periodic** 30:11
**periodically** 75:9
**perjury** 12:23
**person** 19:20 27:19 31:11 67:21 121:6,7 122:8,8
**personally** 74:15
**philadelphia** 3:5
**phone** 11:1 45:10,12,14 53:6 58:13 92:22 93:2,6
**pick** 13:7
**piece** 81:18
**pieces** 125:20
**piper** 3:3 10:22
**place** 9:10 19:19 51:21 55:4
**placing** 33:24
**plaintiff** 9:14
**plaintiffs** 1:5 2:2 10:8 19:4 31:19 32:2 34:14,18 35:9 35:19 37:25 38:18,22 42:4

43:12,16 46:2 53:9,14,19 56:19 63:11 65:11 67:4,9 70:16,20 72:20 73:22 81:6 83:10 84:23 85:1 87:14,17 88:22 89:1 91:23 92:2 96:16,19 97:10 97:14 98:12,20 98:24 101:8 102:8,24 105:18,22 109:8,21,24 110:11,14 133:8,15 134:20
**plan** 5:3,21 21:21,22,23 22:1,2 23:13 24:6 29:24 36:3 39:21 46:18 47:4,4 53:21 54:12,13 62:18 73:18,24 74:4,7 75:15 76:13 79:6,15 81:10 82:4 94:7,12 97:4 97:15,17 98:8 101:20,21 104:15,22 105:3 106:16 107:5 110:8,16 113:11 125:25
**plans** 6:4,13 37:18 79:17 83:17 87:19 94:6,10 95:11 96:3,25 111:17 134:11,12
**play** 24:8
**please** 9:3 10:1 11:4,23 12:25 13:3,6,10,15 14:1 22:6,11 25:4 29:2 31:24 34:15 35:4,8,18 38:19 39:13 42:5 43:13 46:1 49:15 50:7 53:15 56:18 65:7 66:8 67:5 69:21 70:17 73:10 80:2,15 81:20 83:14 88:23 91:24 96:16 97:11,20 98:21 99:16 100:3 101:8 103:19 108:21 109:7,21 110:11 133:7 133:16
**pnc** 17:17
**point** 13:15 24:14 31:11 46:14 50:8,13 50:18,22 52:1 58:1 60:6 67:21,21 68:8 71:10 75:8,16 85:9 110:2,17 122:22 127:2 135:24
**points** 47:6,10 58:23 74:17,23 86:11
**policy** 7:4 75:9 75:12,14 96:24 97:4,17 98:9 98:10 100:17 100:22,24
**poorly** 23:8
**portfolio** 40:8
**portion** 57:22 61:16 104:18
**portions** 58:7,9 61:6 135:24 136:6
**portray** 114:6 116:8
**position** 17:4
**positions** 16:24 17:1,21
**positive** 60:22 119:23
**possible** 51:4 68:24
**potential** 117:22
**potentially** 49:10
**practices** 75:18 76:4
**preparation** 18:9,13,16 19:16 42:21 56:1,5,10
**prepare** 17:24 18:2 19:11,13 40:13 42:24 51:20 66:2
**prepared** 35:15 36:20 42:15,19 47:2 54:16 66:4
**preparing** 47:22 71:3
**present** 3:6 10:3 28:6 44:25 45:3 55:10,20 58:4 63:3,5 72:2,6 72:16 86:1
**presentation** 6:21 7:16 27:7 27:9,11,12,18 28:22 30:16,19 42:8,13,19,22 42:23,25 45:6 45:16,23 46:4 47:22 48:1,6 49:9 50:1,15

