**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Ryan Sweeney et al., | Case No. 2:20-cv-1569 |
| Plaintiffs, | Chief Judge Sarah D. Morrison |
| vs. | Magistrate Judge Chelsey M. Vascura |
| Nationwide Mutual Insurance Company et al., | |
| Defendants. | |

**JOINT FINAL PRE-TRIAL STATEMENT**

Pursuant to Fed. R. Civ. P. 16, the Court has scheduled a final pre-trial conference in this case for July 8, 2026.

**I. APPEARANCES:**

For Plaintiffs and the certified class: Kai Richter, Daniel Sutter, Michelle Yau, Daniel Sommers, and Caroline Bressman of Cohen Milstein Sellers & Toll PLLC, and Eric Zagrans of Zagrans Law Firm LLC.

For Defendants: Michael H. Carpenter, Jeffrey A. Lipps and Michael N. Beekhuizen with Carpenter Lipps LLP; Evan Miller and Daniel C. Loesing with Jones Day.

**II. NATURE OF ACTION**

A. This is an action for alleged violations of ERISA's anti-inurement, fiduciary duty and prohibited transactions provisions, 29 U.S.C. §§ 1103, 1104, and 1106, and is brought by Plaintiffs Ryan Sweeney and Bryan Marshall on behalf of

themselves, the Nationwide Savings Plan, and the certified class pursuant to 29 U.S.C. § 1132(a)(2)-(3) and 1109.

B.     The jurisdiction of the Court is invoked under 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331.

C.     The jurisdiction of the Court is not disputed, except to the extent Defendants assert Plaintiffs lack Article III standing with respect to some or all of Plaintiffs' claims.

## III.    TRIAL LENGTH

Plaintiffs estimate the length of trial will be 8 days.  Defendants estimate the length of trial will be 15 days.  There will be no voir dire as the case will be tried to the Court.

## IV.    AGREED STATEMENTS AND LISTS

### A.     General Nature of the Claims of the Parties

l.     Plaintiffs' Description of the Claims and Defenses:[1] Plaintiffs' claims relate to the Guaranteed Fund in the Nationwide Savings Plan ("Plan" or "NSP"). In summary, Plaintiffs assert the following claims:

---

[1] Consistent with this Court's template Final Pre-Trial Statement, Plaintiffs provide a "brief summary without detail." Although Defendants have offered a much more lengthy narrative bordering on a trial brief, Plaintiffs will not respond in kind and will await submission of proposed findings of fact and conclusions of law (post-trial) to set forth the evidence and law in greater detail  For present purposes, Plaintiffs simply note that many of Defendants' assertions are contrary to the Court's existing rulings in this case. Among other things: (1) Plaintiffs do **not** need to "establish that the Guaranteed Fund was objectively imprudent," *infra* at 10; *contra* Dkt 266 (SJ Order) at 27 n.8; (2) Plaintiffs were **not** "required to exhaust administrative remedies," *infra* at 14; *contra* SJ Order at 29 n.9; (3) Plaintiffs' prohibited transaction claims based on the consideration that Nationwide received during the class period are **not** untimely, *infra* at 15-16 & n.4; *contra* SJ Order at 37; (4) class certification

***Breaches of Fiduciary Duties***.  Plaintiffs allege that the Benefits Investment Committee for the Plan (the "BIC" or "Committee"), breached its fiduciary duties of prudence and loyalty under 29 U.S.C. § 1104(a)(1)(A)-(B) by failing to appropriately monitor and control the expenses associated with the Plan's investment in the Guaranteed Fund. Plaintiffs also allege that the BIC breached its fiduciary duty to follow Plan documents under 29 U.S.C. § 1104(a)(1)(D) by (i) failing to follow Section 14.05 of the Plan document (which Plaintiffs allege prohibits contract charges associated with the Guaranteed Fund's annuity contract from being assessed against the Plan), and (ii) failing to follow the Plan's Investment Policy Statement ("IPS"). Plaintiffs further allege that the Plan sponsor, Nationwide Mutual Insurance Company ("Nationwide Mutual"), failed to satisfy its fiduciary duty to monitor the BIC to ensure compliance with the Plan and statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17).

***Prohibited Transactions***.  Plaintiffs allege that the BIC, Nationwide Mutual, and Nationwide Life Insurance Company ("Nationwide Life") engaged in prohibited transactions by causing Nationwide Life to furnish services to the Plan in connection with the Guaranteed Fund, *see* 29 U.S.C. § 1106(a)(1)(C); transferring

---

under Rule 23(b)(1) is ***not*** improper, *infra* at 17-18; *contra* Dkt. 172 (Class Cert Order) at 13-15; and (5) Plaintiff Marshall's release is ***not*** relevant to his claims on behalf of the Plan, *infra* at 30; *contra* SJ Order at 39. Further, Defendants are incorrect in asserting (without legal support) that an Investment Policy Statement is "not a plan document." *Infra* at 11; *contra* 29 C.F.R. § 2509.2016-01 ("Statements of investment policy … would be part of the 'documents and instruments governing the plan' within the meaning of ERISA section 404(a)(1)(D)."); *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 404 (E.D. Pa. 2007) ("Investment strategy policies are typically considered 'plan documents' that investment managers must follow in exercising their discretion.").

assets to Nationwide Life's general account during the class period, *see id.* § 1106(a)(1)(D); dealing with the Plan's assets for their own account or in their own interest, *id.* § 1106(b)(1); and, with respect to Nationwide Mutual and Nationwide Life, receiving consideration in connection with the Plan's investment in the Guaranteed Fund, *id.* § 1106(b)(3).

Defendants have asserted two statutory defenses to Plaintiffs' prohibited transaction claims: (1) the exemption in ERISA § 408(b)(5) [29 U.S.C. § 1108(b)(5)]; and (2) the Transition Policy safe harbor under 29 C.F.R. § 2550.401c–1. *See* Dkt. 266 (SJ Order) at 17; *see also id.* at 18, 23.   Defendants bear the burden of proof on **both** of these exemptions. SJ Order at 17.

An essential element of the ERISA § 408(b)(5) exemption is that the Plan pays "no more than adequate consideration." SJ Order at 18 (citing 29 U.S.C. § 1108(b)(5)). The same requirement applies under the Transition Policy safe harbor because the safe harbor incorporates § 408(b)(5) by reference. *See* SJ Order at 24 (citing 29 C.F.R. § 2550.401c–1(b)(2)(ii)).

ERISA defines "adequate consideration" to mean "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with" applicable regulations. SJ Order at 19 (quoting 29 U.S.C. § 1002(18)(B)). The Sixth Circuit has held that this "definition of 'adequate consideration' has two distinct parts. First, there is the 'fair market value' part, then there is the 'as determined in good faith by the trustee' part." SJ Order at 20 (quoting *Chao v. Hall Holding Co.*, 285 F.3d 415, 436 (6th Cir. 2002)). Thus, to

satisfy the § 408(b)(5) exemption and the Transition Policy safe harbor that incorporates that exemption, Defendants must show that (1) "the Annuity Contract price (*i.e.*, the spread) is no more than fair market value," and (2) "the process that led to the Annuity Contract price satisfied Defendants' fiduciary duties." SJ Order at 20-21. Plaintiffs do not believe that Defendants will be able to meet their burden as to either prong. Indeed, the Court has already noted the "dissonance" in Defendants' position with respect to the process prong. *See* SJ Order at 23.[2]

***Unlawful Inurement of Plan Assets to Plan Employer***. Plaintiffs further allege that the BIC, Nationwide Mutual, and Nationwide Life improperly allowed assets of the Plan to inure to the benefit of Nationwide Mutual and Nationwide Life in violation of 29 U.S.C. § 1103(c).

These claims are discussed further in the Court's Opinion and Order denying (in substantial part) Defendants' motion for summary judgment. *See* Dkt. 266. Consistent with the Court's Opinion and Order, Plaintiffs only seek to hold Defendants liable for these claims for the period from March 26, 2014 forward.

Plaintiffs' expert has calculated two measures of loss for the period at issue. First, with respect to Plaintiffs' claims that the financial transactions were prohibited

---

[2] Moreover, Defendants fail to satisfy other requirements of Transition Policy safe harbor. For example, Defendants must show that "[t]he insurer is the employer maintaining the plan, or a party in interest which is wholly owned by the employer maintaining the plan." SJ Order at 24 (citing 29 C.F.R. § 2550.401c–1(b)(2)(i)). Defendants cannot meet this requirement because Nationwide Mutual—not Nationwide Life—is the Plan sponsor, and for the majority of the class period Nationwide Life was not "wholly owned" by Nationwide Mutual. *See* SJ Order at 2 n.2. Further, the safe harbor contains several disclosure requirements that Defendants also will not be able to show have been satisfied here. *See* 29 C.F.R. § 2550.401c-1(c)(1), (3)-(4); Dkt. 243 (Pls' Memo in Opp. to SJ) at PageID 23755-56.

and that Nationwide was obligated to pay all contract charges under the Plan Document, he calculated the loss as the total amount of charges paid. This yields a loss of $128.9 million with a present value of $148.9 million through Q2 2023. Second, with respect to Plaintiffs' claim that Defendants failed to properly monitor and control the amount of expenses, and allowed Nationwide to receive compensation that was "more than adequate" for purposes the Defendants' asserted prohibited transaction exemption under 29 U.S.C. § 1108(b)(5), he calculated the difference between the expenses actually paid by the Plan, and what the Plan would have paid if the inputs in Nationwide's own Pricing Model from 2009 had been updated. This yields a loss of $63.7 million with a present value of $74.0 million through Q2 2023.

Plaintiffs request that the Court order Defendants to "make good" these losses, *see* 29 U.S.C. § 1109(a), plus prejudgment interest at the appropriate rate. In addition, Plaintiffs request that the Court order an accounting of the excessive amounts paid to Nationwide Life for the balance of the class period after Q2 2023, *see Rochow v. Life Ins. Co. of N. Am.,* 2009 WL 10680512, at *7 (E.D. Mich. June 16, 2009) (ordering an accounting for profits under ERISA § 502(a)(3) and setting evidentiary hearing on calculation of such relief),[3] and also order other appropriate equitable and remedial relief, including injunctive relief, pursuant to 29 U.S.C. §§

---

[3] The accounting remedy in *Rochow* was affirmed by a panel of the Sixth Circuit, but later vacated en banc on the ground that it allowed the plaintiff to obtain a double recovery in that case because he had already received a full recovery on his denial of benefits claim. *See Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 370-72 (6th Cir. 2015). Plaintiffs do not seek such a double-recovery here where their request for an accounting is limited to the period *after* the damages period that runs through Q2 2023. Nor do they assert a denial of benefits claim under 29 U.S.C. § 1132(a)(1)(B).