50:19,22 52:6 52:9,12,15 53:25 54:16,19 55:1 56:16 58:7,10 61:17 63:6 64:19 70:24 71:2,3,6 71:7,9,14,22 72:9,17,20 73:7,15,25 77:16 80:3 82:12 87:22 91:12 101:2 103:2,16,20 104:7 113:23 121:9,12 122:22 125:2 125:11 127:3
**presentations** 44:20,22 88:1 93:15 121:4
**presented** 26:24 27:15 28:1 30:2,5,13 31:2,8 44:18 58:2 72:17 86:3,7 101:3 113:6 116:24 121:17
**presenting** 88:4 121:15
**preservation** 22:15,23 23:3 57:4,12,16 78:11 113:10
119:15
**president** 15:2 15:4,13,19 16:23 17:3,5 17:18
**pretty** 91:1
**previous** 68:8
**previously** 85:11 96:5 110:3,7,18
**prior** 17:5,7,10 24:24 55:1,18 64:24 83:24 93:4,18 113:1 115:22
**private** 94:12
**privilege** 20:13
**privileged** 20:8 20:19
**privy** 120:25 122:1
**probably** 27:8 99:20
**problem** 79:12 102:22
**proceed** 11:9
**proceeding** 10:1
**process** 33:23 76:6,11 79:23 108:9,13
**produce** 18:25
**produced** 19:3 81:11,19 89:4 129:20 136:2
**producers** 97:16
**product** 57:21 59:11,17,23 62:5,6 86:12
**products** 59:8 95:10 114:20
**professional** 14:10,13
**project** 4:16,22 5:19 6:5 23:17 23:21,21,24 24:16,21 31:15 33:17 34:4,6 35:21 36:15 37:3,5 39:6,9 39:10 43:19 64:14 66:1 68:21 70:22 71:20 72:3 83:6,17 85:15 101:2 105:11 115:20 134:4
**projects** 23:19 25:8,19 26:4 27:14,25 28:2 30:1 33:13 76:17,17 85:17 85:25 111:21 113:18 115:11 119:9 124:9
**prompted** 101:24
**pronounce** 125:5
**pronouncing** 11:17
**properly** 104:12
**proposal** 36:13 36:16 66:5
**proposed** 89:12 89:17 90:19
**proposing** 89:15
**proprietary** 69:8,11,17 122:9,19 127:4 127:16,20
**protective** 135:20
**provide** 16:14 24:18 35:2 41:10,16,20 43:2 44:14 51:16 54:8,19 54:22 69:3,8 71:19 73:6 124:2
**provided** 50:4 50:25 52:13 56:6 62:6 68:6 71:9,22 73:5 77:7 91:5 104:19 115:10 116:21 123:17 127:19,24 129:15 130:2
**provider** 57:22 79:22 127:2

**providers** 101:16,25 128:5
**provides** 14:19 22:15 23:11 78:13
**providing** 23:24 27:23 38:11 66:20 131:6
**provision** 33:2
**provisions** 95:16
**prudent** 79:22
**public** 94:12 137:4 140:19
**publicly** 81:13 95:17
**published** 86:10
**pull** 109:8,21 110:11
**purposes** 73:7 103:8 123:6 124:2,3,6
**pursuant** 21:10 33:18 37:22 38:9 42:16 54:16 66:18 92:7
**pursued** 47:8
**pushed** 55:5,8
**put** 18:25 28:21 31:1,7 36:14 40:16 41:3,7 50:18,22 54:25 56:7,15 75:1 85:25 91:1 104:7 112:25 122:21,22 124:1
**putting** 26:23 30:4 50:14

**q**

**quality** 9:4,5
**quarter** 8:12 114:18 129:3 129:23,23
**question** 7:24 11:16 13:4,18 13:19 20:12,24 22:7,25 23:6,9 25:3 26:11,16 28:10 34:2 44:13 47:5 48:19 49:13,23 51:17 55:17 61:10 65:2 68:5 71:18 77:18 78:6 82:20 95:21,25 107:17 110:10 122:6,15 123:14 135:11
**questioning** 95:13 108:19 135:17
**questions** 5:9 5:15 7:20 12:19,25 13:6 27:1 68:1,15 68:23 109:6 110:23,25 111:7 122:24 123:22 132:6,9 135:8
**quick** 64:1 128:15
**quickly** 12:16 75:5

**r**

**r** 2:4 137:1 139:3,3
**raises** 12:20
**rate** 40:2,3,22 40:25 41:11 60:18,18,21 78:14 94:2 115:9 119:11 128:9 132:18 132:20,25
**rated** 95:9 112:18 113:19 116:3
**rates** 8:4,12,14 116:17 120:2 128:4 129:3,16 129:22,24 130:1,21 131:6 131:6,10,16
**rather** 57:21 67:24 114:21 115:2 118:17
**rating** 112:15 112:20,21 113:2,11 116:2
**ratings** 112:15
**read** 107:15 135:13 138:9 140:5
**reading** 32:24
**really** 104:11 134:16
**reason** 13:22 39:1 89:22 90:3 105:4 108:7 134:18 138:11 139:6,9 139:12,15,18 139:21
**reasons** 62:17
**recall** 19:7 45:12,14,15,22 46:24 47:5 52:18,20,21,23 55:3,7 63:21 64:10,19 68:4 69:15 72:15 73:3 84:10 85:12 89:17 90:14 91:9 92:21 93:2,6 94:24 99:21 100:24 103:15 103:18 110:4 122:12,16 132:21
**recalled** 125:1
**receipt** 138:18