1109 and 1132(a)(3) to ensure that the Plan and its participants are not improperly or excessively charged for investing in the Guaranteed Fund going forward. In addition, Plaintiffs seek to recover their attorneys' fees and expenses under ERISA's fee-shifting provision. *See* 29 U.S.C. § 1132(g)(1). Plaintiffs suggest that a hearing on prejudgment interest, the accounting remedy, and an appropriate award of attorneys' fees and expenses be set post-trial, after a liability determination and a determination of losses through Q2 2023.

2. Defendants' Description of the Claims and Defenses:

Defendants incorporate their prior summary judgment and class certification briefing. Generally, Defendants dispute Plaintiffs' allegations and contend there has been no violation of ERISA.  The Guaranteed Fund available in the Nationwide Savings Plan is a fixed-return investment option that is different and unique compared to the investments at issue in Plaintiffs' description.  When compared to any other real world capital preservation/stable value product, the Guaranteed Fund provides an above average rate of return.  In addition,  principal and credited interest are guaranteed by Nationwide Life, a highly rated and financially strong insurance company, and there are features that are very beneficial for the Plan and its participants, such as no restrictions on the Plan offering competing capital preservation options, and no restrictions on transfer of participant funds  from the Guaranteed Fund into the competing money-market fund option or any of the other investment options in the Savings Plan line up.  This mix of above-market investment returns and favorable terms provides Plan Participants with a product so beneficial

to their interests that – as Defendants will demonstrate at trial – other commercial insurers have not offered anything similar in the marketplace.

Furthermore, given the unique and extraordinary nature of this fixed-return product, the Benefits Investment Committee ("BIC") engaged in a reasoned decision-making process when deciding to continue to offer the Guaranteed Fund throughout the alleged class period.  As will be established at trial, the BIC had an extensive review process in place supported by a Secretary and Legal Counsel.  It held monthly meetings with presentation materials circulated in advance of the meetings. Minutes were maintained and there were regular executive sessions during which matters could be discussed with legal counsel

As will be further shown,  the BIC members received multiple training sessions regarding their fiduciary obligations – including with regard to ERISA's prohibited transactions – and on a quarterly basis received reports from their retained Consultant, Nationwide Investment Management, a SEC registered investment advisor.  These quarterly reports detailed the Guaranteed Fund crediting rate and comparative returns on the competing money-market fund, and Treasury yields. They confirmed that the Guaranteed Fund's crediting rates consistently delivered guaranteed above-market returns to Plan participants from a capital preservation investment option.

Similarly, the BIC received further analysis from independent consultant Callan confirming the above-market performance of the Guaranteed Fund as well as the financial strength of Nationwide Life. The BIC also received materials from

Nationwide's competitive intelligence unit further confirming the above-market performance.  After the lawsuit was filed the BIC requested and received analysis from Keith Wild, an executive familiar with the Guaranteed Fund, describing the cost structure used in determining the quarterly crediting rate, comparing the Guaranteed Fund to that of other stable value and bond investment vehicles, and again confirmed the top of the market returns of the Guaranteed Fund.  It is also undisputed that the executives serving on the BIC during the alleged class period were highly sophisticated, experienced in market conditions and had a deep knowledge of the risk to Nationwide Life in this product as well as how its expense structure was below that of other general account investment products offered by Nationwide Life in the marketplace.

And, importantly, the above review process confirmed that the "spread" (or expense structure used in determining the crediting rate for fixed-rate products like the Guaranteed Fund) is considered proprietary by the issuers of these products and is not publicly disclosed.  In other words, there is no independent source through which spreads for these fixed rate products can be observed or compared or benchmarked. As a result, it is not possible to monitor the spread of such fixed rate products in the market.  Instead, the rate of return – *i.e.,* the crediting rate which is announced quarterly *in advance* – is the most important consideration in evaluating a fixed-return general account product like the Guaranteed Fund.  The crediting rate itself bears on the expense structure or spread underlying it. If the spread were excessive, the crediting rate would necessarily fall below market. Moreover, the other

9

important considerations in evaluating a general account fixed-return product are (i) the financial strength of the insurer's guarantee, and (ii) the key terms of the contract, such as whether the plan acquiring it is free to offer competing products (like money markets or short term bond funds) or has restrictions on participant transfers among investment options.

The Court will hear from multiple fact and expert witnesses, who will testify in detail regarding these principles that are well-known in the insurance general account, fixed-return product industry. Here, the Guaranteed Fund's spread was fair, reasonable, below what was offered in the market, and had no layer of profit built into it. Plaintiffs simply have no evidence to the contrary. Indeed, the spread was renegotiated in 2009 down to a "bare bones" level that eliminated any profit. The BIC's process was reasonable and its decision to keep the Guaranteed Fund was prudent.

The following additional principles are also relevant to Plaintiffs' claims and Defendants' defenses:

(a) Plaintiffs' Section 1104 Prudence/Loyalty Claim: Plaintiffs must establish that the Guaranteed Fund was **objectively imprudent** and that a "prudent fiduciary would have acted differently." *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168-1169 (6th Cir. 2022). This Court must "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Forman v. TriHealth, Inc.*, 40 F.4th 443, 448 (6th Cir. 2022). A plan fiduciary also has no obligation to offer investment options with the highest returns

10

or the lowest fees. *CommonSpirit Health*, 37 4th at 1164, 1169. A breach of the duty of loyalty, in turn, requires proof that the "fiduciary's operative motive was to further its own interests" and disadvantage the plan's participants. *CommonSpirit* at 1170; *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 824 (8th Cir. 2018) (cited with approval in Sixth Circuit's *CommonSpirit* decision).

Here, Plaintiffs' prudence and loyalty claims fail because the Guaranteed Fund delivered above-market returns to Participants, had a below market margin – the only aspect of the spread being challenged by Plaintiffs – and had additional benefits such as full liquidity (e.g., no restrictions) for a Participant to transfer money out of the Guaranteed Fund. It also had a feature known as an Additional Interest Reserve, that was funded in part through Nationwide's giving up a portion of its already below market contract margin, and which always during the alleged Class period resulted in an increase in the crediting rate. A prudent and loyal fiduciary would not have acted any differently than the BIC acted with respect to the Guaranteed Fund.

(b) <u>Plan Documents</u>: Plaintiffs contend Defendants failed to follow Plan documents, including Section 14.05 of the Plan, and the Investment Policy Statement ("IPS"). But for starters, the IPS is not a plan document. ERISA requires fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). The IPS does not "govern" the Plan. Testimony will show that, by the start of the alleged class period, the IPS was no longer viewed as having any force or effect. Moreover, by its own terms, the IPS is "not binding," and so does not "govern" the Plan. In other words, the terms of the IPS

11

do not "'control[], direct[], or strongly influence[] the actions and conduct' of the Plan." *Snyder v. UnitedHealth Group, Inc.,* 2024 WL 1076515, at *11 (D. Minn. Mar. 12, 2024). In fact, the IPS gives the BIC wide discretion in evaluating investment options, and "is too indefinite to allow for judicial enforcement." Id.

In any event, there was no breach of any of the provisions of either the formal Plan or the IPS, as will be established at trial. And, as this Court held in its summary judgment decision, claims based on an alleged failure to follow Plan documents require a showing of bad faith. December 22, 2025 Opinion and Order at 30 (quoting *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 721 (6th Cir. 2000)). There was no bad faith here.

Furthermore, Plan documents should not be construed to "force particular results" that the "parties neither intended nor imagined." *Turner v. Safeco Life Ins. Co.*, 17 F.3d 141, 145 (6th Cir. 1994). The Court must also construe the Plan documents "as part of an integrated whole." *Everson v. Blue Cross and Blue Shield of Ohio*, 898 F.Supp. 532, 537 (N.D. Ohio June 15, 1994). Applying these principles, Plaintiffs' Plan document claims fail. There simply is no evidence that Defendants – or anyone else – intended for the "spread" in a fixed-rate product to be paid by Nationwide Mutual, as Plaintiffs contend, let alone that Defendants acted in bad faith. There has been no breach of Plan documents.

Defendants also note that the BIC had no fiduciary obligation to monitor, interpret or enforce Section 14.05 of the Plan. Fiduciary status is "not an all or nothing concept." *Maniace v. Commerce Bank of Kansas City, N.A.*, 40 F.3d 264, 267

12

(8th Cir. 1994) (quotation marks omitted).  When alleging breach of ERISA fiduciary duty, then, the "threshold question" is whether the defendant assumed a fiduciary function in connection with the challenged action or inaction.  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).  If the defendant was not "acting in a fiduciary capacity" at that time, he bears no ERISA liability, even if he adversely affected the beneficiaries' interest.  *Pfahler v. Nat'l Latex Prods.*, 517 F.3d 816, 829 (6th Cir. 2007).  Thus, ERISA plaintiffs arguing breach must demonstrate that the "particular activity in question" implicated the defendant's actual fiduciary duties.  *Harris v. Am. Elec. Power Serv. Corp.*, No. 2:23-cv-769, 2024 WL 4434831, at *3 (S.D. Ohio Oct. 7, 2024).

Here, the Plan divides fiduciary duties between the BIC and the Administrative Committee.  The Plan charges the BIC with "the oversight of the investment of the Plan's assets" and "carrying out the provisions of any applicable investment policy"—***and nothing else***.  Plan § 12.02(a)(i).  All other fiduciary duties reside in the" Administrative Committee.  *Id.*  The Administrative Committee, by contrast, serves as "the Plan Administrator" and "named fiduciary" under ERISA.  *Id.* § 12.01(a)(i).  It performs "all aspect of the administration of the Plan," *id.* § 12.01(a)(ii), including "the authority, power, and discretion to construe and interpret the provisions of the Plan[.]"  *Id.* § 12.01(b)(i).