**receive** 14:5,8 37:22
**received** 36:12 36:12,18 117:8 130:17
**recent** 27:19
**recently** 58:19
**recognize** 124:20 126:16 130:16
**recollection** 44:6 55:23 125:7,10 126:20
**recommendat...** 63:3
**recommends** 62:18
**record** 9:2,11 10:5,25 11:24 12:20 13:3,16 13:20 32:23 48:19 49:17 51:6,7,10,15 52:4 70:2,5,8 87:6 108:18,22 108:23 109:2 129:8 132:1,3 135:12,16 136:17,20 137:9
**recorded** 9:8 9:12
**recording** 9:4,9
**recordkeeper** 79:20 125:18
**recordkeeping** 119:4
**records** 103:6 110:8
**refer** 22:2 33:13 80:22 92:13 113:23
**reference** 118:21
**referenced** 80:21 121:1,25 138:6
**referencing** 60:6 92:20
**referred** 26:10 27:11 28:7 37:12 39:9 40:6 82:12
**referring** 16:17 18:5 22:3 25:15 26:16,18 26:19 27:13,22 29:17,18 40:7 54:11 62:4 68:18 71:7 78:1,5,9 90:21 91:8,13 100:25 106:10,11,21 106:23 107:3
**refers** 40:2 106:6 132:18
**reflect** 115:2
**reflected** 50:10 50:23 72:25 73:3 116:19 129:16
**reflecting** 125:19
**refrain** 13:11 49:16
**refresh** 44:6
**regarding** 39:20 45:6 59:2,3,22 60:1 60:24 61:4,15 92:8 120:12 121:23
**regardless** 60:14
**regular** 76:24
**regularly** 75:19 79:22 118:25 119:7
**relate** 59:22
**related** 9:22 37:18 40:9 65:25 101:16 101:25 104:23 137:11
**relates** 110:10
**relating** 20:17 21:2 68:9 93:11,17 120:18,21 123:23
**relations** 17:19
**relationship** 23:15,20 24:3 24:11,13,19 25:6 27:17
**relationships** 26:21 95:15
**relevant** 125:16
**rely** 92:24
**remember** 43:6 45:7,19 47:1 64:14,16 69:13 69:18 71:23 83:23 99:18,23 99:25 101:1,3 103:3 123:24
**remote** 1:14 121:13
**remotely** 2:1 3:1 10:4 121:14
**remove** 58:6,8 58:9 61:6,16
**repeat** 13:1 23:6 25:2 36:8 49:13 65:1 77:18 107:17 123:13
**rephrase** 13:1 20:24 34:3 44:18 55:16 71:18 78:6 89:25 123:13
**report** 15:14 112:8,23,25 115:20,24

116:1,24 120:20 123:5 124:5 131:16
**reported** 1:23
**reporter** 9:21 11:4 12:18 13:2,7 135:11 137:3
**reports** 27:15 111:20 123:12 124:8 131:9
**represent** 10:22 81:11 89:3 99:12 111:6 134:5
**representing** 9:19 10:12
**request** 8:8 33:17 36:13,16 39:16,20,23 41:9,15,19 52:16,18 53:1 53:2,5 58:12 66:5 69:5 101:25
**requested** 36:15 38:12 40:22 52:14 59:25 60:3,10 61:6,16 66:20 73:6 77:2,6
**requesting** 34:6 36:13
**required** 140:13
**research** 17:13 26:22 81:18
**respect** 23:12 24:8 33:23 123:1
**respond** 13:18
**response** 36:19 66:5 69:5
**responses** 12:19 51:16
**responsibilities** 38:2,10 66:12 66:19 100:18
**responsibility** 108:5
**responsible** 26:4
**rest** 57:23
**restate** 25:2 61:10
**restrictions** 55:5
**retained** 118:17 136:22
**retains** 57:22
**retirees** 94:13
**retirement** 6:12 87:19 94:6,10 96:3 134:12
**retirements** 110:16
**return** 22:16 40:2,4 46:1 60:18,19,21 132:18,20,25
138:13,17
**returns** 114:7 114:19 117:17 118:5 119:16 119:23 131:18
**revamped** 85:15,19 86:2
**reveal** 95:19
**revenues** 118:16 125:16
**revert** 96:15
**review** 4:20 6:4 8:9 16:4 18:12 27:8 36:1 37:6 37:17 42:9 43:3 44:7,15 45:1 47:2 49:8 50:1 52:5 64:22 68:9,15 68:18,21,23 75:9,16,19,24 76:5,11,24 77:7 83:4,17 85:15 96:24 104:14 109:12 109:14 136:5 138:7
**review.2020....** 44:3
**reviewed** 18:16 18:20 19:8 39:11 42:17,23 54:17 82:23 85:9,13 91:5 110:2,6,17
112:11 114:24
**reviews** 112:19 112:21
**rfp** 36:12,18
**richards** 17:15
**richter** 2:5 10:10
**right** 14:22 16:18 19:2 23:10 29:4 44:23 52:3,10 53:8,14,18 54:10 56:20 68:10 87:1,17 89:1 102:8 109:16 111:11 112:12 115:20 116:19 117:19 119:11 120:13 121:5,20 123:18 125:6 127:21 129:19 135:6
**risk** 22:16 62:1 62:3,7,9,13,14 133:19,24 134:13
**roadmap** 75:13
**rob** 31:9,13,16 45:4,5,13,16,24 52:17 54:24 58:11 67:20 69:12 90:11,15 91:3 122:10