Plaintiffs argue that the BIC members breached their fiduciary duty under § 14.05 when failing to ensure Nationwide Mutual paid the spread.  Not so.  Plaintiffs misread § 14.05 of the Plan. It does not require Nationwide Mutual to pay the spread. But even if there were such a payment requirement, the Plan does not assign the BIC

the duty to enforce it. The BIC's sole fiduciary duty under the Plan—oversight of the investment of the Plan's assets—does not encompass compelling entities to follow the Plan or to pay expenses. Any such administrative action resides with the Administrative Committee. Yet Plaintiffs have not sued those individuals. In fact, Plaintiffs dropped the Administrative Committee as defendants when they amended their Complaint.

Lastly, Plaintiffs were required to exhaust their administrative remedies to the extent they are asserting "plan-based" claims involving "the Plan's contractual terms." *Hitchcock v. Cumberland University*, 851 F.3d 552, 565 (6th Cir. 2017) ("relevant inquiry" is whether the "right to relief" is based on "the contractual terms of the pension plan" or "the provisions of ERISA"). Plaintiffs failed to exhaust their administrative remedies as will be established at trial.

(c)    <u>Affirmative Defenses</u>:

(1) <u>Prohibited Transaction Exemption (29 U.S.C. § 1108(b)(5)) & Transition Policy Exemption (29 U.S.C. § 1101(b)(2) & (c)(1)(A); 29 C.F.R. § 2550.401c-1)</u>: As this Court recognized in its summary judgment decision, the key issue with respect to the prohibited transaction and Transition Policy exemptions is whether the "plan paid no more than adequate consideration." Here, the contract margin – which is not paid by the Plan but used in calculating the crediting rate – is the lowest known in the ERISA marketplace, and is lower than Nationwide Life's contract margin on general account products offered to unaffiliated entities in the

marketplace.  Plaintiffs will not at trial point to any comparable market product with a lower spread.

The BIC's process of reviewing and monitoring the Guaranteed Fund also was reasonable and appropriate given its fixed-return nature. BIC members knew and understood that the Guaranteed Fund was  delivering above-market returns, and that Nationwide Life is a financially strong guarantor, and that the contract has features that allowed the BIC to offer competing capital preservation products to enable participants to switch without restriction to the better performing option at any point in time.  Furthermore, the evidence at trial will confirm that the various disclosures required for a Transition Policy were made by Nationwide Life and that the various other prohibited transaction exemption and Transition Policy requirements have been met as well.

(2)     Statute Of Repose (29 U.S.C. § 1113): This Court already has held that Plaintiffs' prohibited transaction claim is barred to the extent it is based on "the initial decision to enter into the Annuity Contract or to provide the Guaranteed Fund as an investment option."  December 22, 2025 Opinion at 37.  This Court likewise held that Plaintiffs' anti-inurement claim is barred to the extent it "is based on conduct outside the six-year period before Plaintiffs filed suit."  *See* December 22, 2025 Opinion at 38.  Defendants also respectfully submit that courts have rejected any "continued" or "repeated" theory of prohibited transaction liability and look instead to the point in time of the initial transaction for statute of repose purposes. *See, e.g., White v. Chevron Corp.*, 2017 WL 2352137 at \*22 (N.D. Cal. May 31, 2017)

15

("there is no such thing as a 'continuing' prohibited transaction—as the plain meaning of 'transaction' is that it is a point-in-time event.").[4]

      (d)      <u>No Loss Causation, Harm Or Injury; No Article III Standing</u>.

Plaintiffs cannot establish that they have suffered any loss, harm or injury as required by 29 U.S.C. § 1109, or as necessary to establish standing under Article III of the U.S. Constitution. Specifically, in order to recover monetary damages, Section 1109 requires Plaintiffs to prove the existence of "losses to the plan **resulting from**" any alleged breach of the duties in "**this subchapter**." *See* 29 U.S.C. § 1109 (emphasis added). The words "resulting from" "impose an important limit on that liability—loss causation." *Pizarro v. Home Depot, Inc.*, 2024 WL 363379 at \*3 (11th Cir. Aug. 2, 2024); *see also Saumer v. Cliffs Natural Resources Inc.*, 853 F.3d 855, 863 (6th Cir. 2017) ("plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan"); *Forman v. TriHealth, Inc.*, 563 F.Supp.3d 753, 760 (S.D. Ohio 2021) (plaintiff must show "harm resulted from the breach").

Furthermore, this "subchapter" includes not only anti-inurement and prudence claims under Sections 1103 and 1104, but also prohibited transaction claims under Section 1106. *See* 29 U.S.C. Chapter 18 Subchapter I. Accordingly, the loss causation requirement of § 1109 applies to **all** of Plaintiffs' claims, including Plaintiffs' prohibited transaction claim.

---

[4]  Defendants acknowledge this Court's "continued" prohibited transaction reasoning in its summary judgment decision, but respectfully note that the *Martin* decision cited by the Court involved a Section 1104/duty of prudence ongoing duty to monitor and did not address whether there is any form of ongoing duty with respect to a prohibited transaction claim. *See* December 22, 2025 Opinion at 37. In contrast, the cases cited by Defendants in their summary judgment brief specifically addressed prohibited transaction claims.

Additionally, as the United States Supreme Court has recognized, a plaintiff who proves an ERISA violation – including a Section 1106 prohibited transaction – but suffers no monetary harm lacks Article III standing.  *See Cunningham v. Cornell University*, 604 U.S. 693, 708 (2025) ("District courts must also, consistent with Article III standing, dismiss suits that allege a prohibited transaction occurred but fail to identify an injury"); *see also Taylor v. BDO USA PC*, 2025 WL 2420941 at *3 (D. Mass. Aug. 21, 2025) (following *Cunningham* and dismissing Section 1106 prohibited transaction claim for lack of Article III standing; case involved same plaintiffs' counsel as here); *Vermeylen v. ProQuest Company*, 2007 WL 1218713 at *5 (E.D. Mich. April 23, 2007) (distinguishing Sixth Circuit's *Hall Holding* decision as failing to address Article III standing, restitution or disgorgement).  Plaintiffs and the class have not suffered any monetary harm here and lack Article III standing.

Lastly, Plaintiffs' reliance on the *Rochow* case is inapposite.  The Sixth Circuit *reversed* en banc the trial court decision, which Plaintiffs rely upon.  *See Rochow v. Life Ins. Co. of North America*, 780 F.3d 364 (6th Cir. 2015).  In particular, the Sixth Circuit held that "disgorgement" of profits was not an appropriate remedy.  *Id.* at 376 ("we VACATE the district court's disgorgement award").  Plaintiffs also miscite *Rochow* for the proposition they are entitled to another damages hearing after the trial.  *Rochow* said no such thing.  There was no trial in *Rochow*.  Rather, the trial court granted summary judgment in favor of the plaintiff on the issue of liability, which judgment was affirmed on appeal.  On remand, the plaintiff then moved the court for a hearing to determine the amount of damages.  *See id.* at 367-368.  Here,

17

there has been no summary judgment decision in favor of Plaintiffs. Instead, this Court has ordered a trial at which Plaintiffs will bear the burden of proving their claims and alleged damages. They do not get a second bite at the apple in a second "hearing" after the trial.

(e)   Decertification Of The Class: This Court has a "continuing obligation to ensure that the class certification requirements are met" and a class may be decertified at any time before final judgment. *See Randleman v. Fidelity National Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011); Civ. R. 23(c)(1)(C). Here, the class should be decertified pursuant to the United States Supreme Court's decision in *Wal-mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) and the Fourth Circuit's recent decision in *Trauernicht v. Genworth Financial Inc.*, 169 F.4th 459 (4th Cir. 2026), rehearing en banc denied (June 4, 2026). In *Dukes*, the U.S. Supreme Court held that a Rule 23(b)(2) class cannot be certified where the plaintiffs' claims for monetary relief predominate over, and are not "incidental to," claims for declaratory or injunctive relief. The Fourth Circuit's *Genworth* decision, in turn, makes clear that *Dukes* applies to ERISA claims and that ERISA claims for individualized monetary relief cannot be certified under Rule 23(b)(1). Furthermore, given the individualized nature of such claims, Rule 23(a)(2)'s commonality requirement also cannot be met. Defendants have filed a motion to decertify the class for these reasons.

(f)   Plaintiffs' Section 1103(c)(1) Anti-Inurement Claim: As noted, this Court granted summary judgment in favor of Defendants on this claim to the extent it "is based on conduct outside the six-year period before Plaintiffs filed suit." *See*

18

December 22, 2025 Opinion at 38. Defendants respectfully submit that this is the entire claim, but to the extent anything remains, Plaintiffs' anti-inurement claim still fails. 29 U.S.C. § 1103(c)(1) generally provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of the providing benefits to participants . . . and defraying reasonable expenses of administering the plan." Plaintiffs' Section 1103 claim simply rehashes Plaintiffs' other claims and fails for the same reasons. *See Varhola v. Cyclops Corp.*, 1990 WL 126412 at *8 (6th Cir. 1990) (rejecting §§ 1103(c)(1), 1104, and 1106 claims based on same allegations). Furthermore, because the Annuity Contract qualifies as a Transition Policy, there has been no use of "the assets of a plan" as required for a § 1103(c)(1) claim. *See Bottle Beer Drivers, Warehouseman & Helpers Teamsters Local 843 v. Anheuser Busch Inc.*, 96 F.App'x 831, 836 (3d Cir. 2004) (plaintiff "cannot maintain its § 1103(c)(1) claim against the company because its payments were not plan assets").

Lastly, Defendants reserve the right to oppose, rebut and address any issues or claims presented at trial by Plaintiffs that are at variance with, or not included in, Plaintiffs' description of claims and defenses in this final pretrial statement.

### B. Uncontroverted Facts

#### 1. Plaintiffs' Statement of Uncontroverted Facts

Plaintiffs submit that the following facts, which are set forth in this Court's Opinion and Order denying summary judgment in substantial part, *see* Dkt. 266, are uncontroverted. Plaintiffs invited Defendants to stipulate to these facts, but Defendants declined to do so.