**robert** 38:23 39:3,15 41:10 41:15 43:18,24 61:5,16 63:15 63:24 64:6,11 67:18 92:3,7 92:16 93:3
**roger** 105:23 106:2,6 107:14
**role** 15:13 24:8 25:6 67:18,20
**roles** 16:24 17:1
**rolling** 114:18
**rotate** 102:11 102:16
**row** 104:3
**rpr** 1:24 137:21
**running** 129:22 133:4
**ryan** 1:4 2:2 9:14 138:4 139:1 140:1

**s**

**s** 139:3
**save** 22:1
**savings** 5:3 21:23 22:1 24:6 36:3 39:21 53:21 74:7 94:6 97:4 97:15 98:8 104:22 110:8
**saw** 120:1,13
**saying** 104:10
**says** 50:9 57:3 80:5 81:22 92:25 101:15 112:8 114:17 118:3,16 120:16 124:5 125:14 126:25 128:2 129:2 130:6
**schill** 2:19 10:19,19
**schleppi** 3:7 11:1
**scope** 6:3 35:21 36:5,10,14 76:23 83:16 96:20,23 101:11,15
**screen** 9:7
**scroll** 35:4,8,18 37:2 39:13 43:23 50:7 57:1 66:8 73:10 77:15 80:15 81:25 97:20 99:16 100:3 102:17 102:18 103:19
**scrolling** 79:8
**search** 16:1,2,8 16:10,21 37:13
**searches** 16:4,7 16:15
**second** 29:2 35:5 39:13 46:4 75:8 99:13,16 108:6 114:16 118:3 129:23 133:16 134:20
**seconds** 87:12 109:12
**section** 35:21 35:25 36:6,11 37:4 38:1 66:11 81:22 82:3 96:21 101:12,15
**sections** 82:4
**see** 32:5 33:10 34:20 35:13,23 37:9 38:3,24 39:6,17,24 40:23 41:14 42:11 43:21,25 44:3 46:7,11 47:10 50:11 53:23 57:12,24 58:20,24 62:1 62:21 63:16 64:3 65:13,19 66:13 67:13 68:2,16 69:1 72:21 73:1 75:6 79:6 80:7 80:8 81:8 82:5 82:8 83:19 84:25 86:14 91:2 92:4,11 93:13 97:1,22 97:23 99:8 100:5,7,20 101:17 102:20 103:23 104:1 106:4,7 114:22 118:6,19 120:23 123:4,8 125:2,7,21 127:5 128:6,25 129:24 130:20 133:20
**seeing** 103:3 113:22
**seems** 69:25
**seen** 9:6 32:7 34:22 42:13 53:25 65:21 70:24 81:15,17 83:21 85:5,7 87:22 89:6 97:18 99:17,20
**select** 18:15,19 54:13
**selected** 47:12 47:18 117:6,16
**sellers** 2:3 10:9
**senior** 3:8 15:2 15:3,13,19 16:23 17:5 37:8,16
**sense** 26:25 27:1