1.      Nationwide Mutual sponsors and maintains the Nationwide Savings Plan ("Plan") to provide retirement savings benefits to its employees and their beneficiaries. SJ Order at 2. The Plan operates like many other 401(k) plans. *Id.* Employees decide whether to enroll and how much to contribute. *Id.* If an employee does enroll, she becomes a Participant. *Id.* As contributions accumulate in the Participant's account, she decides how to invest the funds. *Id.* Available investment options are vetted by a Benefits Investment Committee (the "BIC") appointed by Nationwide Mutual's Board of Directors. *Id.* As of 2022, the Plan's investment options included target-date funds, a brokerage window, a money market fund, and the Guaranteed Fund that is the subject of this litigation. *Id.*

2.      The Guaranteed Fund is supported by an Annuity Contract that Nationwide Life issued to the Plan. SJ Order at 2. Nationwide Life is an affiliate of Nationwide Mutual.[5] *Id.* The Annuity Contract, formally known as Contract GA-P L941, was first issued in 1975 but was amended and restated in 2002. *Id.* at 2-3.

3.      When a Participant invests in the Guaranteed Fund, her contributions into the Plan are transferred to Nationwide Life, which uses that money to purchase securities then held in Nationwide Life's general account. SJ Order at 3. Nationwide Life guarantees the Participant's principal investment and a rate of return, known as the Crediting Rate. *Id.* Historically, Nationwide Life has declared the Crediting

---

[5] As of summary judgment briefing, Nationwide Life was a wholly owned subsidiary of Nationwide Mutual. *Id.* at 2 n.3. But, for "a period of time that included a portion of the class period," Nationwide Mutual Fire Insurance ("Nationwide Fire") owned a portion of Nationwide Life. *Id.* Though Nationwide Mutual and Nationwide Fire had identical slates of directors and officers, they were separate entities until Nationwide Fire merged into Nationwide Mutual at the start of 2023. *Id.* at 2-3 n.3.

Rate on a quarterly basis. *Id.*

4.      The Guaranteed Fund is a heavily utilized investment option for Plan Participants. SJ Order at 3. As of 2020, 86% of Plan Participants had some portion of their account invested in the Guaranteed Fund, accounting for $1.75 billion. *Id.* Indeed, the Plan's design encourages investment in the Guaranteed Fund. *Id.* For example, the default investment option is a Target Maturity Model that aligns the Participant's expected retirement date with an appropriately aggressive/conservative portfolio; the Guaranteed Fund is one component of the TMM portfolio. *Id.* In another example, Nationwide at one time offered an "easy enroll" option for new Participants; Participants who enrolled this way were automatically invested in the Guaranteed Fund. *Id.* at 3-4.

5.      Nationwide Life sets the Crediting Rate using a complex set of analyses and projections. In short, the Crediting Rate "is the sum of a retrospective component and a prospective component[.]" SJ Order at 4.

6.      As the name suggests, the retrospective component of the Crediting Rate looks backwards. SJ Order at 4. Nationwide Life derives the retrospective component by, first, calculating the prior period's investment earnings for the assets backing the Annuity Contract. *Id.* It then "reduces" the investment earnings by applying a charge for default risk and other "expenses." *Id.*  Those include Nationwide Life's investment office expenses and a 48 basis point ("bp") contract margin. *Id.* The result is the "net earnings" for that period. *Id.* The prior period's Crediting Rate is then deducted from net earnings to determine the retrospective component of the next period's Crediting

Rate.[6] *Id.*

7.      The prospective component then looks to expected investment performance. SJ Order at 5. Nationwide Life first forecasts the projected earnings of the assets underlying the Annuity Contract, then reduces that amount by the default risk charge, investment offices expense, and contract margin. *Id.* These three charges are, together, referred to as the "spread." *Id.*

8.      After the Retrospective and Prospective Components are calculated, Nationwide Life adds them together to determine the Crediting Rate for the forthcoming period. SJ Order at 5.

9.      Nationwide Life declares the Crediting Rate in advance of the relevant period, and credits each Plan Participant's Guaranteed Fund balance in accordance with that rate on a daily basis. SJ Order at 5.

10.      The BIC is tasked with monitoring the investment menu available to Plan Participants. SJ Order at 6. Plan fiduciaries like the BIC commonly call on outside experts to assist with such administrative activities. *Id.*

---

[6] The ERISA Section 401(c) Initial Disclosure for the Guaranteed Fund further elaborates as follows:

> The interest credited to the Deposit Fund for the period just ended is subtracted from the net earnings of the Deposit Fund …. This difference is accumulated, along with the like differences from previous periods, into a "gain/loss". The **retrospective component** of the new interest rate is determined so that, under the best estimate of future net cash flows in the Deposit Fund, this "gain/loss" would be reduced (if positive) or increased (if negative) to zero over a period of three years.

Dkt. 217-12 at NMIC_000003.

11.     In 2008, the BIC hired Callan, an independent investment consultant, to review the Plan's investment offerings. SJ Order at 6. Callan's report expressed two concerns about the Guaranteed Fund. *Id.* First was a concern about the risks associated with the Nationwide enterprise being both the Plan's sponsor and the Annuity Contract issuer. *Id.* at 6-7. The report cited "the correlation of both the asset management and insurance feature to the health of Nationwide as a corporation." *Id.* at 7. It went on to explain:

> Severe investment losses in the general account and deterioration in the firm's insurance strength are the primary risks to Nationwide as a company and therefore their employee's income potential. One of the advantages of [a different stable value vehicle] is that the management would be conducted by a separate entity . . . . These steps would help eliminate this correlation and reduce the non-investment or business risk of the Fund.

*Id.*

12.     Second, Callan's report expressed concern about Nationwide Life's fees. SJ Order at 7. Callan suggested that, "at the current asset level[,] top quality stable value management is available at lower fees." *Id.* Callan further concluded that:

> [W]hile the [Guaranteed Fund's] 5.00% current yields are higher than the average stable value yields, the 51 basis point fee arrangement is more than twice as high as the current marketplace[,] which is already priced for distress.

*Id.*

13.     After Callan's review, the BIC engaged Nationwide Life to re-negotiate the Guaranteed Fund's price terms—namely, the spread. SJ Order at 7.

14.     The BIC retained Callan again in 2016 and 2020. SJ Order at 8. But, both times, Callan was denied access to information about the Guaranteed Fund's

23

spread. *Id.* In its 2016 report, Callan again noted two-fold concerns. *Id.* First, Callan repeated its concern regarding Participants' exposure to the financial health of Nationwide as both the employer and insurer. *Id.* And second, Callan stated that it had "no line of sight to the spread on the Guaranteed Fund," even though that information is "an important component of the analysis of any investment product." *Id.* As to the Crediting Rate, Callan determined that "[t]he Guaranteed Fund provides a competitive rate of return relative to the next most similar product, stable value funds." *Id.* Callan presented the BIC with the following option to consider improving its capital preservation investment options:

> In most cases Callan generally recommends including stable value as a preferred capital preservation option. Since the Guaranteed Fund is backed up by the general assets of Nationwide, there is some risk in having both human capital (due to employment) and financial capital tied up in one firm. For this reason, the Plan could eliminate the Guaranteed fund and either continue to offer a money market fund or offer a traditional stable value fund.

*Id.*

15.	In 2020, Callan prepared draft presentations with the same dual concerns. SJ Order at 9. But, Callan did not propose eliminating the Guaranteed Fund. *Id.* Instead, "Callan recommend[ed] that the Plan consider capping participants' contributions to the Guaranteed Fund." *Id.* In support of its recommendation, Callan cited the same "lack of certainty and transparency regarding fees" and "single counterparty risk." *Id.*

16.	Callan's 2020 presentations and recommendations were never delivered to the BIC. SJ Order at 9. Instead, the BIC amended Callan's 2020 contract to state that the BIC did not want Callan to "analyze or present any information with respect

to the guaranteed fund investment option offered within the Nationwide Savings Plan, the guaranteed investment contract issued by Nationwide Life Insurance Company or stable value alternatives available in the marketplace" because the BIC had "access to information relating to the guaranteed fund option" that Callan did not. *Id.*

17.    In lieu of an analysis by Callan, Nationwide Senior Counsel Alan Stalnaker proposed asking "some very knowledgeable [Nationwide Financial] folks who have assisted with the litigation[7] to prepare materials highlighting fee and performance information of the [Guaranteed Fund] compared to other products available on the market." SJ Order at 9-10. BIC Member (and Defendant) Klaus Diem responded:

> Do we not potentially increase our risk if we are not including the [Guaranteed Fund] in the Callan review?  Could someone not further argue that we are abdicating our fiduciary duty by not having it reviewed as part of our ongoing cycle?

*Id.* at 10.

18.    Attorney Stalnaker clarified his view that the risk of having Callan present on the Guaranteed Fund was that:

> without the benefit of the full picture re: fee structure or perhaps an expert understanding of [Guaranteed Fund/Annuity Contract] products, [Callan] could potentially (once again) make what could be argued to be a recommendation to move away from the [Guaranteed Fund] in favor of a stable value product.

SJ Order at 10.

19.    In the end, Nationwide Financial's Keith Wild presented a "product

---

[7] The "litigation" refers to this case. *Id.* at 10.

performance update to the BIC" on the Guaranteed Fund. SJ Order at 10. Mr. Wild's product performance update summarized the Annuity Contract's key features, account value, and returns. *Id.* His presentation's only reference to fees and/or spread is the following description of the Crediting Rate: "Portfolio rate less investment expenses, default risk charges, and 48 bps." *Id.* Mr. Wild "did not go into specific detail around" the charges against the portfolio rate; in his view, if the spread were out of line with the market, Nationwide Life "would not have been able to provide a crediting rate that's above market." *Id.* at 10-11. In other words, in Mr. Wild's view, "comparing crediting rate is inclusive of comparing expenses." *Id.* at 11.

20.     Mr. Wild's approach aligned with the BIC's general philosophy when it came to the Guaranteed Fund: Focus on the Crediting Rate. SJ Order at 11. Indeed, Attorney Stalnaker's "counsel to the BIC from their fiduciary perspective was to focus on the crediting rate, which was net of expenses." *Id.*

Plaintiffs submit that the following additional facts are also undisputed. Defendants also have declined to stipulate to these facts.