**sent** 31:12 39:16 43:6 44:7 45:8,8 54:23 63:24 64:8 67:24,24 103:7 138:14
**sentence** 128:8
**separate** 34:5 80:5
**series** 133:18
**serve** 37:14
**served** 17:18 21:10
**services** 17:21 23:12,25 33:4 33:8,9 35:3 36:15
**session** 19:16 19:18,19
**set** 36:5,10 45:9 88:17 108:20 137:7,16
**seven** 15:5,6 24:7 94:14,20 95:8
**share** 70:1
**shared** 124:18
**shareholder** 15:10
**sheet** 129:21 138:11
**short** 51:9 70:7 108:25 132:2
**shorthand** 137:3
**show** 104:9 112:2,17 114:10 124:11 128:14 130:10
**showed** 106:18
**showing** 114:7 117:21
**shown** 112:3 117:16
**shows** 116:3,9
**sic** 63:16 109:3
**side** 26:23
**sight** 48:10
**sign** 138:12
**signature** 35:6 90:4 97:21 137:20
**signed** 33:5 89:19,23 90:5 91:5 138:20
**similar** 12:17 37:13 67:18 91:15 112:19 112:20
**simply** 104:19 108:2,9 121:8
**simultaneous** 48:13 49:20
**single** 24:14 61:25 62:3
**sit** 110:24
**six** 71:1 94:14 94:19,20 95:8 99:24
**sixth** 103:19
**slide** 46:5 57:11 61:25 72:19,21 72:23 73:14,16 73:17,22,23,25 80:10,11 112:7 112:10 114:3,6 115:16 116:1,5 118:2,15 123:2 123:23 124:1
**slot** 107:4
**slowly** 13:7
**solutions** 136:23 138:23
**somebody** 99:19
**sorry** 28:9 29:1 36:8 56:20 58:16,17 65:1 72:24 79:9 80:10,16 83:25 123:13
**sort** 25:22 40:9
**source** 20:25 74:22 75:2 82:11,17
**southern** 1:2 9:17 21:16
**sow** 6:20 92:10 92:13
**speak** 13:6 18:8 19:10,22 20:1 20:4 27:25 47:21 104:11
**speaking** 48:13 49:16,20 133:10,11
**specialist** 3:7 24:17,20 25:7 25:13,14 26:11
**specialists** 25:24 26:13,17 111:16
**specialty** 25:21 26:1,6,8
**specific** 24:18 99:18 101:16 101:25 104:22 106:13 136:6
**specifically** 26:22 33:4 44:22 127:12 134:8
**specificity** 69:15 136:6
**specified** 47:13 60:15
**speculate** 30:12 64:9 104:8
**speculation** 82:13 86:17 105:7 134:23
**speculative** 98:14
**spoke** 67:22
**spoken** 86:23 87:25
**spread** 39:23 39:24 40:1,2

40:10,11 41:16 41:17,21,21 48:4,11,25 49:7,24 59:8 59:11,17,23 60:3,5,5,10,10 60:17,17,20,22 68:24,25 69:3 69:4,16 73:5,7 94:2 118:4,17 122:9,18 125:16,24 126:3 127:1,19 132:18,25 134:13,21 135:4
**spreads** 118:9 118:11 132:15
**stable** 78:3,5,7 78:10,15,20,21 78:22 79:1 114:9,12,14,20 116:10,23 117:2,6,16 120:21 128:5 131:11,19
**staff** 100:19
**stalnaker** 43:25 105:23 107:20 107:24
**stamp** 34:19 35:20 38:1,23 53:20 56:22 63:15 66:9 67:11 70:23 73:12,17 80:3 80:11,18 83:18 85:3 87:20 89:3 98:25 100:5 101:12 102:25 105:24
**standard** 124:7
**standpoint** 119:16
**stands** 116:14
**start** 11:23 13:4 24:3 121:7
**started** 17:12
**starting** 99:12
**state** 10:1,4 78:4 108:5 137:4
**stated** 23:8 39:15 50:23 63:25 67:25 107:25
**statement** 5:12 7:5 35:10,15 36:6,11,20 37:22 38:9 39:10 42:16 54:17 65:15,25 66:2,4,18 75:10,12 89:11 92:14 94:1 96:25 97:4,17 98:9,11 114:25
**states** 1:1 9:16 33:3 37:4 46:9 47:7 57:19 58:18 59:1 72:23 86:9,10 100:16,17 127:3
**stating** 11:23
**stenographer** 11:8 135:10,15 136:12
**stenographic...** 1:23
**step** 26:9
**steps** 47:9,12 47:18
**stop** 94:1 96:4
**strain** 101:6
**strange** 102:7
**street** 2:12,20 3:4
**strike** 22:7,24 23:9 34:2 44:18 47:5,22 52:22 77:11 78:6 88:3 94:19 99:6 100:23 103:4
**string** 19:1 124:20
**structure** 5:4 6:14 27:7 28:16 47:2 53:21 54:3,4 55:11 56:1,10 58:5 61:17 87:19 106:24 110:16
**studies** 85:22
**study** 68:7
**subject** 27:16 27:21,22 39:5 43:19 99:5,7
**subjects** 28:22
**submit** 33:18 78:21
**subpoena** 21:10,13
**subscribed** 140:14
**suitability** 46:10,14,20 47:8,13
**suite** 2:13,20 3:4 12:2
**summary** 72:21
**supervisor** 15:16,20
**supplemental** 6:8 85:2 110:1
**supplier** 33:3 93:12
**support** 26:2
**supposed** 55:4
**sure** 10:19 11:16 15:7 23:8 36:9 41:13 43:5 49:14 51:5 54:10 56:20 61:12,12 64:7 65:4 70:2