1.     During the Class Period,[8] the BIC's members included individual Defendants David Berson, David LaPaul, Kevin O'Brien, Klaus Diem, Michael Mahaffey, and Michael Leach. *See* Dkt. 181-35, Defs.' Rule 26(a) Initial Disclosures, at 2-4.

---

[8] The Class Period includes the period "from March 26, 2014 through the date of final judgment in this action." Dkt. 172 (Class Certification Opinion and Order) at 4.

2.      Throughout the Class Period, the BIC has maintained the Guaranteed Fund as an investment option for the Plan. Dkt. 74, Defs.' Answer, ¶ 48.

3.      Plaintiffs Brian Marshall and Ryan Sweeney are former employees of Nationwide Mutual who participated in the Plan and invested in the Guaranteed Fund during the Class Period. Dkt. 74, Defs.' Answer, ¶¶ 10-11.

2.      <u>Defendants' Statement of Uncontroverted Facts</u>

Defendants respectfully submit that the following facts and/or issues were conclusively resolved in this Court's December 22, 2025 Opinion and Order ("Opinion"):

(1)      With respect to the prohibited transaction exemption contained in 29 U.S.C. § 1108(b)(5):

(a)      Plaintiffs do not dispute that the Annuity Contract is an annuity, that the insurer (Nationwide Life) is qualified to do business in Ohio, or that the 5%-of-total premium limit is met.  Opinion at 18.

(b)      Nationwide Life is a wholly owned subsidiary of Nationwide Financial, which is a participating employer in the Plan and, thus, a party in interest.  Opinion at 19.

(c)      Section 1108(b)(5)'s exemption applies to prohibited transaction claims under both Sections 1106(a) and 1106(b).  Opinion at 35.

(3)      Plaintiffs' claims for alleged failure to follow Plan documents require a showing of bad faith.  Opinion at 30 (quoting *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 721 (6th Cir. 2000)).

(4)     There was no breach of § 3.3 of the Annuity Contract.  Opinion at 33.

(5)     Plaintiffs' claims are barred by the six-year statute of repose contained in Section 1113 "to the extent Plaintiffs assert prohibited transaction claims based on the initial decision to enter into the Annuity Contract or to provide the Guaranteed Fund as an investment option."  Opinion at 37.

Furthermore, Defendants respectfully submit that Plaintiffs' recitation of background facts includes various alleged facts and/or issues that are controverted, incomplete and/or require additional context.  Defendants intend to present full and complete witness testimony regarding these facts and issues at trial.

### C.     Contested Issues of Fact and Law

1.     Contested Issues of Fact.

a.     *Fact Issues Identified by Plaintiffs*.

Plaintiffs submit that the contested issues of fact remaining for decision are as follows:

(1)     Did the BIC adequately monitor the expenses applied against investment earnings by monitoring the Crediting Rate alone? *See* SJ Order at 28, 33.

(2)     Whether the Annuity Contract price (*i.e.*, the spread) is no more than fair market value. *See* SJ Order at 20.

(3)     Whether the process that led to the Annuity Contract price satisfied Defendants' fiduciary duties. *See* SJ Order at 20-21.

(4)     Do the Plan and Annuity Contract require the spread to be paid by Nationwide Mutual, rather than as a deduction from investment earnings? *See* SJ Order at 29.

(5)     Whether the IPS was, at the relevant time, an operative Plan document. *See* SJ Order at 32.

(6)     To the extent that good or bad faith is relevant to a claim for failure to follow plan documents under 29 U.S.C. § 1104(a)(1)(D), *see infra* § IV.C.2 at ¶ 3, did Defendants act in good faith?

(7)     To the extent that Defendants are liable for the claims alleged,

    (a)     What was the resulting loss to the Plan during the relevant period?

    (b)     What amount of profits did Nationwide Life make through use of assets of the Plan during the relevant period?

    (c)     What equitable and/or remedial relief is appropriate to ensure that the Plan is not improperly or excessively charged for its investment in the Guaranteed Fund going forward?

        b.     *Fact Issues Identified by Defendants.*

Defendants incorporate their prior summary judgment and class certification briefing. Additionally, and in summary, contested issues of fact include, but are not limited to:

29

1.      Whether the Guaranteed Fund was a prudent investment for inclusion as one of the fourteen investment options available to participants in the Nationwide Savings Plan?

2.      Whether the BIC engaged in a reasoned decision-making process when deciding to continue to offer the Guaranteed Fund as an investment option throughout the alleged class period.

3.      Whether the Guaranteed Fund has delivered above-market returns to participants?

4.      Whether the contract margin for the Guaranteed Fund is low, including whether it is equal or lower than similar products offered by Nationwide Life to affiliated entities and lower than what Nationwide Life offers to unaffiliated entities in the private sector marketplace?

5.      Whether any guaranteed investment product could be found in the marketplace that had the combination of high returns, favorable features, and low margin that the Guaranteed Fund provides?

6.      Whether the contractual terms of any plan documents (or the Annuity Contract) were breached, and if so, whether any such breach was in bad faith?

7.      Whether the requirements of the prohibited transaction safe harbor provision contained in 29 U.S.C. § 1108(b)(5) have been met, including whether the "plan pays no more than adequate consideration"?

8.     Whether the requirements of the Transition Policy safe harbor provisions contained in 29 U.S.C. § 1101(b)(2) & (c)(1)(A) and 29 C.F.R. § 2550.401c-1 have been met?

9.     Whether Plaintiffs (or members of the class) have suffered any harm, injury or damages as required by Section 1109 and Article III of the United States Constitution?

10.    Whether Plaintiff Marshall's individual claim is barred as a result of the release he signed?

11.    Whether Plaintiffs failed to exhaust their administrative remedies?

      2.     Contested Issues of Law.

        a.     *Legal Issues Identified by Plaintiffs.*

Plaintiffs suggest that the contested issues of law are as follows:

(1)    Did the BIC breach its duty of prudence and/or loyalty under 29 U.S.C. § 1104(a)(1)(A)-(B) by failing to adequately monitor the expenses of the GIF and the "spread"?

(2)    Did the BIC breach its duty of duty to follow Plan documents under 29 U.S.C. § 1104(a)(1)(D) by allowing contract charges under the Annuity Contract to be paid by the Plan in the form of the spread?

(3)    Is bad faith an element of a claim (or is good faith a defense to a claim) for failure to follow plan documents under 29 U.S.C. § 1104(a)(1)(D)?

(4)    To the extent that good faith or bad faith is relevant to liability under 29 U.S.C. § 1104(a)(1)(D), which party bears the burden of proof on this issue?

31

(5)     Did Nationwide Mutual breach its fiduciary duties under 29 U.S.C. § 1104 by failing to adequately monitor the BIC to ensure compliance with the Plan and statutory standards?

(6)     Did Defendants engage or cause the Plan to engage in transactions prohibited by ERISA under:

   (a)     29 U.S.C. § 1106(a)(1)(C);

   (b)     29 U.S.C. § 1106(a)(1)(D);

   (c)     29 U.S.C. § 1106(b)(1); and/or

   (c)     29 U.S.C. § 1106(b)(3).

(7)     Have Defendants met their burden to prove all required elements of the prohibited transaction exemption under ERISA § 408(b)(5)?

(8)     Have Defendants met their burden to prove all required elements of the Transition Policy safe harbor under 29 C.F.R. § 2550.401c–1?

(9)     Did Defendants violate ERISA's anti-inurement provision in 29 U.S.C. § 1103?

(10)    What legal and equitable remedies are appropriate to redress Defendants' violations of ERISA?

   b.     *Legal Issues Identified by Defendants.*

Defendants incorporate their prior summary judgment and class certification briefing.  Additionally, and in summary, contested issues of law include, but are not limited to:

1. Whether Plaintiffs have met their burden of proving a violation of 29 U.S.C. §§ 1103, 1104 or 1106?

2. Whether Plaintiffs have established loss causation and/or suffered any harm, injury or damages as required by 29 U.S.C § 1109 and Article III of the United States Constitution?

3. Whether Defendants have established one or more of their affirmative defenses (statute of repose, prohibited transaction safe harbor; Transition Policy safe harbor)?

4. Whether the class should be decertified?

**D. Witnesses**

In the absence of reasonable notice to opposing counsel to the contrary, Plaintiffs will call the following witnesses:

| Witness | Expected Testimony |
|---|---|
| Ryan Sweeney (live) | Mr. Sweeney is one of the named Plaintiffs, and will testify regarding (among other things) his participation in the Plan and investment in the Guaranteed Fund. |
| Bryan Marshall (live) | Mr. Marshall is one of the named Plaintiffs, and will testify regarding (among other things) his participation in the Plan and investment in the Guaranteed Fund. |
| Alan Stalnaker (live, or alternatively by deposition) | Mr. Stalnaker is a former Nationwide in-house attorney who provided counsel to the BIC. Plaintiffs intend to call him as an adverse witness to provide testimony regarding (among other things) matters relating to the Guaranteed Fund and any oversight thereof by himself, the BIC, or Nationwide. It is anticipated that Mr. Stalkanker will also testify as to investment |