74:19 75:7 77:19 87:5 90:1,2 107:2 107:18 108:8 108:17,20 127:11 134:5
**surplus** 133:19 133:24
**sutter** 2:4 4:4,6 10:7,8 11:14 20:10,23 23:7 25:1,12 30:9 30:24 31:5,22 32:19 33:1 34:1,9,13 37:1 38:17 42:3 43:7,11 44:12 45:21 46:19 48:16,23 49:5 49:14,18,22 50:6 51:6,13 53:13 55:15,24 56:25 57:5,7 59:9,20 60:11 61:11,24 62:15 63:10 65:3,10 67:3 68:13 69:24 70:13 71:17 73:16,20 74:5,11,21 75:4 76:1,10 77:1 80:1,11 80:14 81:5 82:18 83:2,13 84:22 86:8,21 87:7,10 88:16 88:21 91:7,22 93:8,24 95:20 96:11 97:9 98:1,2,19 102:6,17,22,23 105:2,12,17 108:21 109:4,5 110:22 111:9 111:24 113:3 113:13,21 115:4 116:25 117:10,20 119:12,20 120:3 122:2 123:19 127:22 128:11 131:13 131:20 132:8 132:12 133:6 133:14 134:9 134:17 135:2,8 136:7,17
**swear** 11:4
**sweeney** 1:4 2:2 9:14 21:14,19 138:4 139:1 140:1
**switching** 107:13
**sworn** 11:7,12 137:8 140:14
**system** 79:10 133:9

**t**

**t** 137:1,1 139:3 139:3
**table** 86:12
**take** 9:10 19:19 26:9 51:4,21 55:4 87:7 109:11 130:10 131:24
**taken** 9:13 12:22 51:9 70:7 74:13,14 108:25 113:11 119:7 132:2
**talk** 47:17
**talking** 13:5 52:5 107:2 129:6
**target** 27:6 39:24 40:10,11 41:16,21
**tax** 123:7 124:7
**taylor** 25:16 26:6 28:3,11 40:18 41:4 42:20 47:15,16 47:17,21,23 48:3,24 49:6 49:23 50:14,17 50:21 85:21 111:10,13,21 122:17 125:6 126:2
**taylor's** 125:10
**team** 29:9,11 111:15,19
**teams** 13:12
**technical** 70:3 70:15 129:7
**technology** 133:13
**tell** 112:14 114:5 116:7 118:21
**ten** 108:16 136:12
**term** 29:19 133:4
**terms** 116:17 125:16
**terrible** 29:2
**testified** 11:12 12:11 52:8 132:17
**testifying** 12:17
**testimony** 24:25 55:18 64:25 110:4 115:23 135:18 137:9,9 138:9 138:18 140:8
**texas** 2:21
**text** 13:11,12
**thank** 11:3,8,20 11:21 12:4 13:25 52:3 53:18 57:6,10 63:20 67:8 70:14 80:13