33

| | consulting work performed by third-party Callan, communications with Callan and drafts of presentations provided by Callan (including communications and drafts that the BIC was not privy to), and the amendment of Callan's investment consulting contract to remove the Guaranteed Fund from its purview.<br><br>Plaintiffs reserve the right to offer deposition testimony from Mr. Stalnaker to the extent that he is unavailable at trial. |
|---|---|
| David Berson<br>(via deposition) | Mr. Berson is a named Defendant, and a former BIC member and chairperson. Pursuant to Fed. R. Civ. P. 32(a)(3), Plaintiffs will offer his deposition testimony regarding (among other things) matters relating to the Guaranteed Fund and any oversight thereof by himself, the BIC, or Nationwide. Mr. Berson will also testify as to investment consulting work performed by third-party Callan with respect to the Guaranteed Fund, and the amendment of Callan's investment consulting contract to remove the Guaranteed Fund from its purview.<br><br>The substance of Mr. Berson's testimony is more fully set forth in Plaintiffs' deposition designations. Plaintiffs reserve the right to cross examine Mr. Berson live at trial to the extent that Defendants call him as a witness or any portion of his deposition designations are not admitted at trial. |
| David LaPaul<br>(via deposition) | Mr. LaPaul is a named Defendant, and a former BIC member and chairperson. Pursuant to Fed. R. Civ. P. 32(a)(3), Plaintiffs will offer his deposition testimony regarding (among other things) matters relating to the Guaranteed Fund and any oversight thereof by himself, the BIC, or Nationwide. |

| | |
|---|---|
| | The substance of Mr. LaPaul's testimony is more fully set forth in Plaintiffs' deposition designations. Plaintiffs reserve the right to cross examine Mr. LaPaul live at trial to the extent that Defendants call him as a witness or any portion of his deposition designations are not admitted at trial. |
| Brianne Weymouth (via deposition) | Ms. Weymouth is a Senior Vice President at Callan LLC. Pursuant to Fed. R. Civ. P. 32(a)(4)(B), Plaintiffs will offer her deposition testimony regarding (among other things) the consulting work that she and Callan performed concerning the Guaranteed Fund and the Plan's investments, and the amendment of Callan's investment consulting contract in 2021 to remove the Guaranteed Fund from Callan's purview.<br><br>The substance of Ms. Weymouth's testimony is more fully set forth in Plaintiffs' deposition designations. Plaintiffs reserve the right to examine Ms. Weymouth live at trial to the extent that Defendants secure her attendance and call her as a witness, or if any portion of her deposition designations are not admitted at trial. |
| Robert Watts (via deposition) | Mr. Watts is a former Associate Vice President of Benefits Planning at Nationwide Mutual who attended many BIC meetings. Pursuant to Fed. R. Civ. P. 32(a)(4)(B), Plaintiffs will offer his deposition testimony regarding (among other things) Nationwide Mutual's appointment of BIC members, Nationwide Mutual's monitoring of the BIC, and matters of discussion at BIC meetings. In addition, Mr. Watts will testify regarding information in the Plan's Form 5500 filings (which he signed) and Callan's request for certain information concerning the Guaranteed Fund that was not provided by Nationwide. |

| | The substance of Mr. Watts' testimony is more fully set forth in Plaintiffs' deposition designations. Plaintiffs reserve the right to cross examine Mr. Watts live at trial to the extent that Defendants call him as a witness or any portion of his deposition designations are not admitted at trial. |
|---|---|
| Richard Kopcke (live) | Dr. Kopcke will testify as an expert witness at trial.  Dr. Kopcke is a financial expert who offers opinions regarding (among other things) the 2009 pricing model for the Guaranteed Fund, the adequacy of the contract margin, and the BIC's oversight of the Guaranteed Fund. *See* SJ Order at 14. The substance of his expected testimony is more fully set forth in his expert reports. |
| Marcia Wagner (live) | Ms. Wagner will testify as an expert witness at trial.  Ms. Wagner is a fiduciary counselor and process expert who offers opinions regarding (among other things) the BIC's fiduciary processes and approach, and whether it was consistent with prevailing standards of care. *See* SJ Order at 14. The substance of her expected testimony is more fully set forth in her expert report. |

Plaintiffs also <u>may call</u> the following additional witnesses:

| Witness | Expected Testimony |
|---|---|
| Ann DeLuce | Ms. DeLuce previously provided a declaration authenticating the documents produced by third-party Callan, and establishing that those documents were maintained by Callan in the regular course of business. *See* Dkt. 217-53. The Court previously ruled that this declaration is sufficient to admit the documents and consider them. *See* SJ Order at 7 n.4. However, Plaintiff reserves the right to take a trial deposition of Ms. DeLuce or call her live at trial should that be necessary. |

|  |  |
|---|---|
| Nationwide records custodian(s) | Plaintiffs may call one or more records custodians from Nationwide to authenticate documents produced by Defendants and establish the business records exception for those documents, as necessary. |

Plaintiffs reserve the right to call rebuttal witnesses and to examine any witnesses on Defendants' witness list.

2.    In the absence of reasonable notice to opposing counsel to the contrary, Defendants will call the following witnesses:

| Name/Affiliation | Anticipated Subjects Of Testimony |
|---|---|
| Kevin O'Brien Nationwide | Knowledge of operation of the BIC including processes and training; knowledge of the BIC's monitoring and evaluation of the Guaranteed Fund and other investment options offered participants under the Nationwide Savings Plan ("NSP"); knowledge of crediting rates and spreads for other Nationwide Life and commercial insurer Guaranteed Investment Contract ("GIC") products; involvement of Callan in review of the Guaranteed Fund; Wild report to the BIC; investment policy statement; SVIA and competitive intelligence reports; Transition Policy exemption requirements; terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP; all matters addressed in affidavit testimony |
| Klaus Diem Nationwide | Knowledge of the operation of the BIC including processes and training; knowledge of the BIC's monitoring and evaluation of the Guaranteed Fund and other investment options offered participants under the NSP; Guaranteed Fund risk considerations; cost of capital determinations; involvement of Nationwide Asset Management; involvement of Callan in review of the Guaranteed Fund; Wild report to the BIC; investment |

| Name/Affiliation | Anticipated Subjects Of Testimony |
|---|---|
|  | policy statement; terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP |
| David Berson Nationwide (former) | Knowledge of the operation of the BIC including processes and training; knowledge of the BIC's monitoring and evaluation of the Guaranteed Fund and other investment options offered participants under the NSP; involvement of Callan in review of the Guaranteed Fund; Wild report to the BIC; investment policy statement; terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP; all matters addressed in deposition testimony |
| David LaPaul Nationwide (former) | Knowledge of the operation of the BIC including processes and training; knowledge of the BIC's monitoring and evaluation of the Guaranteed Fund and other investment options offered participants under the NSP; involvement of Callan in review of the Guaranteed Fund; investment policy statement; Nationwide Mutual financial information; terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP; all matters addressed in affidavit and deposition testimony |
| Michael Mahaffey Nationwide | Knowledge of the operation of the BIC including processes and training; knowledge of the BIC's monitoring and evaluation of the Guaranteed Fund and other investment options offered participants under the NSP; terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP; Guaranteed Fund risk considerations; cost of capital determinations |
| Michael Leach Nationwide (former) | Knowledge of the operation of the BIC including processes and training; knowledge of the BIC's monitoring and evaluation of the Guaranteed Fund investment option and other investment options offered participants under the NSP; cost of capital |

| Name/Affiliation | Anticipated Subjects Of Testimony |
|---|---|
| | determinations; terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP. |
| Alan Stalnaker Nationwide (former)) | Knowledge of the operation of the BIC including processes and training; knowledge of the BIC's monitoring and evaluation of the Guaranteed Fund and other investment options offered participants under the NSP; involvement of Callan in review of the Guaranteed Fund; Wild report to the BIC; knowledge regarding the terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP; knowledge regarding Guaranteed Fund spread; knowledge of communications from Nationwide to participants in the NSP relating to investment options; all matters addressed in deposition testimony |
| Steve Ginnan Nationwide | Knowledge of the performance and crediting rates for the Guaranteed Fund; knowledge regarding the terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP; knowledge regarding participant portal and participation in the Guaranteed Fund; role of Administrative Committee; knowledge regarding AIR; knowledge regarding spread for the Guaranteed Fund; knowledge regarding general account product pricing and/or spread; knowledge regarding 2023/2024 transfers from the Guaranteed Fund; all matters addressed in deposition testimony |
| Keith Wild Nationwide | Knowledge of the performance of, and crediting rates for, the Guaranteed Fund; knowledge regarding the Guaranteed Fund product performance report given to the BIC; knowledge regarding Public Plan pricing and the GMIR reduction project; all matters addressed in deposition testimony |
| Don Schley Nationwide (former) | Knowledge of crediting rates for the Guaranteed Fund and crediting rates on Nationwide general account products; knowledge regarding spread for Guaranteed |

| Name/Affiliation | Anticipated Subjects Of Testimony |
|---|---|
|  | Fund and other general account products; knowledge regarding terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP; all matters addressed in deposition and affidavit testimony |
| Craig Ryan<br>Nationwide | Knowledge of crediting rates for the Guaranteed Fund and crediting rates on Nationwide general account products; knowledge regarding spread for Guaranteed Fund and other general account products; knowledge regarding 2023/2024 transfers from the Guaranteed Fund; knowledge regarding terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP; all matters addressed in affidavit testimony |
| Ed Weilgus<br>Nationwide | Knowledge of the calculation of the crediting rates for the Annuity Contract and the computation of, and distribution from, the Additional Interest Reserve; Nationwide quarterly reserves and other financial reporting for Guaranteed Fund |
| Robert Watts<br>Nationwide (former) | Knowledge of the operation of the BIC; knowledge of the BIC's monitoring and evaluation of the Guaranteed Fund and other investment options offered participants under the NSP; involvement of Callan in review of the Guaranteed Fund; NSP financial reporting; knowledge of the language of the NSP; knowledge of communications from Nationwide to participants in the NSP relating to investment options; all matters addressed in deposition testimony |
| Julie Stein<br>Nationwide (former) | Knowledge of the operation of the BIC; knowledge of the BIC's monitoring and evaluation of the Guaranteed Fund and other investment options offered participants under the NSP; involvement of Callan in review of the Guaranteed Fund; knowledge of communications from Nationwide to participants in the NSP relating to |

40

| Name/Affiliation | Anticipated Subjects Of Testimony |
|---|---|
|  | investment options; all matters addressed in deposition testimony |
| Wendy Shaw Nationwide | Knowledge of Nationwide Life's compliance with Labor Department Transition Policy regulations, including knowledge needed to address and/or to authenticate documents relating to the same; all matters addressed in affidavit testimony |
| John Kilbane Nationwide (former) | Knowledge of GIC products that Nationwide Life sold in the public sector market; GMIR project including State of Florida; 457 plans; all matters addressed in affidavit testimony |
| Brian Deleget Nationwide | Knowledge of the assessment or calculation of the default risk charge, investment expense, contract margin or other components of the spread for the Annuity Contract; terms and features of the Annuity Contract. |
| Brianne Weymouth Callan | Knowledge of Callan reviews of the Guaranteed Fund; knowledge regarding availability of general account product information; knowledge of general account/fixed return product spreads or fees; all matters address in deposition testimony |
| Wesley Whiteman Expert/Nationwide | All matters addressed in expert reports including supplemental and rebuttal reports; all matters addressed in affidavit and deposition testimony; *see also* Section E below |
| Robert Cahill Expert/Nationwide | All matters addressed in expert reports including supplemental and rebuttal reports; all matters addressed in affidavit and deposition testimony; *see also* Section E below |
| Kelly Driscoll Expert/Nationwide | All matters addressed in expert reports including supplemental and rebuttal reports; all matters addressed in affidavit and deposition testimony; *see also* Section E below |
| Ryan Marshall (as upon cross-examination) | Plaintiffs' Amended Complaint allegations; all matters addressed in deposition testimony |

| Name/Affiliation | Anticipated Subjects Of Testimony |
|---|---|
| | |
| Bryan Marshall (as upon cross-examination) | Plaintiffs' Amended Complaint allegations; all matters addressed in deposition testimony |