82:19 87:6 102:20 109:4 110:23 132:5 135:15
**thanks** 70:20 102:20
**thing** 40:9 135:19
**think** 30:8 32:24 41:14 54:25 55:2,5 58:14 65:5 69:12 74:3 83:22 85:10 89:10 90:24 91:2,11 92:9 96:10 97:19 98:13 100:10 102:10 108:14 117:25 121:3 122:6 126:13 131:23 135:24
**third** 21:10 35:9 46:10 63:23
**thoroughly** 76:5
**thread** 126:22 126:25
**three** 19:15 47:6,9,12 58:22
**thursday** 108:1
**tick** 75:5
**tier** 57:11
**tierney** 17:15
**time** 10:1 22:2 30:1,14 33:6,6 37:16 45:9 51:11 53:1 67:19,21 69:14 70:9 77:8 83:7 84:1,8 85:22 86:22 87:24 88:3 89:21 107:25 109:2 110:24 121:15 121:16 129:16 130:5 132:4,6 132:7 136:10 138:19
**timeframe** 138:8
**timely** 66:21
**times** 113:17
**timing** 4:17 39:6
**title** 15:1,3,18 34:19 71:1 73:17 103:20
**titled** 21:14 32:4 35:10,21 42:8 46:6 53:20 57:11 62:16 65:14 73:23 81:9 83:16 85:2 89:2 97:15 99:10 103:1
**today** 11:22 12:16 132:17
**today's** 13:9,22 17:24 18:2,9 18:13,16 19:11 19:23 20:1,6 110:24
**together** 26:23 27:18 28:21 30:4 31:1,7 33:7 36:14 40:17 41:4,7 50:14 54:25 56:16 75:1 85:25 91:1 104:7 112:25
**told** 69:16
**toll** 2:3 10:9
**top** 39:13 41:13 43:23 63:23 66:10 80:15 81:22 98:14 105:23 117:24 126:24 128:24 129:13
**topic** 88:6 125:15
**topics** 26:12
**total** 86:10 104:16 125:16 136:21
**trading** 40:9
**traditionally** 114:19
**transcribe** 12:18
**transcript** 136:2,11 137:8 138:6,20 140:5 140:8
**transcripts** 135:22
**transparency** 58:23 59:2,22 60:24 61:4,14
**treat** 136:4,7
**trial** 12:11
**true** 39:2 126:21 129:12 137:9 140:8
**truthfully** 12:22
**try** 13:1,5
**trying** 26:12 59:6 104:9 107:23
**turn** 80:2 81:20 101:8 123:2 136:12
**turning** 51:2
**twice** 105:11
**two** 27:17 94:23,24 95:7 111:20,20 119:9 121:4,18 128:14 132:8
**type** 27:12 57:16 78:7 122:18

**types** 59:15 133:23 135:4
**typical** 76:12
**typically** 59:17

**u**

**uh** 29:5 77:17 82:6 93:14 101:13 115:21 120:10
**ultimately** 52:9 52:13 60:23 64:5 120:12
**under** 12:23 37:3 47:6 58:22 94:22 95:4 96:23 114:17 117:8 118:15 130:2 133:11 135:20
**underlying** 40:3 132:19
**underneath** 80:4 90:4 97:21
**understand** 12:24 21:5,9 22:3,11 25:5 29:18 36:17 50:18 55:19 75:7 76:3 79:9 92:13 94:15 104:3 108:14 111:13 115:7 115:22 124:17 135:21,25
**understanding** 21:18,20 22:17 24:2 29:22,23 30:10 32:20 33:12,15,19 34:24 35:1,25 38:5 39:19 42:15 47:23 48:3,9 50:21 54:15 57:15 59:10,13,16 60:4,13 65:23 66:15 67:17 68:12 74:6 75:11,14,23 82:22 83:3 85:10 97:3 98:8,10 106:17 110:3,18 119:13 122:4 123:10 125:24 133:22 134:12 136:4
**unfortunately** 73:12
**unique** 18:24 25:21
**unit** 9:12 51:8 51:12 70:6,10 108:24 109:3 136:21
**united** 1:1 9:16
**units** 136:21
**universe** 114:8 114:14 116:11
**university** 14:7 14:9
**update** 7:8 99:6 99:8,11,15
**us.dlapiper.c...** 3:5 138:2
**usage** 21:20
**use** 29:19 77:10 77:13,21 95:9 107:3
**used** 28:21 40:1 79:2 131:11,16 136:21 138:20
**uses** 26:1,7
**using** 13:11 106:15
**usually** 19:1

**v**

**v** 125:6 126:2 138:4 139:1 140:1
**valuation** 28:16 28:16 106:24
**valuations** 28:18
**value** 78:3,5,7 78:10,15,20,21 78:23 79:1 114:9,12,14,20 116:11,24 117:2,6,16 120:21 128:5 131:11
**values** 131:19
**variable** 60:21
**various** 86:13 104:15 125:19
**vehicles** 59:15
**veneruso** 25:16 25:25 26:15 27:4,4 46:22 56:14 72:12
**verbance** 97:22 98:5
**verify** 138:9
**veritext** 9:20,21 136:22 138:14 138:23
**veritext.com.** 138:15
**version** 58:4 71:19 72:2,17 85:16 106:11 115:23
**versus** 9:15 21:15,19 114:8 116:10 126:3
**vice** 15:2,4,13 15:19 16:23 17:3,5,18
**video** 1:14 3:7 9:9,12 11:2
**videographer** 9:1,20 11:3 12:20 51:7,10 70:4,8 108:23 109:1 131:25 132:3 136:19