Defendants also may call the following additional witnesses:

| Name/Affiliation | Anticipated Subjects Of Testimony |
|---|---|
| Amy Notestone Nationwide | Knowledge of pool investments and pool guidelines; knowledge of investment office decisions including asset acquisitions |
| Alice Janecek Nationwide | Knowledge of the assessment or calculation of the default risk charge, investment expense, contract margin or other components of the spread for the Annuity Contract; communications and work with Administrative Committee |
| Joseph Burke Nationwide | Knowledge of Nationwide Life's compliance with Labor Department Transition Policy regulations, including knowledge needed to address and/or to authenticate documents relating to the same; knowledge regarding the terms and features of the Annuity Contract, the Guaranteed Fund and/or the NSP; knowledge of involvement of Callan in review of Guaranteed Fund. |

Defendants additionally reserve the right to call (1) any witnesses named or identified by Plaintiffs; (2) any records custodian(s) required to authenticate exhibits, records, or documents; (3) any persons deposed; and (4) any person needed for rebuttal or impeachment purposes.

3.　　There is reserved to each of the parties the right to call such rebuttal witnesses as may be necessary, without prior notice to the other party. Questions frequently arise as to whether a witness will offer rebuttal testimony or is more appropriately designated as part of the case-in-chief. If questions arise as to the nature of a witness's testimony, the Court will err on the side of required disclosure five days prior to trial of rebuttal witnesses. If no disclosure is made, the Court shall not permit such witness to testify.

Note: Only witnesses listed in the Joint Final Pre-trial Statement will be permitted to testify at trial, except witnesses called solely for the purpose of impeachment or for good cause shown.

### E.　　Expert Witnesses

Parties are limited to the following number and names of expert witnesses, including treating physicians, whose names have been disclosed to the other side.

1.　　Plaintiffs: Plaintiffs will call Dr. Richard Kopcke (resume attached as **Exhibit A1**) and Marcia Wagner (resume attached as **Exhibit A2**) as expert witnesses.  Dr.  Kopcke has 50 years of relevant finance experience since receiving his Ph.D. from Harvard, is intimately familiar with insurance products such as the Guaranteed Fund, and is the author of an article entitled *What Does It Cost to Guarantee Returns?* (Feb. 2009). Dr. Kopcke's anticipated testimony is summarized in his expert reports, and will focus primarily on financial matters (including excess expenses, losses to the Plan, and profits to Nationwide) in connection with the Guaranteed Fund.  Ms. Wagner similarly has decades (30+ years) of experience as an ERISA fiduciary advisor, is well-published on such matters, and is widely regarded

43

as one of the leading experts on ERISA fiduciary matters in the country. Ms. Wagner's testimony is summarized in her expert report, and will focus on Defendants' fiduciary process (or lack thereof). The substance of these experts' anticipated testimony is discussed in Section IV.D above, and is further discussed in their expert reports and the Court's order denying Defendants' motion to exclude their testimony. *See* Dkt. 266 at 14-15.

    2.    <u>Defendants</u>:

Defendants' experts will testify regarding the opinions disclosed in their reports, including any supplemental and rebuttal reports.  Defendants' experts are:

    (a)    Wesley Whiteman (CV attached as **Ex. A3**).  Mr. Whiteman has more than 28 years of experience in the stable value marketplace, primarily with the Prudential Insurance Company of America.  He had responsibility for general account offerings and led an interdisciplinary team responsible for, among other things, sales, contract underwriting and contract administration.  He also managed the stable value offering under Prudential's plan that is analogous to the Guaranteed Fund in the Nationwide Savings Plan.  Generally, Mr. Whiteman will testify and offer opinions regarding Nationwide Life's methodology for determining the crediting rate for the Guaranteed Fund, the reasonableness of the various components of the "spread," the terms of the Annuity Contract, and benefits to participants such as the lack of an equity-wash provision.  Mr. Whiteman also will rebut the opinions offered by Plaintiffs' expert Kopcke.

(b) Robert Cahill (CV attached as **Ex. A4**). Mr. Cahill has worked in the stable value industry for approximately 37 years, including as a Stable Value Portfolio Manager for three large U.S. asset management firms (Bankers Trust Company, Deutsche Asset Management, and Goldman Sachs Asset Management), and as the manager of the Guaranteed Investment Contract Desk for a large U.S. insurance company (Prudential). He has managed stable value options in sizeable 401(k) plans with combined stable value assets totaling approximately $5 billion. Generally, Mr. Cahill will testify and offer opinions regarding the stable value industry, the types of capital preservation funds, the crediting rates of the Guaranteed Fund, terms of the Annuity Contract, and benefits to Guaranteed Fund participants such as the lack of an equity-wash provision. Mr. Cahill also will rebut the opinions offered by Plaintiffs' expert Kopcke.

(c) Kelly Driscoll (CV attached as **Ex. A5**). Ms. Driscoll has worked in the retirement and investment industry for over thirty years, including as the Senior Vice President for State Street Corporation and Senior Managing Director for State Street Global Advisors. State Street is one of the world's leading providers of financial services to institutional investors. During her years at State Street, Ms. Driscoll served on various committees including State Street's fiduciary committee, State Street Global Advisors' fiduciary committee, and State Street Global Advisors' independent fiduciary committee. These committees were responsible for governance and oversight of various ERISA related businesses at State Street. Generally, Ms. Driscoll will testify and offer opinions regarding the BIC's diligent and prudent

monitoring of the Guaranteed Fund. Ms. Driscoll also will rebut the opinions offered by Plaintiffs' expert Wagner.

* * *

Counsel have attached a resume or curriculum vitae of each expert's qualifications as **Exhibits A1 – A5**.

**F.      Exhibits**

Needless Court time is taken up in the marking of exhibits during trial. Accordingly, the exhibit lists should be prepared prior to trial and set forth in the Joint Final Pre-trial Statement. The parties shall include separate exhibit lists for joint exhibits, plaintiff exhibits, defendant exhibits, and third-party exhibits. Exhibits should not be included on more than one list. For those exhibits to which there may be objections, note by whom the objection is made (if there are multiple adverse parties), the nature of the objection, and the authority supporting the objection.

Except for good cause shown, the Court will not permit the introduction of any exhibits unless they have been listed in the Joint Final Pre-trial Statement, with the exception of exhibits to be used solely for the purpose of impeachment.

Exhibit lists are attached to the Joint Final Pre-trial Statement as follows:

> **Exhibit B**   Joint Exhibits
> **Exhibit C**   Plaintiffs' Exhibits
> **Exhibit D**   Defendants' Exhibits
> **Exhibit E**   Defendants' Objections To Plaintiffs' Exhibits[9]

---

[9] Defendants assert that Section IV.F of this Court's template Final Pretrial Statement plainly states "For those exhibits to which there may be objections, note by whom the objection is made (if there are multiple adverse parties), the nature of the objection, and the authority supporting the objection." Exhibit E is Defendants'

46

**Exhibit F:**   Plaintiffs' Objections to Defendants' Exhibits[10]

### G.   Remaining Issues & Matters

1.   The following legal issues must be resolved before the trial begins:

Defendants have filed a motion to decertify the class.  Otherwise, the Court has already addressed the parties' motions for summary judgment and expert motions. *See* Dkt. 266.

2.   A jury view is not being requested.

3.   Any additional matters the Court should be aware of:

a.   ***Trial length***.  The parties disagree on the appropriate length of the trial.

Plaintiffs' Position: Plaintiffs believe the parties should be able to complete the trial in eight days.  As part of the meet and confer process, Plaintiffs

---

list of those objections.  Defendants sent their objections to Plaintiffs on June 16th and attempted to meet and confer with Plaintiffs regarding these objections but Plaintiffs refused to do so.  Plaintiffs instead have taken the position that Defendants' objections should be stricken.   This is directly contrary to the Court's express instructions in Section IV.F.  Plaintiffs then provided Defendants with Plaintiffs' Exhibit F objections at 4:46pm on June 22nd, thereby preventing any opportunity to meet and confer as required.

[10] Plaintiffs assert that Exhibit E was not referenced in Defendants' belated June 19 markups to the Pretrial Statement, *see infra* at 49-50, and was not shared as a potential exhibit until the afternoon that the Pretrial Statement was due. Contrary to Defendants' assertions, Defendants never proposed a date or time to meet and confer regarding objections to exhibits, and Plaintiffs have *never* "refused" to meet and confer with Defendants about evidentiary objections or admissibility of evidence. Indeed, Plaintiffs believe it is in the interest of all concerned to resolve as many objections in advance of trial as possible.  To the extent that the Court deems Exhibit E to be an appropriate part of the Joint Pretrial Statement (the template of which only includes Exhibits A-D), Plaintiffs tender their own list of objections as Exhibit F. Plaintiffs are happy to meet and confer with Defendants regarding exhibit objections and regret that such objections were not more fully vetted beforehand.

indicated that they would be willing to agree to 10 days as a compromise (5 per side), but Defendants did not agree to that compromise proposal. Plaintiffs do not believe the additional time that Defendants have requested is justified. Plaintiffs' undersigned counsel has tried three ERISA class action cases involving 401(k) plans, and the trials in those cases generally lasted between one and two weeks. *See Reetz v. Lowe's Co., Inc.*, No. 5:18-cv-00075 (W.D.N.C.) (five trial days); *Wildman v. Am. Cent. Servs., LLC*, No. 4:16-cv-00737 (W.D. Mo.) (11 trial days); *Brotherston v. Putnam Invs., LLC*, No. 1:15-cv-13825 (seven half days of trial). Plaintiffs' undersigned counsel also resolved an ERISA class action on the eve of trial that was slated by the court for 10 ½ hours per side. *See Moreno v. Deutsche Bank Americas Holding Corp.*, No. 1:15-cv-09936 (S.D.N.Y.), Dkt No. 318 at 17:8-16 (THE COURT: " … the amount of time that I'm thinking is about ten-and-a-half hours per side. Yes, I know. That's the way people always react. Ten-and-a-half hours per side, and that includes your opening, direct and cross, and if we do it that way, we can get in about five hours of testimony a day, unless I start asking a lot of questions. So that would be somewhere north of 20. So if we did five hours a day, it would be four days and a little bit …"). Finally, Plaintiffs note that a recent ERISA trial in this circuit involving a stable value investment product lasted only seven days. *See Iannone v. Autozone, Inc.*, No. 2:19-cv-02779 (W.D. Tenn.). Plaintiffs believe the parties should be able to complete the trial in a similar amount of time here. Much of the witness testimony that Defendants propose would be cumulative. Moreover, Defendants' witness list includes several witnesses who were not properly disclosed. *See* § IV.G.3.b (below).