**view** 76:4 107:7 107:19 126:3
**viewer** 81:22
**virtually** 9:4 13:10 19:19,21
**vs** 1:6

**w**

**wait** 13:3
**want** 11:16,20 32:24 75:5 87:5 90:1 94:17 104:8,11 108:8,10 124:11 128:14 129:19 130:9 131:23
**wanted** 51:15 52:1 87:4 90:17
**washington** 2:6 2:17 10:16
**watts** 31:9,16 38:23 39:3,15 41:10,15 43:18 43:24 45:4,5 45:13,16,24 52:17 54:24 58:11 61:5,16 63:15,24 64:6 64:11 67:18 90:11,15 91:9 92:3 93:3 120:12 122:10 124:21,25 126:17 127:8 127:11 128:24 129:14
**way** 45:22 73:13 86:1 101:2 130:25 135:3 137:13
**wb** 100:13
**wb1** 100:7,9
**we've** 135:20
**week** 92:8,9 93:3
**welcome** 51:14
**went** 17:14,17 31:15 52:4 121:4 131:5
**weymouth** 1:15 4:3 9:13 10:23 11:10,15,18,25 111:5 132:5 137:6 138:5 139:2,24 140:2 140:4,12
**whereof** 137:16
**white** 106:6,9 106:11,15 107:1,9,21 108:12
**wide** 114:21 115:3 131:17
**window** 57:1
**wisdom** 25:17 28:13 42:20 46:21 56:14
**witness** 4:2 9:7 10:23 11:5,6 11:11 20:9 23:6 25:11 30:8,23 31:4 32:18 33:22 34:8 36:24 43:5 44:11 45:19 46:17 48:15 49:13 50:4 55:14,23 59:6,19 60:9 61:10,22 62:13 65:1 68:12 71:13 73:19 74:3,10,19,25 75:23 76:9,23 79:25 82:16 83:1 86:6,20 88:15 90:24 93:6,22,22 95:14,18 96:10 104:25 105:10 110:21 111:2 111:25 113:4 113:14,22 115:5 117:1,11 117:21 119:13 119:21 120:4 122:3 123:20 127:23 128:12 130:14 131:14 131:21 133:3 134:3,16 135:1 135:14 137:6 137:10,16 138:8,10,12,19
**work** 5:12 12:1 24:16,18 26:20 26:22 28:19,20 29:25 30:6 31:6 35:10,15 35:21 36:5,7 36:10,11,14,20 37:5,17,21,22 38:9 39:10 42:16 54:17 65:15,25 66:2 66:4,18 84:7 84:13,16 88:5 88:7 89:11 92:9,14 94:1 96:20,23 98:3 101:11,15 103:9 104:13 105:11 111:16 112:11 113:8 119:9 131:9 136:18
**worked** 14:24 58:3 64:14 84:2,11 85:17 100:12 101:4,5 105:10 111:20 113:18
**working** 24:5 27:5 30:1 76:17 83:24 86:22 87:24 88:3 99:23,25
**works** 26:3

**wrap** 78:12
**writes** 92:7
**writing** 33:5
**wrong** 102:10

**x**

**x** 4:1

**y**

**yeah** 26:9 30:13 32:8 56:25 57:9 63:19 82:1 98:13 100:2 107:15 113:5 123:15
**year** 85:12
**years** 14:25 15:5,6,8 24:1,7 84:10 96:2 99:24
**yesterday** 51:22
**york** 2:5

**z**

**zero** 103:24
**zoom** 13:12 27:20 121:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Sweeney, Ryan Et Al v. Nationwide Mutual Insurance Company Et Al

Brianne Weymouth (#5681825)

E R R A T A S H E E T

PAGE 33 LINE 22 CHANGE "As I am not an attorney" instead of "As an attorney"

REASON incorrect transcription / answer

PAGE 60 LINE 14 CHANGE add the word "performance" instead of two dashes

REASON incorrect transcription / answer

PAGE 63 LINE 1 CHANGE "limiting" should replace "not allowing"

REASON incorrect answer

PAGE_____ LINE_____ CHANGE____________________

REASON____________________

PAGE_____ LINE_____ CHANGE____________________

REASON____________________

PAGE_____ LINE_____ CHANGE____________________

REASON____________________

B. Weymouth (signature) 3/15/23

Brianne Weymouth Date

Sweeney, Ryan Et Al v. Nationwide Mutual Insurance Company Et Al

Brianne Weymouth (#5681825)

ACKNOWLEDGEMENT OF DEPONENT

I, Brianne Weymouth, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

B. Weymouth ______________ 3/15/23 ______________

Brianne Weymouth Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_______ DAY OF _________________, 20___.

______________________________

NOTARY PUBLIC