48

Whatever amount of time the Court decides to set aside for trial, Plaintiffs request that the time be allocated equally among the parties (i.e., four days for Plaintiffs and four days for Defendants in the event of an 8-day trial), and that the parties be treated as "on the clock" during their respective direct examinations, cross examinations, and any opening or closing arguments.

Defendants' Position:  In a prior January 21, 2026 email to the Court, Plaintiffs made the identical request to limit the length of the trial.  This Court implicitly rejected Plaintiffs' request when it issued its January 22, 2026 Order Setting Bench Trial indicating the case would proceed "until completion" and without any artificial limitation on the number of trial days or witnesses.  Furthermore, Plaintiffs' request is highly prejudicial to Defendants and is improperly intended to prevent Defendants from presenting a full and complete defense to Plaintiffs' meritless claims.  While Plaintiffs apparently intend to call very few witnesses in their case-in-chief, Defendants currently intend to call at least 23 witnesses, most if not all of whom Defendants expect to testify live.  Defendants intend to fully defend themselves from Plaintiffs' meritless claims.  Lastly, Plaintiffs' citation to other cases (involving different parties and issues) is irrelevant.

b.  ***Trial Witnesses.***  Plaintiffs object to some of Defendants' trial witnesses on the ground that they were not properly disclosed.

Plaintiffs' Position: Plaintiffs shared a draft of this joint pretrial statement and a list of their trial witnesses with Defendants on June 1, 2026. Plaintiffs repeatedly requested that Defendants provide timely feedback on the joint

statement and timely share their list of trial witnesses, but Defendants failed to do so until after close of business on June 19, 2026 (the Friday preceding the joint statement deadline the following Monday). Defendants' witness list includes several witnesses who were not disclosed in their Rule 26(a) witness disclosures and were therefore never deposed, including Ed Weilgus, Joseph Burke, Brian Deleget, Amy Notestone, and Alice Janacek. *See* Dkt. 181-35 (Defendants' Rule 26(a) Disclosures). Although Defendants mentioned three of these individuals (Mr. Wielgus, Mr. Deleget, and Ms. Notestone) in a supplemental interrogatory response on the last day of fact discovery, *see* Dkt. 181-43 (Supplemental Response to Interrogatory No. 3), that interrogatory was not directed to witnesses, Defendants never supplemented their Rule 26(a) witness disclosures, and Defendants did not disclose any of these individuals as potential trial witnesses (apparently purposefully) until after the June 15, 2026 motion in limine deadline.[11] In the interest of both fairness and time, Plaintiffs believe that Defendants should not be allowed to call these witnesses at trial. While the Court previously denied Plaintiffs' motion for sanctions, it did so "without prejudice." Dkt. 224. Defendants' continuing concealment of their intent to call these individuals as trial witnesses until June 19, 2026 provides further grounds for their exclusion.

---

[11] Moreover, when Plaintiffs sought to depose Mr. Weilgus following Defendants' supplemental interrogatory response, Defendants represented that Mr. Ginnan (Mr. Weilgus's boss) was a more appropriate witness. Based on Defendants' representation, Plaintiffs deposed Mr. Ginnan instead. Plaintiffs do not object to Defendants calling Mr. Ginnan as a trial witness, even though he was not timely disclosed either.

<u>Defendants' Position</u>:  Plaintiffs' position is baseless and is an improper attempt to relitigate Plaintiffs' motion for sanctions, which this Court denied.  As set forth in Defendants' opposition to Plaintiffs' prior motion, the subject witnesses were properly disclosed in discovery.  *See* Oct. 18, 2024 Defendants' Memorandum In Opposition To Plaintiffs' Motion To Exclude (Doc. 198).  Furthermore, the Court ordered the parties to meet and confer regarding any additional discovery relating to these witnesses.  *See* November 25, 2024 Order at 3-4 (Doc. 224).  The parties then met and conferred and *jointly* moved the Court for an extension of time to complete the agreed-upon additional discovery.  *See* February 13, 2025 Joint Motion (Doc. 231).  Having met and conferred, and having *jointly* agreed to additional discovery relating to these witnesses, Plaintiffs now have no basis whatsoever to seek to exclude them.

c.     ***Callan Business Records Declaration***.

<u>Plaintiffs' Position</u>: Plaintiffs previously submitted a Business Record Declaration of Callan LLC (Dkt. 217-53) in connection with the parties' cross motions for summary judgment, which the Court determined was sufficient for purposes of establishing the admissibility of documents produced by third-party Callan. *See* SJ Order at 7 n.4.  Plaintiffs have included this Business Record Declaration on their trial exhibit list, and wish to confirm that it will be deemed sufficient to establish the authenticity of the Callan documents referenced in the declaration, and the business records exception as to those documents, without calling Ms. DeLuce or any other Callan records custodian as a live witness. *See* Fed. R. Evid. 902(11); *Guardian Ins. & Annuity Co. v. White*, 2014 WL 4426185, at *2-3 (S.D. Ohio Sept. 9, 2014). Plaintiffs

requested that Defendants stipulate to this as part of the meet-and-confer process. Although Defendants indicated that they did not deem it necessary to call a business records custodian live, they more broadly stated that they would not enter into any stipulations for purposes of trial in this matter. As noted above (*supra* n.10), Plaintiffs are happy to confer with Defendants regarding any specific objections they may have to specific exhibits. Plaintiffs simply wish to confirm that Callan documents will not be the subject of an objection or deemed inadmissible merely because the Business Record Declaration is in the form of sworn written testimony rather than oral testimony.

Defendants' Position:  Several of the Callan produced documents are objectionable on grounds irrespective of the business records declaration. Defendants' objections to Plaintiffs' proposed exhibits, including several of the Callan documents, are attached as Exhibit E.  Defendants respectfully submit that these objections are best addressed at trial and on a document-by-document basis.  At a minimum, Plaintiffs are not entitled to a blanket ruling from the Court that all Callan documents are admissible for all purposes without having heard from Callan representative and witness Brianne Weymouth, let alone from any other witness at trial.

d.  ***Attendance of Parties***. Defendants intend to present each of the individual BIC defendants as witnesses, however, Defendants respectfully request the individual defendants be excused from attending the entirety of the trial. Defendants will have a corporate representative in attendance at the trial. The

named Plaintiffs similarly request that they be excused from attending the entirety of the trial. Plaintiffs intend to be present during their case-in-chief.

## V. COMPLIANCE WITH THE COURT'S ORDER SETTING TRIAL DATE AND FINAL PRE-TRIAL CONFERENCE

Counsel have complied with all aspects of the Court's Order Setting Trial Date and Final Pre-Trial Conference, including the stipulations section and, for a jury trial, the jury instructions section.

Failure to comport with the Court's pre-trial requirements may result in sanctions, including but not limited to contempt and dismissal.

Dated: June 22, 2026

Respectfully submitted,

*/s/ Kai H. Richter*
Kai H. Richter (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
400 S. Fourth Street #401-27
Minneapolis, MN 55415
Tel: (612) 807-1575
Fax: (202) 408-4699

Michelle C. Yau (admitted *pro hac vice*)
Daniel R. Sutter (admitted *pro hac vice*)
Daniel Sommers (admitted *pro hac vice*)
Caroline Bressman (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W. Suite 800
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
myau@cohenmilstein.com
dsutter@cohenmilstein.com
dsommers@cohenmilstein.com
cbressman@cohenmilstein.com

Eric H. Zagrans (OH #0013108)
ZAGRANS LAW FIRM LLC
1640 Roundwyck Lane
Columbus, Ohio 43065-8416
(440) 452-7100 (telephone)

53

(866) 261-2008 (fax)
eric@zagrans.com (e-mail)

*Counsel for Plaintiffs and the Class*

**CARPENTER LIPPS LLP**

/s/ *Michael H. Carpenter*
Michael H. Carpenter (Ohio Bar #0015733)
    *Trial Attorney*
Jeffrey A. Lipps (Ohio Bar # 0005541)
280 North High Street
Columbus, Ohio 43215
Telephone: 614-365-4100
Fax: 614-365-9145
Email: carpenter@carpenterlipps.com
Email: lipps@carpenterlipps.com

**JONES DAY**
Daniel C. Loesing (Ohio Bar #0102671)
325 John H. McConnell Boulevard, Suite 600
Columbus, OH 43215
Telephone: (614) 469-3939
Email: dkoenig@jonesday.com
Email: jbaumann@jonesday.com

Evan Miller (admitted *pro hac vice*)
David T. Raimer (admitted *pro hac vice*)
51 Louisiana Avenue N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Email: emiller@jonesday.com
Email: dtraimer@jonesday.com

*Counsel for Defendants Nationwide Mutual Insurance
Company, Nationwide Life Insurance Company,
Investment Committee of the Nationwide Savings Plan,
David Berson, David LaPaul, Kevin O'Brien,
Klaus Diem, Michael Mahaffey, and Michael P. Leach*

54